UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM MOSHER, Individually and as
administrator of the Estate of WILLIAM MOSHER,
JR., CAROLYN MOSHER,

                                        Plaintiffs,

v.

KENNETH NELSON, Individually and as
Superintendent of BRIDGEWATER STATE
HOSPITAL, ELIZABETH CHILDS, Individually
and as Commissioner of the COMMONWEALTH
OF MASSACHUSETTS DEPARTMENT OF
PUBLIC HEALTH, and KATHLEEN M.
DENNEHY, Individually and as Commissioner of
the COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION,

                                        Defendants.

CIVIL ACTION
NO. 04-12560-MLW

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUES OF ELEVENTH AMENDMENT IMMUNITY AND QUALIFIED IMMUNITY

On August 28, 2004, Bradley Burns, a patient at Bridgewater State Hospital ("BSH"),

strangled William Mosher, another BSH patient, with a tee shirt when Mosher entered Burns'

room. The administrator of Mosher's estate and his parents bring four counts alleging federal

civil rights violations (Counts I-IV) and six counts alleging state law tort claims (Counts VII-

XII) against the Department of Correction ("DOC") commissioner, the Department of Mental

Health ("DMH") commissioner, and the superintendent of BSH in their official and individual capacities.[1]

This motion for partial summary judgment addresses all ten counts under both federal and state law insofar as they are brought against the three officials in their official capacities. All of these claims must be dismissed because state officials in their official capacities are neither subject to suit in federal court under the Eleventh Amendment, nor are they "persons" under the applicable federal statutes in Counts I-IV.

The motion also addresses the four federal civil rights claims against the three officials in their individual capacities, as set forth in Counts I-IV (¶¶ 28-62) of the second amended complaint. Count I alleges violations of 42 U.S.C. § 1983. Counts II-IV allege conspiracies in violation of 42 U.S.C. §§ 1983, 1985 (3) and 1986.  All of these claims must be dismissed because the officials have qualified immunity; there is no evidence of any constitutional violation committed by any of the named officials, and in any event none of their purported acts or omissions were clearly established constitutional violations at the time of the incident.

## Undisputed Facts

### The Defendants

Defendant Kenneth Nelson was the superintendent of BSH from 1994 until April 2007. (Deposition of Kenneth W. Nelson, May 21, 2008 ("Nelson Dep. I")[2] at 21:16-19.)  He has been

---

[1] The second amended complaint (Document 58-2) was filed following plaintiffs' motions to dismiss William Mosher's siblings as plaintiffs and UMass Medical School and Daniel Comiskey, M.D. as defendants (Documents 35, 36), and omits former Counts V and VI.  It also omits BSH, DOC and DMH as defendants, eliminating the redundancy of naming both the agencies and their legal equivalent, the corresponding state officials in their official capacities. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 70-71 (1989).

[2] Exhibit 1 to Defendants' Local Rule 56.1 Statement of Material Facts.

employed continuously by the DOC since November 1976.  *Id.* at 20:17-19.  Since April 2007,

he has been assistant deputy commissioner for the Southern Sector of the DOC.  *Id.* at 21:19-22.

Defendant Kathleen Dennehy was the commissioner of the DOC from December 1, 2003

through May 6, 2007.  (Deposition of Kathleen M. Dennehy ("Dennehy Dep.")[3] at 7:4-7.)  She

previously had been a deputy commissioner since 1997.  *Id.* at 6:18-22.  The DOC commissioner

is the CEO of a correctional system with approximately 11,000 offenders and 5,300 employees,

not including contract employees.  *Id.* at 13:16-14:17. The commissioner is responsible for the

budget and overall management of the state correctional system.  *Id.* at 13:22-24.

The DOC commissioner does not have day-to-day supervision over BSH or the

superintendent of BSH.  *Id.* at 23:17-24:6, 73:3-10.  Instead, the BSH superintendent reports to a

DOC assistant deputy commissioner, who then reports to a deputy commissioner, who reports to

the commissioner.  *Id.* at 18:11-24.

Defendant Elizabeth Childs was the commissioner of DMH from 2003 to 2007.

(Deposition of Elizabeth Childs ("Childs Dep.")[4] at 8:13-15).  DMH has no role at BSH other

than to approve the DOC commissioner's appointment of a physician as medical director there.

G.L. c. 125, § 18.

**Bridgewater State Hospital**

  1.  **A Unique Institution**

BSH is a unique institution within the Commonwealth because it is both a prison and a

mental hospital. (Nelson Dep. I at 19:12-21; Deposition of Daniel W. Comiskey ("Comiskey

---

[3] Exhibit 3 to Defendants' Local Rule 56.1 Statement of Material Facts.

[4] Exhibit 4 to Defendants' Local Rule 56.1 Statement of Material Facts.

Dep.")[5] at 51:13-52:12; Dennehy Dep. at 31:1-33:9.)  BSH is operated by DOC, G.L. c. 125, §§ 1(n), 11 and 18, but it functions differently from a mainstream prison.  (Dennehy Dep. at 48.) Unlike a traditional prison, therapists and clinicians have significant input into the ultimate placement of a patient.  *Id.* at 47:14-20.  All security decisions have clinical, medical and legal consequences, and all clinical, medical and legal decisions can have significant security and operational consequences.  (Nelson Dep. I at 19:14-21.)  Segregation, classification, and discipline procedures used in other DOC facilities are all limited at BSH.  (Dennehy Dep. at 31:1-33:9, 38:11-22, 44:1-45:6); G.L. c. 123, § 21; 103 BSH 651(III)(M);[6] *see generally* G.L. c. 123.

BSH is a strict-security environment, equivalent to a medium-security DOC facility. (Nelson Dep. I at 24:7-11.)  There are two fences with razor wire and no-climb mesh around the perimeter, as well as a buried cable motion detection system.  *Id.* at 25:10-17.  There are motion detectors at a vehicle trap and a pedestrian trap.  *Id.* at 25:18-26:3.  Within the perimeter, there is an administration building, a commons building, a medical building, and several buildings (Building A, Building B, Building C, Max 1, and Max 2) which house patients and that vary in level of security.  *Id.* at 24:7-27:3.  There were no escapes from BSH during Nelson's thirteen-year tenure, but everyone is considered an escape risk.  *Id.* at 60:16-61:18.

## 2.    The Statutory Commitment Scheme

Every BSH patient admission is by judicial order based on a finding that the patient is a male who requires observation or treatment under strict security. (Deposition of Kenneth W.

---

[5] Exhibit 5 to Defendants' Local Rule 56.1 Statement of Material Facts.

[6] Dennehy Dep. Ex. 4, attached as Exhibit 6 to Defendants' Local Rule 56.1 Statement of Material Facts.

Nelson, May 28, 2008 ("Nelson Dep. II")[7] at 66:20-67:10; Comiskey Dep. at 40:2-9).

Otherwise, a DMH or private facility could provide appropriate mental health treatment services

without strict security. (Comiskey dep. at 40:7-9). Statutes governing admission to BSH

include:

- G.L. c. 123, § 7(b), addressing "Commitment and retention of dangerous persons" and permitting heads of mental health facilities to petition for patients to be committed to BSH when "the failure to hospitalize in strict security would create a likelihood of serious harm by reason of mental illness";

- G.L. c. 123, § 8(b), addressing "proceedings to commit dangerous persons" and precluding commitment to BSH unless a court finds that "(1) such person is mentally ill; (2) such person is not a subject for commitment to any facility of [DMH]; and (3) the failure to retain such person in strict custody would create a likelihood of serious harm";

- G.L. c. 123, § 13, addressing "Transfer of dangerous males to Bridgewater state hospital," and requiring a finding by the superintendent of any public or private mental health facility that "failure to retain a male resident therein in strict security would create a likelihood of serious harm by reason of mental illness and that the person's violent behavior constitutes an emergency" and permitting emergency transfer to BSH while the petition and hearing process in §§ 7 and 8 are pursued;

- G.L. c. 123, § 15(b), permitting evaluations for competence to stand trial, and requiring a court determination that "such person is male and appears to require strict security";

---

[7] Exhibit 2 to Defendants' Local Rule 56.1 Statement of Material Facts.

- G.L. c. 123, § 16(a), governing "hospitalization of persons incompetent to stand trial or not guilty by reason of mental illness" and requiring a court determination that "the failure to retain him in strict security would create a likelihood of serious harm by reason of mental illness, or other mental defect";

- G.L. c. 123, § 18(a), governing "Hospitalization of mentally ill prisoners" and permitting prisoners already confined in detention facilities to be transferred to BSH if they are in need of hospitalization because of mental illness.

Persons who are not likely to cause serious harm in the absence of strict security are not sent to BSH. *E.g.*, G.L. c. 123, § 8(b).

### 3.    <u>Security Arrangements</u>

Nearly everyone admitted to BSH has a history of violence against other people.  (Nelson Dep. II at 66:15-19.)  Typically a patient has been accused of a violent crime or acted violently against someone else or himself.  *Id.* at 67:6-10.  Approximately one quarter of the population at BSH are serving sentences for first degree murder, second-degree murder, manslaughter, or awaiting trial on one of those charges, or have been found not guilty of murder by reason of insanity.  (Nelson Dep. I at 16:6-21.)

It is a routine part of the admissions process to notify security personnel about patients with a history of violence. (Nelson Dep. II at 67:11-17.)  Security personnel are aware of the level of threat that a person presents in a structured environment like BSH, but BSH takes universal precautions by recognizing that everyone at BSH is a high-risk individual and treating everyone as if he presents a high risk of harm to himself or someone else.  (Nelson Dep. II at 68:16-69:19; Dennehy Dep. at 108:12-109:4.)

Patients at BSH are generally housed in either the admissions unit, a minimum security unit, or a maximum security unit.  The admissions unit consist of a maximum security unit on the

first floor, B-1, where patients typically start, and a less-restrictive unit on the second floor, B-2. (Comiskey Dep. at 18:18-19:8, 26:10-13). In addition to B-1, BSH has two other maximum security buildings, Max 1 and Max 2, for patients who require closer monitoring because of their behavior or psychiatric status. *Id.*. at 26:10-13, 38:20-39:19. The maximum security units usually house between 25-30 people each. *Id.* at 18:13-17, 38:22-23. BSH also has three minimum security units, A-1, A-2 and C-1, which can house as many as 55 patients who have better behavioral control, are more stable, and require less monitoring. *Id.* at 17:23-24, 38:20-39:1. Having more than one maximum security unit is necessary because some patients have enemies, and part of managing patients is having the option to assign patients with conflicts to different units even when they require the same level of monitoring. *Id.* at 37:2-19.

The Max 2 unit (where the incident occurred) was a secure, stand-alone building with individual patient rooms and some common areas. (Nelson Dep. I at 31:5-32:6; Comiskey Dep. at 24:15-18.) Patients generally were not permitted to go into or remain in their rooms during the day other than at count times, primarily because of the concern that they might commit suicide. A brief exception existed between the close of the 11:15 a.m. count and lunch when the patients had a little bit more freedom to interact, including in each others' rooms. (Nelson Dep. I at 35:2-37:24, 40:1-16; Nelson Dep. II at 71:6-18.)

BSH also has an Intensive Treatment Unit ("ITU") that "may only be used in cases of emergency, such as the occurrence of, or serious threat of, extreme violence, personal injury, or attempted suicide[.]" G.L. c. 123, § 21, third para. (emphasis supplied); *see* 103 BSH 651(III). The ITU is a separate unit in the medical building that can hold up to 16 patients in seclusion in individual cells with locked steel doors, although if more cells are necessary patients can be secluded on other units. (Comiskey Dep. at 19:9-20, 31:21-33:6; Nelson Dep. I at 45:11-16) Patients in the ITU are constantly monitored by a specially trained mental health worker by

7

either video camera or one-to-one observation. (Nelson Dep. I at 47:3-17.) The ITU is more likely to contain patients who are on evaluation status; patients who are committed will hopefully within some reasonable time frame achieve greater clinical stability such that they will not be residing in the ITU for long periods of time. (Comiskey Dep. at 26:14-22.)

The decision to assign a patient to the ITU is a clinical decision that can only be made by medical personnel, although correctional staff have the ability to place a patient there briefly while awaiting evaluation by medical personnel. (Comiskey Dep. at 58:13-59:16); G.L. c. 123, § 21, third and seventh para.; 103 BSH 651(III)(B). Assignment to the ITU is valid for only three hours, at which time the patient must be evaluated again by medical personnel to determine whether continued seclusion and/or restraint is warranted for an additional three hours. G.L. c. 123, § 21, seventh para.; 103 BSH 651(III)(C). Seclusion or restraint for any reason not specified in G.L. c. 123, § 21 is not permissible in any mental health facility in the Commonwealth, including BSH. G.L. c. 123, § 21, tenth para.

**Burns' Admission to BSH**

On August 8, 2004, Burns was referred to BSH pursuant to G.L. c. 123, § 18(a). (Comiskey Dep. at 77:17-78:8; Prisoner Data Sheet, Comiskey Dep. Ex. 3.[8]) The Prisoner Data Sheet indicated that Burns had escaped from McLean Hospital, Mt. Auburn Hospital, and HRI/Arbour Hospital, in some cases by taking hostages, and that he assaulted personnel at a McDonalds restaurant. (Comiskey Dep. Ex. 3.) Burns had been in the ITU prior to his arraignment on August 9. (Comiskey Dep. at 77:19-78:3.) After his arraignment on August 9, Burns returned to BSH under G.L. c. 123, § 15(b) for evaluation to determine his competence to stand trial and his criminal responsibility. *Id.* at 78:9-17. On August 10, Burns was evaluated on

---

[8] Exhibit 8 to Defendants' Local Rule 56.1 Statement of Material Facts.

the B-1 unit by Dr. Daniel Comiskey, an attending psychiatrist at BSH employed by UMass Medical Center, not by DOC or BSH.  *Id.* at 11:22-23, 47:10-22, 77:13-16.  Dr. Comiskey was aware that Burns had escaped from three other hospitals, had taken people hostage using ligatures to escape, and had attempted to strangle someone at a McDonalds; and Dr. Comiskey was aware of the prior Section 18(a) referral.  *Id.* at 85:13-20, 90:13-91:16; BSH Admission Assessment II, Comiskey Dep. Ex. 1;[9] Comiskey Dep. Ex. 3.)

Dr. Comiskey recognized Burns' behavior as bad, but believed it was goal-directed, meaning that Burns took people hostage to escape, but there was no indication that he harmed anyone once he did escape.  (Comiskey Dep. at 128:16-129:2.)  At the time he evaluated Burns, Dr. Comiskey did not have any concern that there was a need to contact the superintendent about Burns.  *Id.* at 84:18-20.  Based on his evaluation, Dr. Comiskey decided that Burns could remain assigned to B-1, one of the three maximum security units at BSH.  *Id.* at 26:6-13, 88:4-13.

Dr. Comiskey was also aware that Burns had been seen at the DMH Lindemann Center and Westborough State Hospital, as well as in a previous visit to Arbour/HRI.  *Id.* at 98:3-13.  In order for medical information to be released from DMH or a private mental health facility, however, the patient must sign a release.  *Id.* at 97:6-12, 98:19-99:10; *see, e.g.*, G.L. c. 123, § 36; G.L. c. 66A.  Case administrators at BSH (not the treating psychiatrist) routinely ask patients to sign release forms so BSH can fax requests for records to these facilities, and Dr. Comiskey's understanding was that this practice was followed in Burns' case.  (Comiskey Dep. at 98:19-99:10, 99:20-100:3.)

During his meeting with Dr. Comiskey on August 10, Burns indicated that he was concerned about his safety, and Dr. Comiskey discussed with Burns that if he felt that he was at

---

[9] Exhibit 7 to Defendants' Local Rule 56.1 Statement of Material Facts.

risk of harming himself or acting violently toward other people, he should talk to BSH staff before doing so, and Burns agreed. *Id.* at 103:6-108:6. The shorthand Dr. Comiskey used to describe such a discussion is "contract for safety." *Id.* at 107:11-13. On August 13, 2004, records indicate that Burns told a staff person that he felt unsafe on B-1, that he feared he would be raped or attacked, and that others were threatening him. *Id.* at 116:9-20. Such claims are not unusual among mentally ill patients, and as a result, Burns was transferred from B-1 to Max 2, another maximum security unit at BSH. *Id.* at 117:2-19. When such claims are made, it is routine for security staff to assess the situation as well as medical personnel. *Id.* at 117:20-118:5.

### August 28, 2004

On August 28, 2004, reports indicate that Mosher entered Burns' room after the 11:15 a.m. count, and that Burns strangled Mosher with a tee shirt. (Nelson Dep. II at 70:7-15.) This was the first time during Nelson's tenure at DOC, dating back to 1976, that a patient at BSH had killed another patient. (Affidavit of Kenneth Nelson ("Nelson Aff."),[10] ¶ 2.)

BSH houses between 260 and 340 patients at any given time. (Nelson Dep. I at 42:2-5.) There are approximately 3-6 admissions each weekday, 650-750 admissions each year, and Nelson was not able to keep track of every patient unless there was something outstanding about that patient or the reason for his admission. (Nelson Dep. II at 65:11-66:9.) Nelson did not know who Burns was prior to August 28, 2004, but he did know who Mosher was. He knew who Mosher was because he was a difficult-to-manage individual who had been in and out of the ITU, and had assaulted a nurse with urine and feces. *Id.* at 64:4-15. Nelson was not aware of any prior difficulties between Mosher and Burns. *Id.* at 75:8-15.

---

[10] Filed concurrently.

A BSH staffing analysis conducted in 2000 indicated that three correction officers should be assigned to the Max 2 unit. (Nelson Aff., ¶¶ 3-4 and Ex. A.) On August 28, 2004, four officers were assigned to the Max 2 unit. *Id.*, ¶¶ 5-6 and Ex. B. Ligatures were considered contraband at BSH, and staff conducting searches were trained to find ligatures or items that look like the makings of ligatures, such as ripped sheets. (Nelson Dep. II at 41:13-23.) Unfortunately, ligatures can be made out of virtually anything, such as the tee shirt Burns used to kill Mosher. *Id.* at 36:22-37:1.

<u>Argument</u>

I.    **State Agencies and State Officials in Their Official Capacities are not Subject to Suit in Federal Court on any of the Counts Brought by the Plaintiff.**

All of the plaintiffs' claims against the Commonwealth and its agencies, including those against state officials in their official capacities, are barred by the Eleventh Amendment to the United States Constitution. The Eleventh Amendment reads in pertinent part: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." Despite its phrasing, the amendment applies to suits in federal court by a state's own citizens as well. *E.g.*, *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). The amendment precludes monetary damages suits in federal court against states, state agencies, and state officials sued in their official capacities. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, 120 (1984); *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). This Court lacks jurisdiction to hear the plaintiffs' claims against these defendants.

Further, the Commonwealth, its agencies, and officials in their official capacities are not "persons" subject to suit under 42 U.S.C. §§ 1983, 1985, or 1986. *Will*, 491 U.S. at 71; *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005); *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1307

(D.C. Cir. 2002).   Therefore, the plaintiffs' claims in Counts I-IV must be dismissed on this basis as well.

## II.    The State Officials In their Individual Capacities are Entitled to Qualified Immunity.

The constitutional claims against the state officials in their individual capacities (Counts I-IV) should be dismissed because these defendants are entitled to qualified immunity.   Qualified immunity is "*an immunity from suit*, rather than a mere defense to liability;" and as such must be resolved early in the proceedings to avoid loss of that right.   *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001).   Qualified immunity "is designed to mitigate the social costs of exposing government officials to personal liability—costs such as 'distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.'"   *Farmer v. Moritsugu*, 163 F.3d 610, 613 (D.C. Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)).

Qualified immunity shields public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow*, 457 U.S. at 818.   "[Q]ualified immunity requires merely that a reasonable official could believe that his conduct was lawful . . . ."   *Olmeda v. Ortiz-Quinonez*, 434 F.3d 62, 65 (1st Cir. 2006).   It protects "all but the plainly incompetent or those who knowingly violate the law."   *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The First Circuit applies the *Saucier* test for qualified immunity in three parts, analyzing "(1) whether the claimant [can show] the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both of those questions are answered in the affirmative, whether an objectively reasonable

official would have believed that the action taken violated that clearly established constitutional right . . . ."  *Jennings v. Jones*, 499 F.3d 2, 10 (1st Cir. 2007).

None of the individual defendants deprived Mosher of his constitutional rights, and in no event was any deprivation asserted by the plaintiffs clearly established such that the individual defendants would know that their conduct was unlawful.  For these reasons, they are entitled to immunity.

**A.    The Plaintiffs Cannot Show the Deprivation of a Constitutional Right.**

As a pretrial detainee,[11] Mosher was protected from cruel and unusual punishments under the Fourteenth Amendment due process clause, although the standard to be applied is the same as that used in Eighth Amendment cases.[12]  *Burrell v. Hampshire County*, 307 F.3d 1, 7 (1st Cir. 2002).  "Not every injury suffered by a prisoner at the hands of another results in constitutional liability on the part of prison officials."  *Burrell*, 307 F.3d at 7-8.  Rather, the plaintiff must first show that the deprivation was sufficiently serious.  For a claim based on failure to prevent harm, the plaintiff must show that he was held "under conditions posing a substantial risk of serious harm."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Burrell*, 307 F.3d at 8.  Substantial risk has been defined as "risks so great that they are almost certain to materialize if nothing is done."  *Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005).  The defendants concede, obviously, that the

---

[11] Mosher was a pretrial detainee at the Middlesex Jail sent to BSH for observation pursuant to G.L. c. 123, § 18(a) on July 24, 2004.  (July 24, 2004 Order of Commitment, Exhibit 9 to Defendants' Local Rule 56.1 Statement of Material Facts.)  The 30-day observation period was extended for six months on August 12, 2004.  (August 12, 2004 Order of Commitment, Exhibit 10 to Defendants' Local Rule 56.1 Statement of Material Facts.)  Whether Mosher is considered a pretrial detainee or a mental patient, the substance of the protection is the same.  *See Hasenfus v. LaJeunesse*, 175 F.3d 68, 71 & n.1 (1st Cir. 1999).

[12] The Amended Complaint also asserts violations of the First, Fourth, Fifth, and Thirteenth Amendments, but there is no factual predicate warranting application of these Amendments.

harm Mosher suffered was sufficiently serious.  But the plaintiffs also must demonstrate that the *risk* of that harm was substantial, *Brown*, 398 F.3d at 911, and they cannot do so.

Second, even if the risk were sufficiently substantial, the plaintiff must show that the prison officials possessed a sufficiently culpable state of mind, that of "deliberate indifference" to an inmate's health or safety.  This standard "follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment."  *Farmer*, 511 U.S. at 834 (quotation omitted).  The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serous harm exists, and he must also draw the inference."  *Burrell*, 307 F.3d at 8 (quoting *Farmer*, 511 U.S. at 837).  This requires "an actual, subjective appreciation of risk" akin to the standard for determining criminal recklessness. *Burrell*, 307 F.3d at 8 (quotation omitted).  Further, even if officials are subjectively aware of the risk, they "cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided."  *Burrell*, 307 F.3d at 8.  Any such inquiry must incorporate "due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions."  *Burrell*, 307 F.3d at 8, (quoting *Farmer*, 511 U.S. at 845).

### 1.     Nelson

There is no evidence that defendant Nelson knew of, or was deliberately indifferent to, any substantial risk to William Mosher, to patients in the Max 2 unit, or to patients at BSH in general.  Plaintiffs may proffer much of the evidence they developed during discovery to try to hold Nelson liable for the (proper) actions of other people.  *See* Plaintiffs' answer to interrogatory no. 1.[13]  Generally speaking, the fact that Nelson was the BSH superintendent does

---

[13] Plaintiffs' Answer to Defendants' First Set of Interrogatories is attached at tab 1.  The answer to interrogatory no 1, like many of the plaintiffs' answers, fails to cite to record evidence for many of its allegations, or cites to multi-level hearsay, conjecture and opinions of witnesses not

(footnote continued)

not make him liable for everything that occurs at BSH, because defendants accused of constitutional violations may be held liable only for their own acts or omissions, not on the basis of respondeat superior.[14]  *E.g.*, *Whitfield v. Melendez-Rivera*, 431 F.3d 1, 14 (1st Cir. 2005). Specifically, Nelson also cannot be charged with the knowledge of others at BSH.  *E.g.*, *Farmer*, 511 U.S. at 837; *Burrell*, 307 F.3d at 8 (requiring the prison official to have "an actual, subjective appreciation of risk").  The evidence shows that Nelson did not know who Burns was prior to the murder, and there is no evidence that he was personally involved in any decisions about his placement or treatment.

Plaintiffs may be expected to argue that Burns should have been assigned to the ITU because of his assaultive conduct prior to arriving at BSH.  Nelson cannot be held liable for any decisions concerning the placement of Burns in the Max 2 unit, however, because that was the most secure unit Burns could be assigned to, absent a temporary emergency, and only medical personnel could determine when such an emergency existed.

Nelson was required to enforce the state statute limiting the uses of seclusion and restraint.  *O'Sullivan v. Sec'y of Human Servs.*, 402 Mass. 190, 198 n.10 (1988) ("Seclusion practices in violation of G.L. c. 123, § 21 constitute a violation of a protected liberty interest under the Fourteenth Amendment's due process clause.").  The BSH seclusion and restraint policy, 103 BSH 651, is consistent with the statute and reasonable in light of BSH's unique mission as both a prison and a hospital.  Under the statute and BSH rules, only medical personnel

---

(footnote continued)

designated as experts.  Rather than address all of those issues in this memorandum, defendants will address these evidentiary issues in a reply memorandum in the event the plaintiffs rely on any inadmissible evidence in their opposition to the summary judgment motion.

[14] Even if respondeat superior applied, the mental health clinicians at BSH worked for UMass Medical Center, not BSH.  (Comiskey Dep. at 11:4-20, 47:10-22.)

could require Burns to stay in the ITU, and then only in an emergency. The superintendent could not assign Burns to the ITU other than as a temporary measure until he could be evaluated by medical personnel. (Comiskey Dep. at 58:13-59:6.) Thus, even if Nelson were somehow involved in Burns' intake and evaluation (and there is no such evidence), Nelson could not have assigned Burns to a more secure unit.

Nor is there any evidence that Burns' recent history of violence outside BSH placed him out of the norm of the typical patient assigned to BSH, let alone that it constituted an emergency that would warrant seclusion in the ITU or a duty to warn under G.L. c. 123, § 36B[15] after Dr. Comiskey evaluated him on August 10. It is true that Burns had a history of non-fatal violence just prior to entering BSH, but so did nearly every other patient at BSH found by a court to require strict security, including the twenty-five percent who have been convicted of or charged with killing someone. These dangerous patients do not all live in the ITU, and cannot be placed there unless they pose an *imminent* risk of harming themselves or others. Dr. Comiskey was aware of Burns' violent recent past, and decided to assign him to one of the maximum security units at BSH, B-1. When Burns requested a transfer for his own safety, he was transferred to another maximum security unit, Max 2. There is no evidence that any additional information about Burns available prior to the murder would have changed these determinations.

Nelson cannot be liable for the practice of permitting patients to interact with each other in their rooms for a few minutes between the completion of the 11:15 a.m. count and lunch,

---

[15] G.L. c. 123, § 36B limits the duty of a "<u>licensed mental health professional</u>" to warn or protect potential victims of said professional's patient to situations where "(a) the patient has communicated to the . . . professional an explicit threat to kill or inflict bodily injury upon a <u>reasonably identified victim or victims</u> and the patient has the apparent intent and ability to carry out the threat . . . or (b) the patient has a history of physical violence which is known to the . . . professional and the . . . professional has a reasonable basis to believe that there is a clear and present danger that the patient will attempt to kill or inflict serious bodily injury against a <u>reasonably identified victim or victims</u> . . . ." (emphasis supplied).

because it is not a constitutional violation to permit patient interaction. Patients at BSH generally were not permitted to go into their rooms during the day, primarily because of the concern that they might commit suicide, but a brief exception existed between the close of the 11:15 a.m. count and lunch when the patients had a little bit more freedom to interact, including in each others' rooms. (Nelson Dep. I at 35:2-37:24, 40:1-16; Nelson Dep. II at 71:6-18.) There is no evidence that anyone came forward to warn Nelson that such a practice was almost certain to result in harm, or that he had reason to believe that such a practice created a substantial risk in a mental health facility. In *Burrell v. Hampshire County*, prison inmates lived on units where violent and non-violent prisoners were not segregated, and they were still permitted to enter each other's rooms. The court found no constitutional violation after one inmate was brutally assaulted in another inmate's cell. 307 F.3d at 6, 8, 10. If such a policy is permissible for prisoners, then there is no reason to believe that a less-permissive policy that permits only a few minutes of interaction among patients at BSH violates the constitution.

In sum, the plaintiffs seek to hold Nelson personally liable for purported acts or omissions of others that were in fact proper and for which Nelson cannot be held liable. The plaintiffs fall far short of their burden of producing evidence sufficient to show that there was an almost certain risk of harm to BSH patients, that Nelson knew of that risk, and that he was deliberately indifferent to it.

### 2.    Dennehy

As DOC commissioner, defendant Dennehy was even further removed from the day-to-day operations at BSH, and thus less likely to know of any risk to a particular patient or class of patients. As with defendant Nelson, the fact that Dennehy was DOC commissioner does not make her liable, as defendants accused of constitutional violations may be held liable only on their own acts or omissions, not on the basis of respondeat superior. *Whitfield*, 431 F.3d at 14.

Similarly, any purported knowledge must be her own, not that of her subordinates. *E.g.*, *Farmer*, 511 U.S. at 837; *Burrell*, 307 F.3d at 8. The BSH superintendent reports to an associate deputy commissioner, who in turn reports to a deputy commissioner established by statute, G.L. c. 27, § 2, who in turn reports to the commissioner. None of the facts cited in plaintiffs' interrogatory responses demonstrate any basis for actual, personal knowledge by Dennehy of any specific threat, other than a general appreciation of the always-present danger inherent in prisons that was made trickier by the special rules and regulations applicable to BSH. *See* Plaintiffs' answer to interrogatory no. 3.

In response to this danger, Commissioner Dennehy reasonably delegated responsibility for maintaining reasonable patient safety in the unique BSH environment to the superintendent and the associate deputy commissioner responsible for that institution, recognizing that these subordinates had extensive correctional experience. (Dennehy Dep. at 72:7-74:22.) There is no evidence that she had actual knowledge that anything about this delegation of responsibility created an unreasonable risk to patients at BSH, or that she was deliberately indifferent to any such known risk.

Dennehy was not involved in the development of the ITU, but her understanding was that it was an attempt to create some level of intensive treatment and supervision that went to the limit permissible by law. *Id.* at 49:12-50:3. She believed that a greater ability to segregate patients was necessary, *id.* at 54:20-55:6, and she attempted to get the law changed to permit segregation at BSH to give the administrators a fuller range of options, *id.* at 102:20-103:18, but those legislative proposals were unsuccessful. None of her actions constitute deprivations of any constitutional right.

### 3.    Childs

Dr. Childs, formerly DMH commissioner, was not a prison official, and thus had no duty under the Eighth or Fourteenth Amendment to provide humane conditions of confinement to detainees at BSH.  The DMH commissioner's only role with respect to BSH is to approve the DOC commissioner's appointment of a medical director.  G.L. c. 125, § 18.  DMH does not supervise or regulate BSH in any way.  None of the evidence cited in the plaintiffs' interrogatory responses concerning Dr. Childs constitutes a violation of any other constitutional right.  *See* Plaintiffs' answer to interrogatory no. 2.  The claims against her are frivolous.

**B.    The Plaintiffs Cannot Show that Any Right Violated Was Clearly Established At the Time of the Alleged Violation.**

**1.    The Point at Which the Risk of Inmate Assault Becomes Sufficiently Substantial is not Clearly Established.**

Even if the plaintiffs could demonstrate a constitutional violation, the individual defendants would still be entitled to qualified immunity because "it has for some time been unclear '[a]t what point a risk of inmate assault becomes sufficiently substantial' for purposes of a failure to protect claim."  *Brown*, 398 F.3d at 911 (quoting *Farmer*, 511 U.S. at 834 n.3).  It is, of course, well known as a general proposition that pretrial detainees are entitled to be free from cruel and unusual punishment and that prison officials have a responsibility not to be deliberately indifferent to the risk to patients of violence at the hands of other patients.  *Burrell*, 307 F.3d at 7; (Nelson Dep. II at 38:22-39:10).  Under *Saucier*, however, this level of analysis is insufficient.  *Buchanan v. Maine*, 469 F.3d 158, 168-69 (1st Cir. 2006).  The determination that a right is clearly established, however, "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.  "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official

would understand that what he is doing violates that right." *Id.* at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The purpose of this requirement is "to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Saucier*, 533 U.S. at 206). "By providing government officials with the ability to reasonably anticipate when their conduct may give rise to liability for damages, the doctrine of qualified immunity strikes a balance between compensating those injured by official conduct and protecting the [g]overnment's basic ability to function." *Farmer v. Moritsugu*, 163 F.3d at 613. (citation and internal quotation marks omitted). Officials are entitled to the same "fair warning" that their conduct will deprive prisoners of constitutional rights as criminal defendants charged under 18 U.S.C. § 242. *Hope*, 536 U.S. at 739-40. When cases show that the area of law is one in which the result depends on the facts of each case, then the right is not clearly established. *Brouseau v. Haugen*, 543 U.S. 194, 201 (2004).

In *Farmer*, the Supreme Court specifically declined to address the point at which a risk of inmate assault becomes sufficiently substantial for Eight Amendment purposes. 511 U.S. at 834 n.3. Nor was the issue resolved prior to the killing of Mosher in August 2004. *Brown*, 398 F.3d at 911. Thus, any constitutional right that could have been violated was not clearly established.

### 2. If a Clearly Established Standard Existed, The Facts of This Case Would Not Satisfy that Standard in the First Circuit.

Even if the point at which the risk of inmate assault becomes sufficiently substantial had been clearly established, the facts of this case would not satisfy the First Circuit standard. In the First Circuit decision closest to the date of the incident, *Burrell v. Hampshire County*, (October 4, 2002) the prison officials were found not to be deliberately indifferent, even though they had specific information about an ongoing conflict and likely fight between two inmates and where

20

one of the inmates had a history of violence against other inmates. 307 F.3d at 8-9. The

officials, including correction officers directly involved with the inmates on a day to day basis,

acted reasonably in response to this information because they believed that the victim was able to

defend himself, he had not requested protective custody, he was not a member of a rival gang or

an informant, and there had been no history of violence between the inmates even though they

had been on the same block for four months. 307 F.3d at 9. *Burrell* also specifically

distinguished two other First Circuit where deliberate indifference was found, distinguishing

*Giroux v. Somerset County*, 178 F.3d 28 (1st Cir. 1999), on its facts and *Calderon-Ortiz v.

Laboy-Alvarado*, 300 F.3d 60 (1st Cir. 2002), because it was evaluated under the more lenient

Rule 12(b)(6) standard. *Burrell*, 307 F.3d at 9. Further, although the inmates in *Burrell* were

permitted to enter each other's cells and the assault happened when one inmate entered another's

cell, no constitutional violation was found. 307 F.3d at 6, 8.

    The purported acts and omissions in the present case do not even rise to the level of those

in *Burrell*. Unlike in *Burrell*, there is no evidence that any of the defendants knew of a specific

threat to Mosher from Burns, or that any such threat existed prior to the murder. The defendants

in *Burrell* included corrections officers who had direct interaction with inmates on a day to day

basis and who heard those specific threats and actually made decisions about how to respond to

them, whereas in the present case the defendants are all high-ranking officials with little to no

direct involvement with individual patients, and none with Burns. In light of the Supreme

Court's judicial restraint in *Farmer*, the Seventh Circuit's clear proclamation that the issue has

not been decided, and the First Circuit's caselaw, the plaintiffs cannot show that the defendants'

actions violate clearly established constitutional rights in the specific context of this case.

    Even if any cases clearly established the defendants' specific actions to be

unconstitutional in the context of a prison, it is not clear that such cases would clearly establish

that similar conduct was unreasonable in the context of a mental health facility like BSH, where treatment decisions and security decisions must be balanced and punishment is restricted by statute. What is clearly established is that seclusion practices that violate G.L. c. 123, § 21, constitute a violation of a protected liberty interest under the Fourteenth Amendment's due process clause. *O'Sullivan*, 402 Mass. at 198 n.10. Any security decisions Nelson made had to be made with that clearly established right in mind.

C. **An Objectively Reasonable Official Would Not have Believed that His/Her Actions Violated Any Clearly Established Constitutional Right.**

In light of *Farmer*, *Burrell*, G.L. c. 123 § 21, and *O'Sullivan*, and the conflicting mandate of running a facility that is simultaneously a prison and mental hospital, objectively reasonable officials in the positions of these defendants would not have believed that their actions violated any clearly established constitutional rights. "Common sense dictates that reasonable public officials are far less likely to conclude that their actions violated clearly established rights when they are enforcing a statute on the books with no transparent constitutional problems. Thus, in the realm of objective reasonableness, we hold that enforcement of a presumptively valid statute creates a heavy presumption in favor of qualified immunity." *Connecticut v. Crotty*, 346 F.3d 84, 104 (2d Cir. 2003). The plaintiffs can provide no evidence nor any legal citation to overcome that heavy presumption.

<u>**Conclusion**</u>

For the foregoing reasons, all counts against the state officials in their official capacities should be dismissed because the Court has no jurisdiction pursuant to the Eleventh Amendment, and Counts I-IV against these defendants should be dismissed for the additional reason that they are not "persons" under the applicable civil rights statutes. Further, counts I-IV against the

individual defendants in their individual capacities must be dismissed because these defendants

have qualified immunity.

Respectfully submitted,

KENNETH NELSON, Individually and as Superintendent
of BRIDGEWATER STATE HOSPITAL, ELIZABETH
CHILDS, Individually and as Commissioner of the
COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF MENTAL HEALTH, AND
KATHLEEN M. DENNEHY, Individually and as
Commissioner of the COMMONWEALTH OF
MASSACHUSETTS DEPARTMENT OF CORRECTION

By their attorneys,

MARTHA COAKLEY
ATTORNEY GENERAL


s/Daniel G. Cromack_____
Ronald F. Kehoe (BBO# 264260)
Daniel G. Cromack (BBO#652252)
Assistant Attorneys General
Government Bureau/Trial Division
One Ashburton Place, Room 1813
Boston, MA 02108
(617) 727-2200

August 15, 2008

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 15, 2008.


/s/ Daniel G. Cromack_____
Daniel G. Cromack
Assistant Attorney General

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-12560 MLW

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WILLIAM MOSHER, individually and as
administrator of the Estate of WILLIAM
MOSHER, JR., CAROLYN MOSHER,
    Plaintiffs,

               V.

KENNETH NELSON, Individually and as
Superintendent of BRIDGEWATER STATE HOSPITAL,
ELIZABETH CHILDS, Individually and as
Commissioner of the COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF MENTAL HEALTH, KATHLEEN M. DENNEHY,
Individually and as COMMISSIONER OF THE
COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF
CORRECTIONS
    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFFS' ANSWER TO DEFENDANTS' FIRST SET OF INTERROGATORIES

### Introduction

Rule 26.5(8)(c) et seq. of the Local Rules of the United States District Court require that the party answering these interrogatories "..state separately the acts or ommissions to act on the part of any person….which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory:…".  These interrogatories are designed to elicit facts and basis for complex legal theories. The plaintiffs are without the training, skill, or experience to

answer in compliance with the mandate of Rule 26.5 et seq.  The answers to the interrogatories propounded by the defendants are answered by counsel for the plaintiffs.

The answers to these interrogatories are based on the deposition testimony of Kenneth Nelson, Kathleen M. Dennehy, Elizabeth Childs, Dr. Daniel W. Comiskey, and Steven P. Kenneway, exhibits marked during those depositions, and records disclosed by the defendants during discovery.

Counsel(s) for the defendants were present at each deposition and upon information and belief possess transcripts of each deponee.

Counsel for the plaintiffs will endeavor to direct counsel(s) for the defendant to specific portions of each transcript where relevant in support of the following answers. Counsel for the plaintiffs does so in good faith without the intention of limiting reflection or reliance on other testimony not directly cited herein.

Where no references are designated, counsel(s) for the defendant are advised to rely on the totality of the testimony related to the issues addressed.

It is intended that each subsequent answer to these interrogatories incorporate by reference answers to prior interrogatories submitted with this response.

<u>Answers</u>

<u>Interrogatory Number One:</u>

State the basis of the allegations in Paragraph 30 of your Complaint.

**Answer to Interrogatory Number One:**

Paragraph Number 30 reads as follows:

"30.    At all times relevant to this complaint, Kenneth Nelson failed to take steps necessary to exercise a reasonable degree of supervision and control over the Bridgewater State Hospital staff, administrators, clinical advisors and practitioners when he knew or should have known that Bradley Burns posed a threat to the safety of patients and inmates at the Bridgewater State Hospital."

I.

Kenneth Nelson was aware of a custom, policy, and/or practice at Bridgewater State Hospital that allowed patients and/or inmates on MAX II to remain in their rooms between the end of the major count that began at approximately 11:15 a.m. and ended at approximately 11:30 a.m. or 11:40 a.m. and lunch at approximately 11:45 a.m. 12:00 p.m. (Tr. May 21, 2008, 39; 40. Tr. May 28, 2008, Page 12)[1] Other than this exception and at "major count time", patients, including Bradley Burns, could not go into or remain in their rooms between 7:00 a.m. and 9:00 p.m.[2] (Tr. May 21, 2008, Pages 34; 35; 36; 37; 38)

Kenneth Nelson was aware of a custom, policy, and/or practice at Bridgewater State Hospital that allowed patients

---

[1]    Page references in section I are to the transcripts of the Deposition of Keneneth Nelson unless otherwise noted.

[2]    Exlcuding those patients on "special status" or who request and are allowed to be alone in their rooms with the door closed.

and/or inmates on MAX II who remained in their rooms between the end of the major count that began at approximately 11:15 a.m. and ended at approximately 11:30 a.m. or 11:40 a.m. and lunch at approximately 11:45 a.m. 12:00 p.m. to have other inmates or patients in their rooms. (Tr. May 28, 2008, Page 28; 71-73)

Kenneth Nelson was aware that the custom, policy, and/or practice at Bridgewater State Hospital that allowed patients and/or inmates on MAX II to remain in their rooms between the end of the major count that began at approximately 11:15 a.m. and ended at approximately 11:30 a.m. or 11:40 a.m. and lunch at approximately 11:45 a.m. 12:00 p.m. to have other inmates or patients in their rooms, resulted in an inability of his staff, employees, or others under his control to monitor the activities of these patients and inmates. (Tr. May 28, 2008, Page 29; 71-73)

The custom, policy and/or practice of allowing patients entering rooms of other patients was ended after the death of William Mosher, Jr.. (Tr. May 28, 2008, Page 28)

Kenneth Nelson was aware that Bridgewater State Hospital housed patients and inmates who had extrememly dangerous and severe proclivities towards physical assault against other persons including other patients and inmates. (Tr. May 21, 2008, Page 15; 16; Tr. May 28, 2008, Page 30; 66; 67; 68; 69)

Kenneth Nelson was aware that the environment at Bridgewater State Hospital presented unique and distintive security problems because it was a secure facility housing inmates and patients who had been convicted of violent crimes including murder or who had been placed in the facility by court order after committing violent offenses against other persons and whom suffered from varying degrees of serious and severe mental illness. (Page 15; 16; 66; 69)

Kenneth Nelson was aware that vigilence, defined as staff being able to readily observe what's occuring in the unit, was critical to safe operation of the facility. (Page 46)

Kenneth Nelson was aware of the policy, custom, or practice that allowed patients to have consumables in their rooms. (Page 32)

4

Kemmeth Nelson was aware a ligature could be fashioned from virtually anything. (Page 36; 37)

There was a complete absence of consideration that a patient could use a ligature fashioned from virtually anything to kill another patient. (Page 37-42)

Bradley Burns was a member of the population at Bridgewater State Hospital who had demonstrated violent proclivities and had been admitted as a consequence under court order for evaluation.

Bradley Burns murdered William Mosher, Jr. during the period between count and lunch and during the time patients were allowed to intermingle with each other outside the view of corrections staff. (May 28, 3008, Page 71-73)

Kenneth Nelson failed to take steps to end the custom, policy, or practice that allowed inmates or patients to remain in their rooms, with doors open, and to have other patients or inmates present in their rooms between the end of "major count" and lunch, despite being aware of that custom, policy, or procedure, despite being aware that the population was dangerous and violent, despite being aware that the custom, policy, and procedure provided that inmates and patients would be out of "eyeball" view, unable to be viewed by staff, and without supervision, and despite being aware that there would be sufficient time to commit murder.

This failure was the proximate cause of the death of William Mosher, Jr..

Kenneth Nelson failed to take steps to require that his employees or staff maintain constant view of inmates or patients housed in MAX II. This failure was the proximate cause of the death of William Mosher, Jr..

II.

Security concerns and clinical concerns paralleled each other on the units at Bridgewater State Hospital. The Max units are the more secure units. Security is a shared responsibility. By definition security is the responsibilty of the Department of Corrections. (Page 62-68)[3] The ultimate decision of where a

---

[3]    Page references in section II are to the deposition of Daniel W. Comiskey, May 16, 2008

patient is housed is not a clinical decision.  The Superintendent
would make the final decision.  The placement decision was a
security decision. It was not a clinical decision. (Page 57; 58)

There was nothing prohibiting access to the recent past
history of a particular patient before making a final decision on
a person's placement at Bridgewater State Hospital (Page 68)

Bradley Burns was placed in MAX II after evaluation by Dr.
Daniel W. Comiskey and after having complained he was in fear of
his safety in B-1. (Page 71-72; 101)

Bradley Burn's "Admission Assessment" and "Personal De-
Escalation Plan" were available to the Superintendent if he
elected to review them. (Page 76-77)

The "Personal De-Escalation Plan" indicated that Bradley
Burns was at risk for assaulting other patients. (Page 79)

Dr. Comiskey agreed that he had the "Prisoner Data Sheet"
with him when he evaluated Bradley Burns for placement at
Bridgewater State Hospital. (Page 83).  It was important to have
this information because it gave reasons for his commitment and
was necessary to determine clinical and security concerns
including the safety of others at the facility. (Page 83-84) The
"Prisoner Data Sheet" revealed Mr. Burn's had escaped from
McCleans and Arbour hospitals, his hostage taking, and the fact
that he was homicidal and suicidal. (Page 84- 86)  Dr. Comiskey's
write-up revealed he was aware of the allegation Mr. Burns
strangled a person at a hospital, eloped, and strangled a person
at a McDonald's restaurant.  (Page 90)

Dr. Comiskey was not possessed of records related to much of
Mr. Burn's past involvement with the Courts and was without
reports on his prior court ordered evaluation.[4] (Page 91-101)
This despite Dr. Comiskey's belief that possession of these
records would have been a "nice idea". (Page 95)

Dr. Daniel W. Comiskey employed a "Contract for Safety"
which essentially allowed for the placement of Bradley Burns
within access to other patients or inmates at the facility if Mr.
Burns verbally agreed to self-administer his medication, report

---

unless otherwsie designated.
[4]     Please see Exhibits to the deposition of Daniel W. Comiskey.

if he had suicideation, or report if he had homicideation. (Page 103-109)  Dr. Comiskey evaluated Mr. Burns for 15-20 minutes. (page 108)  This was the first time Dr. Comiskey met with Bradley Burns. (Page 108)

Non-compliance with medication would make it unlikley a patient would improve and likely the patient would worsen. (page 111-112)

On August 15; 16; 18; 24; 25; 26; 27, 2004, Bradley Burns reported delusional behavior including non-compliance with medication, auditory command controls and deterioation into a serious psychosis.[5] (Page 118-122, Please also see nurses notes "Bridgewtaer State Hospital, Progress Notes" for same dates)

The use of the "Contract for Safety" was improper and resulted in the placement of Mr. Burns in MAX II where he murdered William Mosher, Jr.. A "Contract for Safety" is not a useful clinical assessment. A "Contract for Safety" or its equivalent was an unacceptable clinical assessment tool for use with Bradley Burns. (Deposition transcript of Elizabeth Childs, May 14, 2008, Page 61 – 69; Please see also Section VI(a)(1) "Practice Considerations for Bridgewater State Hospital Review", Interagency Review Panel Report Concerning the Death of William Mosher)

Daniel W. Comiskey was an employee of Bridgewater State Hospital and as such he was under the control and supervision of Kenneth Nelson. (Page 46-54) (Please also see Williams v. Hartman, 413 Mass. 398, 400, 597 N.E.2d 1024 [1992]; Restatement [Second] of Agency § 220[2]) [1958]; Rodriquez v. Furtado, Et Al., 771 F. Supp. 1245 [1991]).

Kenneth Nelson had a duty to protect inmates and patients housed at the facility against harm. (Deposition transcript of Kenneth W. Nelson, May 28, 2008, Page 39)

The medical unit, including Dr. Comiskey, had an obligation to report to the Superintendent and security staff at Bridgewater State Hospital the likelihood that Bradley Burns presented a grave risk to other patients and failed to do so. (Please see G.L. c. 123, § 36B)

---

[5]    Please see Exhibit "11" to the deposition of Daniel W. Comiskey.

Kenneth W. Nelson failed to ensure compliance with G.L. c. 123, § 36B.

Kenneth Nelson allowed the medical unit, including Dr. Comiskey, to dictate the placement of Bradley Burns without appropriate consideration of the risk he posed to other inmates and patients.

Kenneth Nelson failed to take steps to ensure that Dr. Daniel W. Comiskey did not employ and rely on the "Contract for Safety" for placement of Bradley Burns within the facility.

Kenneth Nelson failed to take the necessary steps to make certain that noncompliance with a "Contract for Safety" required removal from MAX II, and/or heightened staff presence, and/or heightened observation of Bradley Burns. Mr. Nelson failed to ensure that non-compliance with the "Contract for Safety" required that Mr. Burns could not be allowed to be alone in his room with other patients or inmates at any time. Mr. Nelson failed to ensure that non-compliance with the "Contract for Safety" was reported to security personel in order to keep security personel fully apprised that an inmate or patient had failed to abide by the agreement and therefore posed a serious, imminent, and violent threat to the population at Bridgewater State Hospital.

As a proximate result of these failures, Mr. Burns was placed in a unit and given the opportunity to murder William Mosher, Jr..

III.

Kenneth Nelson failed to take steps necessary to ensure that his security staff or personel were adequately trained in the identification of issues associated with maintaining a secure and safe environment in a facility that housed violent offenders suffering from mental illness.

That failure was the proximate cause of the death of William Mosher, Jr..

8

IV.

Kenneth Nelson failed to ensure that medical and security personel were fully apprised of the violent history of inmates or patients at Bridgewater State Hospital including Bradley Burns.

Kenneth Nelson took no steps to begin or incorporate a system of communication between the Bridgewater State Hospital, the Department of Corrections, and the Department of Mental Health for inmates or patients who may have had involvement with the Department of Mental Health and had demonstrated severe and serious proclivities toward interpersonal violence. (Page 91-101)

Bradley Burns had been housed at McLeans Hospital and the Arbour Hospital and had escaped both facilities prior to his commitment.

Bradley Burns took an employee at McLeans Hospital hostage by ligature and escaped by breaking through a plate glass window on the first floor of the facility.

Bradley Burns took a hostage by ligature at a McDonald's restaurant after his escape.

Bradley Burns murdered William Mosher, Jr. by ligature.

V.

Sergeant Michael Reddy, Lieutenant Stephen Studley, Correction Officer James Machado were on duty on the MAX II unit at the time of the murder of William Mosher, Jr.. Corrections Officer Russell Kaeterle was in the MAX II breakroom eating lunch. There was no other staff officer on the unit at the time Bradley Burns murdered William Mosher, Jr..

The Department of Corrections and Bridgewater State Hospital were "short staffing" serious blocks such as MAX I and MAX II. (Page 27)[6] The normal contingent of corrections officers on MAX II was 5 or 6. (Page 28) An example of understaffing was that an inmate had to help staff officers with a hostage situation. (Page 29; 30)

---

[6]    Page references are to the deposition transcript of Steven P. Kenneway unless otherwsie noted.

The issue of low staffing levels at Bridgewater State Hospital was raised in conference with Kathleen Dennehey and Superintendent Nelson in 2004. Despite the intent of Mr. Kenneway to resolve the issue of low staffing levels, there was no interest in resolving the issue. (Page 32; 35) There was a deliberate indifference to staffing and security issues at the facility. (Page 179; 180; 181)

The Department moved staff from one location in the facility to another. This method of dealing with short staffing, instead of hiring more officers, was the cause of the death of Mr. Mosher. (Page 28; 29; 47; 157)

The culture of the Department of Corrections was to ignore acknowledged and rational actions and conduct in favor of actions that had immediate desired consequences. (Page 36 - 45) The culture was to attempt to get by with minimal staffing, despite the ability to hire more officers. Superintendent Nelson had the authority to hire staff officers. (Page 46 - 51; 140; 141; 143; 160; 161)

Bridgewater State Hospital was grossly understaffed in 2004. Bridgewater State Hospital had at least 30 vacancies with at least another 30 out on sick leave. (Page 51; 52; 99; 100 - 104) In 2004 Bridgewater State Hospital was among the most serious of facilities breaching appropriate staffing levels. (Page 124) Staffing issues were especially prevalent on MAX II and MAX I in 2004. (Page 126; 127) Kathleen Dennehey instituted a policy called a "pull plan" allowing for an officer to be pulled off MAX II to be placed in another area of the facility. (Page 127- 128; 145; 146; 176; 177)

The department allowed attrition to reduce staffing until they were 600 officers below proper staffing levels. With accident leave the department staffing level was approximately 1000 persons below proper levels. The department was budgeted for 3800 officers. They had 2800 officers employed. The interest was to come in below budget. (Page 129- 31) Corrections officer positions decreased as management and vendor positions increased. (Page 131 - 137)

Bridgewater State Hospital is a very violent place. It was a very violent place in 2004. (Page 124; 125) The patients are extremely aggressive. Aggression includes patients against

patients. If there is a brawl, the facility will loose 3 or 4
officers.  It is a staff intensive environment.  The ratio of
violence is higher at Bridgewater State Hospital than at other
facilities. (Page 52; 53). It was an unpredictable environment
with an unpredictable population. (Page 84) Patients have a
tendency to harm themselves and each other. (Page 94) Patients
with idle time are an increased security risk. (Page 105 – 107;
189)

Mr. Kenneway's office routinely received assault reports
every month.  Kathleen Dennehey stopped Mr. Kenneway's access to
these monthly reports.  (Page 54)

Bridgewater State Hospital presents unique security
characteristics because it is a state hospital and a secure
facility. (Page 55; 56)  The administration's interest was to
keep the hours of seclusion of inmates low to acquire JHACO
accreditation.  (Page 58; 59)  They did not lock the individual
room doors at night out of fear that it would count as exclusion
hours against accreditation.  (Page 85; 86)

When Kathleen Dennehey became Commissioner of the Department
of Corrections the attrition rate of staff officers rose from
about 135 per year to 250 to 350 per year.  The majority of
those leaving the Department of Corrections left because they
felt their jobs were unsafe and untenable and management was not
backing them up. (Page 61; 62)

There is very little training that addresses the special
needs of Bridgewater State Hospital. (Page 69 –71)  Despite
advising Kathleen Dennehey and the superintendent of Bridgewater
State Hospital of the need for training, they cancelled training.
(page 71; 73)

Staff officers at Bridgewater State Hospital were
demoralized in 2004 as a consequence of issues related to
staffing. (Page 76; 77)

Allowing patients to be alone with other patients in their
rooms outside of the view of officers on MAX 2 was a terrible
measure; a terrible policy. (Page 79; 86; 87; 88; 107; 109)

A staff officer needs to be relieved in order to take a
break in the staff dining room. (Page 192)

11

Out of the three officers present on the unit when William Mosher, Jr. was murdered, none were on the floor of the unit at the time Bradley Burns lured William Mosher, Jr. into his room and murdered him.

There was no replacement for Officer Kaeterle who was off the unit and at lunch.

There was a deliberate indifference by Mr. Nelson and Ms. Dennehey to low staffing levels and to customs, policies, and practices that resulted in only three officers on MAX II at the time Mr. Mosher was murdered.

Mr. Nelson and Ms. Dennehey had the werewithall to hire corrections officers, but instead, intentionally elected to keep staffing levels low and to institute a dangerous "pull plan".

Security on the unit was compromised in an effort to gain JHACO accreditation.

Interrogatory Number Two:

State the basis of the allegations in Paragraph 35 of your Complaint.

Answer to Interrogatory Number Two:

Paragraph Number 35 reads as follows:

"35.  At all times relevant to this complaint, Elizabeth Childs, failed to take steps necessary to exercise a reasonable degree of supervision and control over the Bridgewater State Hospital, its staff, administrators, clinical advisors and practitioners when she knew or should have known that Bradley Burns posed a threat to the safety of patients and inmates at the Bridgewater State Hospital."

The Medical Director at Bridgewater State Hospital is appointed by the Commissioner of Correction with the approval of the Commissioner of Mental Health.  (Page 47, Deposition transcript of Kathleen M. Dennehey, May 14, 2008)  The Medical Director at Bridgewater State Hospital assigned duties to Dr. Comiskey. (Page 12, Deposition transcript of Daniel W. Comiskey,

May 16, 2008)  The Medical Director at Bridgewater State Hospital
was involved in the decision to place Dr. Comiskey at Bridgewater
State Hospital. (Page 11, Deposition transcript of Daniel W.
Comiskey, May 16, 2008).  Only a doctor or nurse could order
seclusion of a patient at Bridgewater State Hospital. (Page 59,
Deposition transcript of Daniel W. Comiskey, May 16, 2008)

Elizabeth Childs interacted with Kathleen Dennehy of the
Department of Corrections on a number of levels. (Page 31)[7]

Despite the fact that Ms. Childs acknoweldged that
Bridegwater State Hospital housed persons with violent tendencies
or antisocial tendencies who suffered from mental illness, she
never discussed with Kathleen Dennehy the transfer of information
regarding personS admitted to Bridgewater State Hospital who had
been involved with the Department of Mental Health. (Page 35; 36;
40; 41)

Ms. Childs never instituted a policy requiring subordinates
to report to her that a patient who had exhibited extreme
violence while in the Department of Mental Health had been
admitted to Bridgewater State Hospital. (Page 39)

The reason she was not informed of the violent past history
of Bradley Burns prior to the murder was because she had
delegated that responsibility to licensing within her agency.
(Page 56)

In principle, it would be a good idea to share information
and work across the agencies, the better for the inmates in the
system. (Page 43)

Ms. Childs agreed that it would have been better to advise
Bridgewater State Hospital that Bradley Burns, whom Bridgewater
State Hospital had just taken into custody, had in the past
number of weeks, tried to strangle three innocent persons and
might try to strangle somebody else. (Oage 44; 45)

Elizabeth Childs consciously elected to remove herself from
consideration of the day to day operation of the Department of
Mental Health.  She consciously elected to abdicate her
responsibility to ensure that the Department of Corrections was

---

[7]     Page references in section III are to the deposition transcript of Elizabeth Childs, May 14,
2008.

advised of the violent tendencies of its patients or inmates from empirical data in her possession or available to her from patient/inmate involvement in facilities licensed or controlled by the Department of Mental health.

These failures were conscious, intentional, and deliberate with full knowledge of the deficiencies that led to the murder of William Mosher, Jr..

Despite the reasonable alternative of incorporating a system of transfer of information between agencies, Ms. Childs elected to remain uninformed of valuable information that would have advised the Department of Corrections of the full extent of the violent proclivities of Bradley Burns and the grave risk he presented to other persons while in custody.

Her failure was in concert with the failures of Kathleen Dennehey who acknowledged that she did have interaction with the Department of Mental Health over the free flow of transfer of information related to persons in custody at Bridgewater State Hospital.

These failures were systemic and pervasive and were a contributing and proximate cause of the death of William Mosher, Jr..

These failures constituted a failure by Ms. Childs to exercise the appropriate amount of supervision and control over the Bridgewater State Hospital that was attendant with her ethical, moral, and constitutional obligations as an officer, commissioner, and employee of the Commonwealth of Massachusetts.

Interrogatory Number Three:

State the basis of the allegations in Paragraph 40 of your Complaint.

Answer to Interrogatory Number Three:

Paragraph Number 40 reads as follows:

"40. At all times relevant to this complaint, Kathleen M. Dennehy, failed to take steps necessary to exercise a reasonable degree of supervision and control over the

Bridgewater State Hospital, its staff, administrators, clinical advisors and practitioners when she knew or should have known that Bradley Burns posed a threat to the safety of patients and inmates at the Bridgewater State Hospital."

Kathleen Dennehey was the Chief Executive Officer for the Department of Corrections with the responsibility for overall oversight and management of the state correctional system. (Page 13; 14)[8]  Bridgewater State Hospital is under the umbrella of the Department of Corrections. (Page 17)  Commissioner Dennehey had the express duty to establish rules and regulations relating to the safety, care and custody of persons committed to Bridgewater State Hospital. (Please see *Dimarzo v. Cahill Et Al.*, 575 F.2d 15 (1978)

Ms. Dennehey had the power to hire and fire Superintendent Nelson. (Page 18)[9]

Because of the chain of command structure, policy or custom dictated that Mr. Nelson would not ordinarily have direct access to Ms. Dennehey but would have to go through the Deputy Commissioner. (Page 19- 23)

One of the major responsibilities of Mr. Nelson at Bridgewater State Hospital was security. (Page 25)  Mr. Nelson's duties were under the supervision of Ms. Dennehey's agency. (Page 25)

Any significant change in policy or procedure by Mr. Nelson would be reported to Ms. Dennehey's supervisory staff. (Page 26)

Ms. Dennehey recognized that there were real security concerns attendant with the custody of a patient or inmate at Bridgewater State Hospital because it is a hospital and prison regulated under statute. (Page 31 - 33)

During the previous administration, there was considerable discussion about creating the MAX unit. It was discussed to give clinicians and staff a measure of observation and supervision that was not the equivalent of segregation. (Page 43)

---

[8]     Page references are to the deposition transcript of Kathleen M. Dennehey, May 14, 2008.
[9]     Ms. Dennehey did not hire Mr. Nelson but did accept his position as Superintendent of Bridgewater State Hosiptal

There was access to exclusion and restraint on clinical recommendation at Bridgewater State Hospital in 2004. (Page 45; 46)

Security and treatment were expected to dialogue to develop appropriate response to patient/inmate behavior. (Page 48-51)

Ms. Dennehey had no knowledge of the protocols for dealing with a patient, such as Bradley Burns, who had just murdered another patient. (Page 49)

Ms. Dennehey was assured that after the murder of William Mosher, Jr., Bradley Burns was contained within Bridgewater State Hospital. (Page 57)

Any major plan or discipline or anything that a Superintendent would be involved in either for a day or long term would be under the supervision of Ms. Dennehey's agency. (Page 73; 74)

Ms. Dennehey had discussed with the prior Commissioner of the Department of Mental Health the appropriate sharing of information between the two agencies involving persons who had been involved in both agencies. (Page 71; 72)

Ms. Dennehey became aware of Bradley Burn's involvement with the Department of Mental Health after the murder of William Mosher, Jr.. (Page 69; 70)

Ms. Dennehey had interest in what kind of information was made available at different points in the process prior to the commitment of Bradley Burns. This interest was after the murder of William Mosher, Jr.. She directed a group to investigate and make recommendations. She checked with the group every 4 - 6 weeks but the report and any recommendations took 3 years to complete. There were no interim emergency measures to prevent a re-occurrence of murder at Bridgewater State Hospital. (Page 81; 82; 84 - 88; 111)

Ms. Dennehey was not made aware of investigations by the Department of Mental Health into Bradley Burn's hostage taking and elopement from McLeans and Arbor hospital. (Page 70; Please also see exhibits to deposition of Elizabeth Childs))

Nobody had advised Ms. Dennehey that Bradley Burns was in custody at Bridgewater State Hospital. (Page 72)

Ms. Dennehey's direct involvement at Bridgewater State Hospital was in the context of dealing with politically sensitive issues. Otherwise, she would leave the management of the facility to her subordinates. (Page 75 - 80)

There is no provision that only medical staff at Bridgewater State Hospital can place an inmate. (Page 105)

There is always the potential for something, like the murder of Mr. Mosher, to happen at Bridgewater State Hospital. (Page 108; 109)

Ms. Dennehey had questions and issues after the murder about how and why it was that Bradley Burns and Mr. Mosher were in Mr. Burn's room. (Page 111 - 113)

There was no process in place that would allow for Mr. Nelson to reach out to any prosecutorial agency to request a history on a person admitted to Bridgewater State Hospital. (Page 121; 122)

Ms. Dennehey never advised Mr. Nelson or anyone else at Bridgewater State Hospital to reach out to gain information on a person admitted to Bridgewater State Hospital. (Page 122; 123)

Other than a general consideration and acknowledgement that information sharing between the DOC and the DMH on persons who had demonstrated violent tendencies was important, the DOC and DMH relied only on the transfer of a list of patients at Bridgewater State Hospital from the DOC to the DMH in order to best provide a continuum of treatment. (Page 126-130)

Ms. Dennehey was aware that there existed an ongoing potential for patients or inmates at Bridgewater State Hospital to commit serious and /or fatal acts of violence.

Ms. Dennehey was aware there needed to be an increased level of communication and information sharing between the Department of Mental Health and the Department of Corrections. Other than discussions with the former Commissioner and the development of a

list of patients given to the DMH by the DOC, Ms. Dennehey failed to take steps to ensure that there was a sufficient and appropriate sharing of information.

The custom, policy, or practice of allowing patients to interact in their rooms with other patients was allowed to continue during Ms. Dennehey's tenure,

Despite knowledge that patients were allowed to interact in their rooms at Bridgewater State Hospital, Ms. Dennehey took no steps to stop the custom, policy, or practice until after the death of Mr. Mosher.

According to Ms. Dennehey, it was not until 3 years after the death of Mr. Mosher that the issue of inappropriate access by patients to other patients was addressed.

Ms. Dennehey failed to provide sufficient oversight, programs, protocols, or methods by which she would be advised of and interact or intercede with the placement of a patient presenting a grave risk of violence towards other patients at Bridgewater State Hospital.

The primary and major concern for Ms. Dennehey was to provide a safe environment for patients and inmates in custody of the Department of Corrections. Ms. Dennehey's primary and major focus was to do all things reasonable and necessary to prevent murder at the facilities under the control of her agency.

Ms. Dennehey failed to employ reasonable alternatives of notice and prevention.

As a proximate result, Bridgewater State Hospital was deprived of critical information concerning Bradley Burns, placed Bradley Burns in a unit where he had access to other patients, allowed Bradley Burns to entice Mr. Mosher into his cell and out of view of security staff, and gave Bradley Burns the opportunity to murder Mr. Mosher.

The failures of Ms. Dennehey were pervasive and systemic.

<u>Interrogatory Number Four:</u>

If you contend that Defendant Childs had any custody of

Burns or Mosher, or any supervision or control over the
operations of Bridgewater State Hospital, state the basis of that
contention.

**Answer to Interrogatory Number Four:**

Please see answers to Interrogatories numbered One through
Three.

Interrogatory Number Five:

State the basis of the allegations in Paragraph 19 of
your Complaint, stating separately the acts or omissions of
each defendant as required by L.R. 26.5(8)(c).

**Answer to Interrogatory Number Five:**

Paragraph Number Nineteen reads as follows:

"19. At all times material to this complaint, the
defendants harbored, encouraged, and cultivated conditions
of confinement that placed inmates and patients held in the
custody of the Commonwealth of Massachusetts in imminent
threat of bodily harm and death. This violent condition of
confinement was persistent, continuing, and systemic."

Please see answers to Interrogatories numbered One through
Four.

Interrogatory Number Six:

State the basis of the allegations in Paragraph 23 of your
Complaint, stating separately the acts or omissions of each
defendant as required by L.R. 26.5(8)(c), and including the basis
for each defendant's alleged awareness and notice.

**Answer to Interrogatory Number Six:**

Paragraph Number twenty-three reads as follows:

"23. At all times material to this complaint, the
defendants were aware and had been put on notice of Bradley
Burn's violent past, and were aware and put on notice that
he posed an imminent threat to the health and safety of

Mosher, Jr., from attack and murder at the hands of Bradley Burns, constituted negligence rising to the level of deliberate indifference and/or reckless disregard for William Mosher, Jr.'s safety."

Please see answers to Interrogatories numbered One through Four and answer to Interrogatory numbered Seven.

Interrogatory Number Nine:

State the basis of the allegations in Paragraph 27 of your Complaint, stating separately the acts or omissions of each defendant as required by L.R. 26.5(8)(c).

Answer to Interrogatory Number Nine:

Paragraph Number twenty-seven reads as follows:

"27. The conduct of the defendants amounts to the infliction of summary punishment and/or cruel and unusual punishment upon William Mosher, Jr."

Please see answers to Interrogatories numbered One through Four and answer to Interrogatory numbered Seven.

Interrogatory Number Ten:

State the basis of the allegations in Paragraph 46 of your Complaint, and in particular your allegation that the defendants acted in concert, stating separately the acts or omissions of each defendant as required by L.R. 26.5(8)(c).

Answer to Interrogatory Number Ten:

Paragraph Number forty-six reads as follows:

"46.    During all times material to this complaint Kenneth Nelson, Elizabeth Childs, Kathleen M. Dennehy, separately and in concert, acted under color of law, ordinances, and regulations of the Commonwealth of Massachusetts.  As a result of the aforesaid unconstitutional and illegal acts by said defendants, the plaintiff William Mosher, Jr., suffered death, conscious pain and suffering, loss of earnings, and anguish of mind.

The remaining plaintiffs suffered pain and suffering, loss of earnings, and anguish of mind."

Please see answers to Interrogatories numbered One through Four and answer to Interrogatory numbered Seven.

In addition, the defendants all swore an oath to the Commonwealth of Massachusetts and the Constitution of the United States to do all things possible to fulfill their obligations, responsibilities, and duties to the Commonwealth of Massachusetts, its citizens, residents, patients, and inmates. This includes providing a safe and secure environment for the custody, health, and treatment of mentally ill patients and inmates.

Moreover, the statutes listed in answer to interrogatory numbered One impose upon them obligations to provide a safe and secure environment for the custody, health, and treatment of mentally ill patients and inmates.

The failures, omissions, actions, and conduct described above amount to a violation of those oaths and duties. The failure to address the conditions that led to the death of William Mosher, Jr. constitutes deliberate indifference to a grave risk and the failure to take reasonable and available steps to address those failures.

<u>Interrogatory Number Eleven:</u>

State the basis of the allegations in Paragraph 52 of your Complaint, stating separately the acts or omissions of each defendant as required by L.R. 26.5(8)(c), and including the basis for each defendant's alleged motivation.

**Answer to Interrogatory Number Eleven:**

Paragraph Number fifty-two reads as follows:

"52. The aforementioned conduct of the individual defendants was conduct motivated by class-based invidiously discriminatory animus towards the class of persons who were patients at Bridgewater State Hospital, in the custody of the Commonwealth of Massachusetts, receiving treatment for

emotional disorders of which William Mosher, Jr. was a member."

The Americans with Disabilities Act of 1990 (ADA or Act) or Title 42 U.S.C. §§ 12101-12213 is intended to protect persons with disabilities, including those suffering from mental illness, from discrimination based on their disabilities.  Persons suffering from mental illness are to be accorded equal treatment under the law, consistent with their abilities, and may not be accorded less rights, opportunity, or deprived of life, liberty, or Due Process of Law because of their status in the community.

Mr. Mosher was, as were all patients at Bridgewater State Hospital, a member of the community at large and of the community of Bridgewater State Hospital.

Among other acts and ommissions described herein, the custom, policy, and practice of failing to address the free flow of critical information about patients and inmates, the custom, policy, and practice of maintaining low staffing levels and the "pull plan", the custom, policy, and practice of not requiring the replacement of a corrections officer in the unit while a corrections officer is "on break" and off the floor, the custom, policy, and practice of deference to low exclusion hours in order to attain JHACO accreditation; the custom, policy, and practice of allowing patients in their rooms with other patients or inmates without supervision, and the custom policy, and practice of permitting mentally ill patients to enter into "Contracts for Safety" as a means of placement within the facility constituted acts and ommissions motivated, designed, and based on the unique environment of the Bridgewater State Hospital that focused prinicipally on mental health to the detriment of providing a safe and secure environment for its residents.  These acts and ommissions were based on the fact that members of this community were mentally ill.

These acts and ommissions placed each of the patients at Bridgewater State Hospital in jeopardy of serious bodily harm and death and constituted invidious discrimnation under the law.

The acts and ommissions of the defendant deprived the community of the valuable talents of William Mosher, Jr., deprived William Mosher, Jr. of the public services of the Commonwealth of

23

Massachusetts, and failed to afford William Mosher, Jr. the
dignity he deserved and equal-citizenship stature.

Interrogatory Number Twelve:

State the basis of the allegations in Paragraph 58 of your
Complaint, stating separately the acts or omissions of each
defendant as required by L.R. 26.5(8)(c), and including the basis
for each defendant's alleged knowledge.

**Answer to Interrogatory Number Twelve:**

Paragraph Number fifty-eight reads as follows:

"58.  The defendants had knowledge that Bradley Burns
posed a serious and imminent threat to the health and safety
of inmates and patients, including William Mosher, Jr., at
the Bridgewater State Hospital."

Please see answers to all interrogatories.

Interrogatory Number Thirteen:

State the basis of the allegations in Paragraph 61 of
your Complaint, stating separately the acts or omissions of
each defendant as required by L.R. 26.5(8)(c).

**Answer to Interrogatory Number Thirteen:**

Paragraph Number sixty-one reads as follows:

"61.  The above stated conduct of the defendants
constituted a conspiracy prohibited by Title 42 U.S.C.,
section 1986 in that there was an agreement and/or a
concerted action by the defendants to commit the acts
prohibited."

The acts and conduct, omissions and deliberate indifference
above described were committed by all defendants in concert with
each other.  More specifically, but not limited to, the custom,
policy, and practice of failing to address the free flow of
critical information about patients and inmates, the custom,
policy, and practice of maintaining low staffing levels and the
"pull plan", the custom, policy, and practice of not requiring
the replacement of a corrections officer in the unit while a

24

corrections officer is "on break" and off the floor, the custom,
policy, and practice of deference to low exclusion hours in order
to attain JHACO accreditation; the custom, policy, and practice
of permitting mentally ill patients to enter into "Contracts for
Safety" as a means of placement within the facility, and the
practice of allowing patients in their rooms with other patients
or inmates without supervision were all acts in furtherance of a
conspiracy prohibited by Title 42 U.S.C., section 1986.

Interrogatory Number Fourteen:

State the basis of the allegations in Paragraph 62 of your
Complaint stating separately the acts or omissions of each
defendant as required by L.R. 26.5(8)(c), and including the basis
for each defendant's alleged intent.

**Answer to Interrogatory Number Fourteen:**

Paragraph Number sixty-two reads as follows:

"62. The conduct of the individual defendants was intended
and/or did deprive William Mosher, Jr., of equal protection
of law or of equal privileges and immunities under law
guaranteed in accordance with the Thirteenth and Fourteenth

Amendments of the Constitution of the United States and was
the direct and proximate cause of his death."

Please see answers to all interrogatories.

The murder of William Mosher, Jr. deprived him of the most
valuable, irreplaceable, and important right guaranteed by the
Constitution of the United States.  He was deprived of life
without Due Process of Law, was a victim of summary punishment by
all defendants, and was deprived of his right to equal treatment
under the law.

Interrogatory Number Fifteen:

If any of the plaintiffs communicated with defendants
Nelson, Dennehy, Childs and/or any other employees of the
Department of Correction, Bridgewater State Hospital or the
Department of Mental Health prior to August 28, 2004, identify

the parties to the communication, the date, the manner and the substance of those communications.

**Answer to Interrogatory Number Fifteen:**

The pliantiff is unable to answer this interrogatory other than to state that in the course of William Mosher's custody, William Mosher, Sr. may have reached out to Bridgewater State Hospital on occasion to verify some fact related to his son's custody, but cannot recall details at this time.

I, William Mosher, individually and as administrator of the Estate of William Mosher, Jr., under oath, upon information and blief, hereby certify that the above answers to interrogatories are true and accurate.

_____
William Mosher

I, Joseph J. Balliro, Jr., under oath, hereby certify that the above answers to interrogatories are true and accurate and that I have complied with the provisions of Rule 16.5 of the Local Rules of the United States District Court for the First District.

_____
Joseph J. Balliro, Jr.

Date:  June 24, 2008

26