UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM MOSHER, Individually and as administrator of the Estate of WILLIAM MOSHER, JR., CAROLYN MOSHER,<br><br>                                    Plaintiffs,<br><br>v.<br><br>KENNETH NELSON, Individually and as Superintendent of BRIDGEWATER STATE HOSPITAL, ELIZABETH CHILDS, Individually and as COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH, and KATHLEEN M. DENNEHY, Individually and as Commissioner of the COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF CORRECTION,<br><br>                                    Defendants. | CIVIL ACTION<br>NO. 04-12560-MLW |

**DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS**

**The Defendants**

1.      Defendant Kenneth Nelson was the superintendent of Bridgewater State Hospital ("BSH") from 1994 until April 2007.  (Deposition of Kenneth W. Nelson, May 21, 2008 ("Nelson Dep. I")[1] at 21:16-19.)  He has been employed continuously by the Department of Correction ("DOC") since November 1976.  *Id.* at 20:17-19.  Since April 2007, he has been assistant deputy commissioner for the Southern Sector of the DOC.  *Id.* at 21:19-22.

2.      Defendant Kathleen Dennehy was the commissioner of the Department of Correction from December 1, 2003 through May 6, 2007.  (Deposition of Kathleen M. Dennehy

---

[1] Attached as Exhibit 1.

("Dennehy Dep.")[2] at 7:4-7.) She previously had been a deputy commissioner since 1997. *Id.* at 6:18-22. The DOC commissioner is the CEO of a correctional system with approximately 11,000 offenders and 5,300 employees, not including contract employees. *Id.* at 13:16-14:17. The commissioner is responsible for the budget and overall management of the state correctional system. *Id.* at 13:22-24.

3.     The DOC commissioner does not have day-to-day supervision over BSH or the superintendent of BSH. *Id.* at 23:17-24:6, 73:3-10. Instead, the BSH superintendent reports to a DOC assistant deputy commissioner, who then reports to a deputy commissioner, who reports to the commissioner. *Id.* at 18:11-24.

4.     Defendant Elizabeth Childs was the commissioner of the Department of Mental Health ("DMH") from 2003 to 2007. (Deposition of Elizabeth Childs ("Childs Dep.")[3] at 8:13-15). DMH has no role at BSH other than to approve the DOC commissioner's appointment of a physician as medical director there. G.L. c. 125, § 18.

**Bridgewater State Hospital**

     **1.**     **A Unique Institution**

5.     BSH is a unique institution within the Commonwealth because it is both a prison and a mental hospital. (Nelson Dep. I at 19:12-21; Deposition of Daniel W. Comiskey ("Comiskey Dep.")[4] at 51:13-52:12; Dennehy Dep. at 31:1-33:9.) BSH is operated by DOC, G.L. c. 125, §§ 1(n), 11 and 18, but it functions differently from a mainstream prison. (Dennehy Dep. at 48.) Unlike a traditional prison, therapists and clinicians have significant input into the ultimate placement of a patient. *Id.* at 47:14-20. All security decisions have clinical, medical

---

[2] Attached as Exhibit 3.
[3] Attached as Exhibit 4.
[4] Attached as Exhibit 5.

and legal consequences, and all clinical, medical and legal decisions can have significant security and operational consequences. (Nelson Dep. I at 19:14-21.)

6.      Segregation, classification, and discipline procedures used in other DOC facilities are all limited at BSH. (Dennehy Dep. at 31:1-33:9, 38:11-22, 44:1-45:6); G.L. c. 123, § 21; 103 BSH 651(III)(M);[5] *see generally* G.L. c. 123.

7.      BSH is a strict-security environment, equivalent to a medium-security DOC facility. (Nelson Dep. I at 24:7-11.) There are two fences with razor wire and no-climb mesh around the perimeter, as well as a buried cable motion detection system. *Id.* at 25:10-17. There are motion detectors at a vehicle trap and a pedestrian trap. *Id.* at 25:18-26:3. Within the perimeter, there is an administration building, a commons building, a medical building, and several buildings (Building A, Building B, Building C, Max 1, and Max 2) which house patients and that vary in level of security. *Id.* at 24:7-27:3. There were no escapes from BSH during Nelson's thirteen-year tenure, but everyone is considered an escape risk. *Id.* at 60:16-61:18.

## 2.    <u>The Statutory Commitment Scheme</u>

8.      Every BSH patient admission is by judicial order based on a finding that the patient is a male who requires observation or treatment under strict security. (Deposition of Kenneth W. Nelson, May 28, 2008 ("Nelson Dep. II")[6] at 66:20-67:10; Comiskey Dep. at 40:2-9). Otherwise, a DMH or private facility could provide appropriate mental health treatment services without strict security. (Comiskey dep. at 40:7-9). Statutes governing admission to BSH include:

- G.L. c. 123, § 7(b), addressing "Commitment and retention of dangerous persons" and permitting heads of mental health facilities to petition for patients to be

---

[5] Dennehy Dep. Ex. 4, attached as Exhibit 6.
[6] Attached as Exhibit 2.

committed to BSH when "the failure to hospitalize in strict security would create a likelihood of serious harm by reason of mental illness";

- G.L. c. 123, § 8(b), addressing "proceedings to commit dangerous persons" and precluding commitment to BSH unless a court finds that "(1) such person is mentally ill; (2) such person is not a subject for commitment to any facility of [DMH]; and (3) the failure to retain such person in strict custody would create a likelihood of serious harm";

- G.L. c. 123, § 13, addressing "Transfer of dangerous males to Bridgewater state hospital," and requiring a finding by the superintendent of any public or private mental health facility that "failure to retain a male resident therein in strict security would create a likelihood of serious harm by reason of mental illness and that the person's violent behavior constitutes an emergency" and permitting emergency transfer to BSH while the petition and hearing process in §§ 7 and 8 are pursued;

- G.L. c. 123, § 15(b), permitting evaluations for competence to stand trial, and requiring a court determination that "such person is male and appears to require strict security";

- G.L. c. 123, § 16(a), governing "hospitalization of persons incompetent to stand trial or not guilty by reason of mental illness" and requiring a court determination that "the failure to retain him in strict security would create a likelihood of serious harm by reason of mental illness, or other mental defect";

- G.L. c. 123, § 18(a), governing "Hospitalization of mentally ill prisoners" and permitting prisoners already confined in detention facilities to be transferred to BSH if they are in need of hospitalization because of mental illness.

Persons who are not likely to cause serious harm in the absence of strict security are not sent to BSH. *E.g.*, G.L. c. 123, § 8(b).

### 3.    **Security Arrangements**

9.    Nearly everyone admitted to BSH has a history of violence against other people. (Nelson Dep. II at 66:15-19.) Typically a patient has been accused of a violent crime or acted violently against someone else or himself. *Id.* at 67:6-10. Approximately one quarter of the population at BSH are serving sentences for first degree murder, second-degree murder, manslaughter, or awaiting trial on one of those charges, or have been found not guilty of murder by reason of insanity. (Nelson Dep. I at 16:6-21.)

10.    It is a routine part of the admissions process to notify security personnel about patients with a history of violence. (Nelson Dep. II at 67:11-17.) Security personnel are aware of the level of threat that a person presents in a structured environment like BSH, but BSH takes universal precautions by recognizing that everyone at BSH is a high-risk individual and treating everyone as if he presents a high risk of harm to himself or someone else. (Nelson Dep. II at 68:16-69:19; Dennehy Dep. at 108:12-109:4.)

11.    Patients at BSH are generally housed in either the admissions unit, a minimum security unit, or a maximum security unit. The admissions unit consist of a maximum security unit on the first floor, B-1, where patients typically start, and a less-restrictive unit on the second floor, B-2. (Comiskey Dep. at 18:18-19:8, 26:10-13). In addition to B-1, BSH has two other maximum security buildings, Max 1 and Max 2, for patients who require closer monitoring because of their behavior or psychiatric status. *Id.*. at 26:10-13, 38:20-39:19. The maximum security units usually house between 25-30 people each. *Id.* at 18:13-17, 38:22-23. BSH also has three minimum security units, A-1, A-2 and C-1, which can house as many as 55 patients who have better behavioral control, are more stable, and require less monitoring. *Id.* at 17:23-24,

38:20-39:1.  Having more than one maximum security unit is necessary because some patients

have enemies, and part of managing patients is having the option to assign patients with conflicts

to different units even when they require the same level of monitoring.  *Id.* at 37:2-19.

      12.    The Max 2 unit (where the incident occurred) was a secure, stand-alone building

with individual patient rooms and some common areas.  (Nelson Dep. I at 31:5-32:6; Comiskey

Dep. at 24:15-18.)  Patients generally were not permitted to go into or remain in their rooms

during the day other than at count times, primarily because of the concern that they might

commit suicide.  A brief exception existed between the close of the 11:15 a.m. count and lunch

when the patients had a little bit more freedom to interact, including in each others' rooms.

(Nelson Dep. I at 35:2-37:24, 40:1-16; Nelson Dep. II at 71:6-18.)

      13.    BSH also has an Intensive Treatment Unit ("ITU") that "may only be used in

cases of <u>emergency</u>, such as the occurrence of, or serious threat of, extreme violence, personal

injury, or attempted suicide[.]"  G.L. c. 123, § 21, third para. (emphasis supplied); *see* 103 BSH

651(III).  The ITU is a separate unit in the medical building that can hold up to 16 patients in

seclusion in individual cells with locked steel doors, although if more cells are necessary patients

can be secluded on other units.  (Comiskey Dep. at 19:9-20, 31:21-33:6; Nelson Dep. I at 45:11-

16)  Patients in the ITU are constantly monitored by a specially trained mental health worker by

either video camera or one-to-one observation.  (Nelson Dep. I at 47:3-17.)  The ITU is more

likely to contain patients who are on evaluation status; patients who are committed will hopefully

within some reasonable time frame achieve greater clinical stability such that they will not be

residing in the ITU for long periods of time.  (Comiskey Dep. at 26:14-22.)

      14.    The decision to assign a patient to the ITU is a clinical decision that can only be

made by medical personnel, although correctional staff have the ability to place a patient there

briefly while awaiting evaluation by medical personnel.  (Comiskey Dep. at 58:13-59:16);  G.L.

c. 123, § 21, third and seventh para.; 103 BSH 651(III)(B).  Assignment to the ITU is valid for

only three hours, at which time the patient must be evaluated again by medical personnel to

determine whether continued seclusion and/or restraint is warranted for an additional three hours.

G.L. c. 123, § 21, seventh para.; 103 BSH 651(III)(C).  Seclusion or restraint for any reason not

specified in G.L. c. 123, § 21 is not permissible in any mental health facility in the

Commonwealth, including BSH.  G.L. c. 123, § 21, tenth para.

**Burns' Admission to BSH**

15.    On August 8, 2004, Burns was referred to BSH pursuant to G.L. c. 123, § 18(a).

(Comiskey Dep. at 77:17-78:8; Prisoner Data Sheet, Comiskey Dep. Ex. 3.[7])  The Prisoner Data

Sheet indicated that Burns had escaped from McLean Hospital, Mt. Auburn Hospital, and

HRI/Arbour Hospital, in some cases by taking hostages, and that he assaulted personnel at a

McDonalds restaurant.  (Comiskey Dep. Ex. 3.)  Burns had been in the ITU prior to his

arraignment on August 9.  (Comiskey Dep. at 77:19-78:3.)  After his arraignment on August 9,

Burns returned to BSH under G.L. c. 123, § 15(b) for evaluation to determine his competence to

stand trial and his criminal responsibility.  *Id.* at 78:9-17.

16.    On August 10, Burns was evaluated on the B-1 unit by Dr. Daniel Comiskey, an

attending psychiatrist at BSH employed by UMass Medical Center, not by DOC or BSH.  *Id.* at

11:22-23, 47:10-22, 77:13-16.  Dr. Comiskey was aware that Burns had escaped from three other

hospitals, had taken people hostage using ligatures to escape, and had attempted to strangle

someone at a McDonalds; and Dr. Comiskey was aware of the prior Section 18(a) referral.  *Id.* at

---

[7] Attached as Exhibit 8.

85:13-20, 90:13-91:16; BSH Admission Assessment II, Comiskey Dep. Ex. 1;[8] Comiskey Dep. Ex. 3.)

17.    Dr. Comiskey recognized Burns' behavior as bad, but believed it was goal-directed, meaning that Burns took people hostage to escape, but there was no indication that he harmed anyone once he did escape.  (Comiskey Dep. at 128:16-129:2.)

18.    At the time he evaluated Burns, Dr. Comiskey did not have any concern that there was a need to contact the superintendent about Burns.  *Id.* at 84:18-20.

19.    Based on his evaluation, Dr. Comiskey decided that Burns could remain assigned to B-1, one of the three maximum security units at BSH.  *Id.* at 26:6-13, 88:4-13.

20.    Dr. Comiskey was also aware that Burns had been seen at the DMH Lindemann Center and Westborough State Hospital, as well as in a previous visit to Arbour/HRI.  *Id.* at 98:3-13.  In order for medical information to be released from DMH or a private mental health facility, however, the patient must sign a release.  *Id.* at 97:6-12, 98:19-99:10; *see, e.g.*, G.L. c. 123, § 36; G.L. c. 66A.  Case administrators at BSH (not the treating psychiatrist) routinely ask patients to sign release forms so BSH can fax requests for records to these facilities, and Dr. Comiskey's understanding was that this practice was followed in Burns' case.  (Comiskey Dep. at 98:19-99:10, 99:20-100:3.)

21.    During his meeting with Dr. Comiskey on August 10, Burns indicated that he was concerned about his safety, and Dr. Comiskey discussed with Burns that if he felt that he was at risk of harming himself or acting violently toward other people, he should talk to BSH staff before doing so, and Burns agreed.  *Id.* at 103:6-108:6.  The shorthand Dr. Comiskey used to describe such a discussion is "contract for safety."  *Id.* at 107:11-13.

---

[8] Attached as Exhibit 7.

22.     On August 13, 2004, records indicate that Burns told a staff person that he felt unsafe on B-1, that he feared he would be raped or attacked, and that others were threatening him. *Id.* at 116:9-20.   Such claims are not unusual among mentally ill patients, and as a result, Burns was transferred from B-1 to Max 2, another maximum security unit at BSH. *Id.* at 117:2-19.  When such claims are made, it is routine for security staff to assess the situation as well as medical personnel. *Id.* at 117:20-118:5.

**August 28, 2004**

23.     On August 28, 2004, reports indicate that Mosher entered Burns' room after the 11:15 a.m. count, and that Burns strangled Mosher with a tee shirt.  (Nelson Dep. II at 70:7-15.)

24.     This was the first time during Nelson's tenure at DOC, dating back to 1976, that a patient at BSH had killed another patient.  (Affidavit of Kenneth Nelson ("Nelson Aff."),[9] ¶ 2.)

25.     BSH houses between 260 and 340 patients at any given time.  (Nelson Dep. I at 42:2-5.)  There are approximately 3-6 admissions each weekday, 650-750 admissions each year, and Nelson was not able to keep track of every patient unless there was something outstanding about that patient or the reason for his admission.  (Nelson Dep. II at 65:11-66:9.)

26.     Nelson did not know who Burns was prior to August 28, 2004, but he did know who Mosher was.  He knew who Mosher was because he was a difficult-to-manage individual who had been in and out of the ITU, and had assaulted a nurse with urine and feces. *Id.* at 64:4-15.  Nelson was not aware of any prior difficulties between Mosher and Burns. *Id.* at 75:8-15.

27.     A BSH staffing analysis conducted in 2000 indicated that three correction officers should be assigned to the Max 2 unit.  (Nelson Aff., ¶¶ 3-4 and Ex. A.)  On August 28, 2004, four officers were assigned to the Max 2 unit. *Id.*, ¶¶ 5-6 and Ex. B.

---

[9] Filed concurrently.

28.     Ligatures were considered contraband at BSH, and staff conducting searches were trained to find ligatures or items that look like the makings of ligatures, such as ripped sheets. (Nelson Dep. II at 41:13-23.)  Unfortunately, ligatures can be made out of virtually anything, such as the tee shirt Burns used to kill Mosher.  *Id.* at 36:22-37:1.

29.     Mosher was a pretrial detainee at the Middlesex Jail sent to BSH for observation pursuant to G.L. c. 123, § 18(a) on July 24, 2004.  (July 24, 2004 Order of Commitment.)[10]  The 30-day observation period was extended for six months on August 12, 2004.  (August 12, 2004 Order of Commitment.)[11]

30.     The mental health clinicians at BSH worked for UMass Medical Center, not BSH. (Comiskey Dep. at 11:4-20, 47:10-22.)

31.     The superintendent could not assign Burns to the ITU other than as a temporary measure until he could be evaluated by medical personnel.  *Id.* at 58:13-59:6.

32.     Patients at BSH generally were not permitted to go into their rooms during the day, primarily because of the concern that they might commit suicide, but a brief exception existed between the close of the 11:15 a.m. count and lunch when the patients had a little bit more freedom to interact, including in each others' rooms.  (Nelson Dep. I at 35:2-37:24, 40:1-16; Nelson Dep. II at 71:6-18.)

33.     Commissioner Dennehy reasonably delegated responsibility for maintaining reasonable patient safety in the unique BSH environment to the superintendent and the associate deputy commissioner responsible for that institution, recognizing that these subordinates had extensive correctional experience.  (Dennehy Dep. at 72:7-74:22.)

---

[10] Attached as Exhibit 9.
[11] Attached as Exhibit 10.

34.     Dennehy was not involved in the development of the ITU, but her understanding was that it was an attempt to create some level of intensive treatment and supervision that went to the limit permissible by law.  *Id.* at 49:12-50:3.  She believed that a greater ability to segregate patients was necessary, *id.* at 54:20-55:6, and she attempted to get the law changed to permit segregation at BSH to give the administrators a fuller range of options, *id.* at 102:20-103:18, but those legislative proposals were unsuccessful.

Respectfully submitted,

KENNETH NELSON, Individually and as Superintendent of BRIDGEWATER STATE HOSPITAL, ELIZABETH CHILDS, Individually and as Commissioner of the COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF MENTAL HEALTH, AND KATHLEEN M. DENNEHY, Individually and as Commissioner of the COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF CORRECTION

By their attorneys,

MARTHA COAKLEY
ATTORNEY GENERAL


s/Daniel G. Cromack_____
Ronald F. Kehoe (BBO# 264260)
Daniel G. Cromack (BBO#652252)
Assistant Attorneys General
Government Bureau/Trial Division
One Ashburton Place, Room 1813
Boston, MA 02108
(617) 727-2200

August 15, 2008

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 15, 2008.


/s/ Daniel G. Cromack_____
Daniel G. Cromack
Assistant Attorney General

# O'BRIEN&LEVINE

Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

## William Mosher v. Kenneth Nelson, et al.

Transcript of the Testimony of:

# Kenneth W. Nelson

# May 21, 2008

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Cindy M. Falcon  29284

Kenneth W. Nelson 5-21-2008
William Mosher v. Kenneth Nelson, et al.

14

1  without at least first speaking to a staff
2  member and expressing to that staff member that
3  that individual feels as if he or she is losing
4  control and might injure themselves.
5  Q  Did you come to an understanding of what a
6  contract for safety is as a consequence of your
7  training in any of these mental health programs?
8  A  I would say partially training and partially
9  through my day-to-day work with clinical staff
10  members over the years.
11  Q  Is this understanding you have the same
12  understanding you had in 2004?
13  A  Probably.
14  Q  Did you understand in 2004 that a contract for
15  safety was being employed by psychiatric teams
16  at Bridgewater State Hospital with mentally ill
17  patients?
18  A  It's shorthand for an agreement or an
19  understanding that a clinician has with a
20  patient, and it's a term that was used at that
21  particular time.
22  Q  Did you understand in 2004 that it was being
23  utilized for individuals admitted as a result of
24  criminal charges brought against them for

15

1  attempted murder?
2  A  Not specifically, but it was a term that was
3  used generally with patients that were at
4  Bridgewater State Hospital.
5      And the range of offenses that people at
6  Bridgewater were charged with ranged from murder
7  to less serious property offenses.
8  Q  We'll get into greater detail about Bridgewater,
9  but in the context of this contract for safety
10  or an agreement, however you'd like to label it,
11  was it also used for persons who were committed
12  to Bridgewater State Hospital as a consequence
13  of criminal convictions, if you know?
14  A  Most likely.
15  Q  In 2004?
16  A  Yes.
17  Q  In 2004, did you have any persons who were
18  admitted to Bridgewater State Hospital after
19  conviction of a criminal offense?
20  A  Absolutely.
21  Q  Can you tell me now whether or not in 2004 you
22  had any persons committed at Bridgewater State
23  Hospital after conviction for first-degree
24  murder?

16

1  A  Most likely.
2  Q  Do you have any specific memory of any?
3  A  No.  I will tell you that, just yesterday, I
4  looked at the profiles of the patients at
5  Bridgewater State Hospital.
6      And as of yesterday, roughly a quarter of
7  the population was either serving a natural life
8  sentence for murder first-degree in addition to
9  their civil commitment to Bridgewater State
10  Hospital, or some other, or murder second-degree
11  or manslaughter, or they were awaiting trial on
12  one of those charges or they had been found not
13  guilty by reason of insanity for murder.
14      So having people in the population that had
15  either been accused of or were awaiting trial
16  for or had been NGI for murder was certainly not
17  uncommon.
18  Q  Would you expect that would not have been
19  uncommon in 2004?
20  A  I would say that probably the percentage was at
21  least equal to what I saw yesterday.
22  Q  If we can go back to the training that you
23  discussed in mental health concerning
24  identifying people who are mentally ill, am I

17

1  correct in assuming that admissions to
2  Bridgewater State Hospital are principally
3  admissions of persons who have exhibited some
4  form of mental illness?
5  A  Primarily, but not necessarily exclusively.
6  Q  So are there people at Bridgewater State
7  Hospital who have not exhibited indicators of
8  mental illness?
9  A  It's possible.
10  Q  And is the training that you received for
11  identifying people who are mentally ill designed
12  to give you some basis for determining if a
13  particular admission needs mental health
14  services?
15  A  No, no.  I mean, if a person is sent to
16  Bridgewater State Hospital, they're sent
17  pursuant to a judge's order, and the judge
18  specifies in the order the type of evaluation
19  that the judge wants.
20      So my role as an administrator at
21  Bridgewater State Hospital, I would not be
22  involved in determining the type of services or
23  evaluation that a patient would receive.  Type
24  of evaluation would be dictated by the judge's

5 (Pages 14 to 17)

Kenneth W. Nelson 5-21-2008
William Mosher v. Kenneth Nelson, et al.

**18**

1    order, and the type of services that the patient
2    received would be exclusively within the purview
3    of the clinical staff at the institution.
4    **Q   Describe for me then the purpose of that**
5    **training that you underwent to identify people**
6    **who are mentally ill.**
7    A   The people that attended the training included
8    line staff, supervisor, from not only
9    Bridgewater State Hospital, but from all other
10   DOC institutions.
11       And that's because a large percentage of
12   the DOC population suffers from mental illness.
13   It's been estimated from anywhere from about
14   maybe 14 to 18 percent of our 11,000 inmates do
15   have a major mental illness.  So it's important
16   for all staff to be able to identify people that
17   might be at risk of harm to self or others by
18   reason of mental illness, so that they can make
19   the appropriate referrals.
20       Training regarding mental illness is
21   provided to all new staff through recruit
22   training class, through orientation, new
23   employees, and it's part of the in-service
24   basic, in-service training that's provided to

**19**

1    all staff annually.
2    **Q   Did you receive this training in mental health**
3    **before the year 2004?**
4    A   Oh, I've received a lot of training over the
5    years on various mental health issues.  I just
6    use that as an example.
7    **Q   How did you employ all the training you had in**
8    **mental health in 2004?  What did you use it for?**
9    A   Well, as an administrator at the Bridgewater
10   State Hospital, I'm primarily responsible for
11   the security and operation of the institution,
12   and Bridgewater is a rather unique institution
13   within the Commonwealth.
14       And one of the things that makes it unique,
15   not the only thing but one of the things, is
16   that any security or operations decision that's
17   made has significant clinical and medical and
18   perhaps legal consequences.  And conversely, any
19   clinical, medical or legal decision that's made
20   has or can have significant security and
21   operational consequences.
22       So you really, as an administrator, or as a
23   leader at that institution, whether you're on
24   the clinical side or the security and operations

**20**

1    side, you have to have a pretty good
2    understanding of the entire operation and of the
3    different issues that impact on the operation.
4    **Q   Do you have any military background?**
5    A   No.
6    **Q   Describe your employment from college forward.**
7    A   Well, when I got out of college in '73, I
8    started working in a sheet-metal shop.  I worked
9    there for seven or eight months.
10       I then went to work for the DOC in the
11   spring of '74.  I worked as a correction officer
12   at MCI Framingham for a relatively short period
13   of time.  I then left Framingham to move to
14   Illinois to attend SIU.
15       Upon my return from SIU in April of '76, I
16   worked for a short period of time as a cab
17   driver.  I then started working for the DOC in
18   November of 1976, and I've been employed
19   continuously with the DOC since November '76.
20       I started working initially as what's now
21   called a correctional program officer at MCI
22   Norfolk.  I worked there from November '76 until
23   November of '79.
24       In November of '79, I went to MCI Concord,

**21**

1    and I worked as what would probably be now
2    called a CPOCD, which is basically a supervisor
3    of correctional program officers, and I worked
4    there from 1979 until 1983.
5        In 1983 I returned to MCI Norfolk as the
6    director of treatment.  In 1985 I was promoted
7    to the position of Deputy Superintendent at MCI
8    Norfolk, and I continued in that position until
9    1991.
10       In 1991 I worked for a few months as acting
11   administrator of the Northeastern Correctional
12   Center in Concord.  Later on in 1991, I worked
13   as Deputy Superintendent at the Old Colony
14   Correctional Center in Bridgewater.
15       In 1992 I began working as Superintendent
16   at Bay State Correctional Center.  In 1994 I
17   began working as the Superintendent at
18   Bridgewater State Hospital.  I remained in that
19   position until April of 2007.  And since April
20   of 2007, I've served as Assistant Deputy
21   Commissioner for the Southern Sector of the
22   Department of Correction.
23   **Q   Correctional program officer, is that a**
24   **corrections officer?**

6 (Pages 18 to 21)

Kenneth W. Nelson 5-21-2008
William Mosher v. Kenneth Nelson, et al.

22

1   A   No.
2   Q   What is it?
3   A   It depends where you work.  At most sites it
4       involves working with inmates regarding their
5       classification.  They're also at multiple sites
6       what we call CRPUs, which are criminal records
7       processing units.
8           CPOs work in the CPUs, and at two sites,
9       South Middlesex Correctional Center and
10      Pondville Correctional Center, the only people
11      that work there are CPOs, so they do both
12      classification and security.
13  Q   What's a CPOCD?
14  A   That's a supervisor.
15  Q   What's the CD stand for?
16  A   Beats me.  I think it's A, B, C, D.  AB is like,
17      or A is perhaps the entry level position, and B
18      IS like a first-line supervisor, and CD is a
19      higher rank.  I could have the thing all
20      flip-flop.  It could be CD is the entry level.
21      I have to be honest with you.  I'm not really
22      totally up to speed on the letters that follow
23      the CPO designation.
24  Q   In any of these positions that you held, did you

23

1       ever work as an actual corrections officer?
2   A   Only initially when I worked at Framingham.
3   Q   That's in 1974?
4   A   That's correct.
5   Q   How long was that position?
6   A   I think about four months.
7   Q   I think you testified in 1974 you worked as a
8       corrections officer in MCI Framingham?
9   A   That's correct.
10  Q   Is that when you went to Southern Illinois, '74
11      to '76?
12  A   Yeah, I left, I left that job probably around
13      the 1st of August.
14  Q   And when you came back in 1976, you worked as a
15      cab driver?
16  A   Yes, from April of '76 until October or November
17      of '76.  I've done a little bit of consulting
18      work over the years, very little.
19  Q   What was that focused on?
20  A   Pardon?
21  Q   What was that focused on?
22  A   American Correctional Association doing
23      accreditation audits of prisons.
24  Q   Are you a member of the American Correctional

24

1       Association?
2   A   I was.  I'm not anymore.
3   Q   Are you a member of any other associations?
4   A   Not related to corrections.
5   Q   Describe the physical environment of Bridgewater
6       in 2004.
7   A   Well, under the statute, it's considered strict
8       security.  And perhaps by mental health
9       standards it's strict security, but by
10      Department of Correction standards it's
11      considered a medium-security environment.
12          It's what we would call campus style in
13      that it has multiple buildings that aren't
14      connected that are inside of a secure
15      perimeter.  So there's certain amount of
16      physical freedom, lack of physical barriers
17      internally, but there's a very secure perimeter
18      around the campus.
19  Q   How are your artistic skills?  Could you draw an
20      overview of the environment there?
21  A   I've done it for many people many times.
22  Q   I always ask that first.  Otherwise it's
23      useless.  An overhead view of the layout.
24  A   The layout is very simple, and on what we call

25

1       the minimum side of the institution, the
2       buildings are identified by letter, A, B and C.
3       There are two floors on every building.  The
4       first floor is called 1, the second floor is
5       called 2.
6           So the units are designated by the building
7       letter and the floor.  So for instance in A
8       building, you'd have Unit A-1, Unit A-2, et
9       cetera.
10          This is the secure perimeter.  It consists
11      of two fences, and on the fences we have razor
12      wire.  We have what's referred to as rat wire or
13      no-climb mesh.  It's a very fine mesh that's on
14      the inside fabric, which makes it extremely
15      difficult to climb.
16          In addition to that, there's a buried cable
17      which serves as a motion detection system, and
18      with two means of entrance and egress into the
19      institution.  One is by the administration
20      building, and I'm going to label it PT.  That's
21      the pedestrian trap.  And the other one is over
22      here.  That's called the vehicle trap.
23          And at these gates there's also microwave,
24      which serves as a motion detection.  On the roof

7 (Pages 22 to 25)

Kenneth W. Nelson 5-21-2008
William Mosher v. Kenneth Nelson, et al.

26

1   of the administration building there's also
2   microwave to serve as motion detection. So
3   that's the ad building.
4       Over here we have A Building in the middle,
5   we have B Building over here, we have C Building
6   over here. We have a large building that's
7   referred to as the commons building. In the
8   commons building is the inmate dining room
9   called the IDR. We have a gym, and we have a
10  library, classrooms, chapel, et cetera. There's
11  also a basement in the commons building, and
12  that's where the central tool room is for the
13  institution.
14      We also have, and I didn't draw these in,
15  we have modular buildings over here. These are
16  really badly drawn. This is called the min-mod
17  because it's we consider this the minimum end of
18  the institution. There is another modular
19  building over here which is called the max-mod
20  because it's in what's considered the maximum
21  area of the institution.
22      There is a medical building which is here,
23  and in the medical building is the Intensive
24  Treatment Unit or ITU, the infirmary, and

27

1   MedWest.
2       And then we have two max units. We have
3   Max 1 and we have Max 2.
4   Q   Could you date and sign that for me?
5   A   Sure.
6       (Exhibit No. 1 marked for identification.)
7   Q   Showing you the diagram that you just drew which
8       is marked Exhibit 1, upon admission of a person
9       at Bridgewater State Hospital in 2004, where
10      would that person initially be taken for
11      evaluation?
12  A   Well, the person would normally come into the
13      institution through the vehicle trap. They'd be
14      dropped off here at the medical building, they'd
15      be brought into the ITU, and they'd be assessed
16      in the ITU.
17      And the assessment would, depending on the
18      time of day they came in, but it would be by a,
19      normally by a nurse, a medical doctor, and a
20      psychiatrist, who is also a medical doctor. And
21      the person would be also booked in by a
22      correction officer.
23      If the person came in after ten PM at
24      night, then it would just be a nurse, a

28

1   correction officer, and a medical doctor. The
2   psychiatrist wouldn't be available after ten
3   PM. Most admissions, though, occur prior to ten
4   PM.
5   Q   Can you tell me generally how soon after a
6       person's admitted and brought to the medical
7       building is he assigned a unit?
8   A   It would vary, depending on the number of
9       admissions. It wasn't unusual then for a
10      vanload to come in. Because you can only see
11      one patient at a time, it could take a while for
12      everyone to be assessed. So it could be several
13      hours before a decision was made regarding
14      housing.
15  Q   For those patients brought in after 10:00, would
16      they remain on the medical unit until the next
17      day, or would they be assigned a unit and
18      transferred from the medical building to that
19      unit that evening?
20  A   Either-or, depending on what needs they
21      presented with. If the admitting doc thought
22      that they might be at risk of harm to self or
23      others, imminent risk of harm to self or others,
24      the doctor could write a seclusion order, in

29

1   which case they'd be housed in the ITU.
2       If the doc thought that the individual had
3   medical needs that required placement in a
4   subacute care environment, the doc could write
5   an order for admission into the infirmary.
6       If the doc thought that neither of those
7   conditions existed, the patient would be moved
8   to the admissions unit.
9   Q   So if a patient comes in after 10:00, there
10      would or would not be a doctor or psychiatrist
11      available to evaluate the person?
12  A   There would be a medical doctor, but not a
13      psychiatrist normally.
14  Q   And the medical doctor was empowered to make
15      decisions on seclusion and restraint or
16      infirmary?
17  A   Yes.
18  Q   Did the medical doctor in 2004 that made those
19      kinds of decisions have psychiatric training?
20  A   Well, we had a variety of different doctors that
21      worked the hours after ten PM at night, and it's
22      my understanding and belief that all of those
23      doctors had training with respect to the
24      identification and management of mentally ill

§ (Pa

8 (Pages 26 to 29)

Kenneth W. Nelson 5-21-2008
William Mosher v. Kenneth Nelson, et al.

---

30

1   persons.
2   Q  Describe for me the distinction you made between
3      medical doctor and psychiatric doctor.
4   A  Well, medical, a psychiatrist is a medical
5      doctor who is either board certified or eligible
6      to be board certified in the discipline of
7      psychiatry, whereas a medical doctor is a doctor
8      who is licensed to practice medicine in the
9      Commonwealth of Massachusetts, but is not
10     necessarily board certified in psychiatry or
11     eligible to be board certified in psychiatry.
12  Q  So by what you've just explained to me, after
13     10:00 a medical doctor who is not certified in
14     psychiatry, not qualified to be certified in
15     psychiatry, would make decisions about the
16     placement of individuals who came in after 10:00
17     into units?
18  A  That's correct.
19  Q  I need you to make another drawing for me since
20     you did so good on Exhibit 1, if you could.
21     Could you draw for me using obviously as much of
22     the paper as possible the interior of the Max 2
23     units in 2004?
24  A  This might be a little bit harder.

---

31

1   Q  If you make an error in size or dimension we can
2      do it over, if you're not --
3   A  That's okay. I'll send you something.
4   Q  You're not married to this.
5   A  This drawing really is bad. Something like
6      that. That area is much too big. It's not
7      proportional to the rest of the building. It's
8      shaped similar. The building is more like a T.
9         Again, this area is way out of proportion,
10     but essentially you have two main -- you have an
11     entrance through a sally port. It's controlled
12     by an officer that's at this post. You walk
13     into a central lobby, sort of, and then you have
14     two corridors, B corridor and A corridor, and
15     all of the patient rooms are on one of these two
16     corridors.
17        On this corridor, B corridor, you have a
18     day room. Behind the day room you have the
19     treatment team offices. On A corridor you have
20     what's called the TV room. You also have an
21     office over here. You have the laundry room or
22     a laundry room. I don't think it's used as a
23     laundry anymore. And then you have patient
24     rooms here.

---

32

1      On C corridor you have a shower, you have a
2      toilet, and you have a gate, and the rest of the
3      rooms down here formerly used as patient rooms
4      are not rooms.
5   Q  Is this how it appeared, was configured in 2004?
6   A  Yes, something like that.
7   Q  Could you date and sign that as well?
8   A  Yes.
9      (Exhibit No. 2 marked for identification.)
10  Q  Now, the rooms that you've identified as patient
11     rooms, did they have doors on them that could be
12     locked?
13  A  Yes.
14  Q  And from what I understand -- correct me if I'm
15     wrong -- in 2004 the doors to the patients'
16     rooms were open at seven AM and shut at 9:30 PM?
17  A  I think that's generally true, yes.
18  Q  Could the doors be manually closed by the
19     patients?
20  A  Yes.
21  Q  Could they be locked by the patients?
22  A  No.
23  Q  Was there a mechanism on Max 2 for closing all
24     the patients' doors at once in an emergency?

---

33

1   A  No.
2   Q  And at 9:30, if we assume that's when all the
3      patients' rooms were closed, would it require
4      then a corrections officer to physically go down
5      and close each door?
6   A  Yes, to physically close it and to lock it.
7   Q  And to lock it?
8   A  Yeah.
9   Q  And is that the mechanism that is the large
10     steel key that has the lock on the door that you
11     put in a door and turn you would see in a
12     facility?
13  A  No.
14  Q  Is it a locking mechanism?
15  A  It's not what we would call a big-bit key. It's
16     a much smaller key. It's not necessarily the
17     same type of lock you have on the front door of
18     your house, but it's a similar lock with a
19     similar key. It's not a big-bit prison type
20     key.
21  Q  Could it be described as some type of deadbolt?
22  A  Yeah, yes.
23  Q  Assuming that the doors are locked after 9:30,
24     is there any way for a patient to unlock the

9 (Pages 30 to 33)

Kenneth W. Nelson 5-21-2008
William Mosher v. Kenneth Nelson, et al.

**34**

1    door from the inside?
2    A  You can break the door down.  We've had that
3    happen.
4    Q  What are the doors constructed of?
5    A  Wood, and they've had steel plates put over them
6    over the years to make it more difficult to
7    break down.
8    Q  Are they slide-type doors?
9    A  No, they're similar to a door that you would
10    have to an office or a room in your house.
11    They're wooden doors with an observation window.
12    Q  How large of an observation window?
13    A  Goodness, I would guess that they're probably
14    maybe six by 12 inches.
15    Q  Solid-core or hollow-core door?
16    A  I believe they're solid-core doors.
17    Q  And we are addressing what you understand was
18    the configuration in 2004, correct?
19    A  That's correct.  I believe in -- actually, I
20    don't recall if the doors had steel on them in
21    2004.
22    Q  Was there in 2004 any prohibition against
23    inmates between seven AM and 9:30 PM entering
24    their room and closing their doors?

**35**

1    A  Could you repeat that question?
2    Q  Was there any prohibition against inmates
3    between seven AM and 9:30 entering their room
4    and closing their doors?
5    A  I believe that other than -- it would depend on
6    the status that an inmate was on.  If an inmate
7    was on what was called special treatment status,
8    an inmate or a patient rather could go into his
9    room and shut the door but not lock it.
10    I believe that other patients who are not
11    on special treatment status could not go into
12    their rooms and shut their doors, except for at
13    count time.
14    Q  Who would determine whether or not a particular
15    patient was on special treatment status?
16    A  A psychiatrist.
17    Q  Were you aware in 2004 what goes into a decision
18    on whether or not a patient is on special
19    treatment status?
20    A  Yes.
21    Q  What was it?
22    A  Basically, it was someone who presented a high
23    risk of harm to either himself or to someone
24    else, but who did not require the level of

**36**

1    supervision and control that was provided to
2    someone that was on seclusion status.
3    Q  Do you know who Bradley Burns is?
4    A  Yes.
5    Q  Was he on special treatment status on August 28,
6    2004?
7    A  I don't believe so.
8    Q  So as a result, he could or could not go into
9    his room and close his door?  Which one?
10    A  He could not go into his room and close his
11    door.  Typically, the only time patients would
12    be allowed to do that would be at count time.
13    Q  Why?
14    A  Because we're primarily concerned at that time
15    with inmates or patients going into their rooms
16    and killing themselves.
17    Q  I'm sorry, I'm missing a little bit of the logic
18    associated with that statement.
19    You said they're allowed to go in and close
20    their doors at count time?
21    A  They have to go into their rooms.  When we take
22    a count, there are two places people can be
23    counted.  One is in their room, standing, or in
24    what we call an out-count area, and there are

**37**

1    only certain areas in the intuition that are
2    designated as out-count areas.
3    If a person is going to be placed in an
4    out-count area during a major count, that has to
5    be approved by the shift commander, I believe
6    it's an hour before the count occurs, so it's
7    common every day for people to be in out-count
8    areas.
9    Typically it's people that are either
10    working in the kitchen that are getting a meal
11    prepared or people that might be on a visit, an
12    attorney visit or in the visiting room.  But
13    other than that, the expectation is that you're
14    going to be in your room standing for the count.
15    Q  So how does suicide prevention play into the
16    issue of them being in their rooms with the door
17    closed during count?
18    A  Well, if they're allowed into their rooms at
19    other times other than count time by themselves,
20    the concern was that they could use that
21    opportunity to kill themselves.
22    Q  So was there then a prohibition against patients
23    being in their rooms at times other than count?
24    A  In that particular unit, yes.  What would happen

10 (Pages 34 to 37)

Kenneth W. Nelson 5-21-2008
William Mosher v. Kenneth Nelson, et al.

**38**

1  is that we'd call five minutes, and this was the
2  way it was done then, we would call five minutes
3  to count. That would be broadcast throughout
4  the entire institution.
5  Patients, all patients, including those on
6  the max units, would be expected to go to their
7  rooms for the count. The doors to their rooms
8  would then be closed. There would be an
9  officer, two officers involved in the count.
10  One would stand at the end of the corridor to
11  insure that no one left their room during the
12  count.
13  The second officer would actually go down
14  and physically observe the patients in their
15  rooms. That served two purposes; one, to make
16  sure that or to find out how many bodies were
17  actually in the unit and that the bodies were or
18  appeared to be in good condition, that there
19  weren't any obvious signs of injury.
20  That officer would then go down one side,
21  up the other, report in a count to this officer
22  in the trap. He would then go down the other
23  side, do the same thing with the second officer
24  posted up here to make sure no one left their

**39**

1  rooms.
2  The count would then be telephoned in to
3  the control center -- no, not in 2004. It would
4  be entered into a computer, and the count would
5  then be verified by the shift commander
6  formally. And once the count for the entire
7  institution had been verified, the count would
8  be over with, and then we'd begin feeding.
9  After count at 7:05 in the morning, we
10  would start feeding breakfast. After the count
11  that began at 11:15, we'd start feeding lunch.
12  And after the count that occurred at 5:00, we'd
13  begin feeding supper.
14  Q  How long would the count take?
15  A  It could take anywhere 20 minutes, normally 15
16  to 20 minutes, but if there was a problem with
17  the count, it could take a lot longer than
18  that. But normally it was 15 to 20 minutes.
19  Q  How would you let the patients know that counts
20  were to occur?
21  A  There was a broadcast that would come over the
22  PA system saying that the count was over, and
23  then the officer in charge would normally tell
24  the patients that the count was over with.

**40**

1  Q  Signaling that they should exit their rooms?
2  A  They could leave their rooms or they could stay
3  in their rooms. It was a transition period from
4  when patients, from when the count ended to when
5  patients went to the dining room for a meal.
6  Q  So there was an exception during this transition
7  period to the policy, custom, rule or regulation
8  that they're not supposed to be in their rooms
9  during --
10  A  Right. Normally, sometimes they'd stay in their
11  rooms or come out in the corridor, or they could
12  go into the TV room. But it was like a -- it
13  was a time where there was a bit more freedom of
14  movement inside with respect to whether or not
15  they wanted to stay in their rooms, stay in the
16  corridor, go to the TV room.
17  Q  Why would that freedom be given to them?
18  A  I don't know. It was a practice that had been
19  long established and in the institution, at
20  least in those units.
21  Q  Do you know how many residents were on Max 2 on
22  August 28, 2008?
23  A  No.
24  Q  What's the maximum residents for that unit?

**41**

1  A  I believe it's 32.
2  Q  Can you give me any kind of sense of -- it's
3  going to be a difficult question to answer, I
4  understand that, but I'm trying to get a sense
5  of how many residents were housed at Bridgewater
6  State Hospital annually.
7  I know it's flexible because you have them
8  coming in and out, but is there any way you can
9  give me a sense --
10  A  No, we don't count it that way. We count it
11  patient days.
12  Q  Can you give me any sense of --
13  A  I mean, what we do, I mean, I've been asked that
14  question many times by many different people.
15  What we'll typically do is pick a day,
16  maybe the first of the month or last of the
17  month or the 15th of the month, and what was our
18  patient census on that particular day, and then
19  pick that same day for every month of the year,
20  and then average it.
21  Q  Have you done that practice or that exercise in
22  the past?
23  A  Oh, yeah.
24  Q  Do you have any memory of the numbers that you

11 (Pages 38 to 41)

Kenneth W. Nelson 5-21-2008
William Mosher v. Kenneth Nelson, et al.

| 42 | |
|---|---|
| 1 | came up with? |
| 2 | A No. I mean, it ranges. The patient censuses |
| 3 | ranged in the period of time I was there from as |
| 4 | low as maybe 260 to as high as maybe 335, 340. |
| 5 | So there's quite a bit of fluctuation. |
| 6 | Q Has there ever been an occasion that you've had |
| 7 | to transfer residents out of the facility |
| 8 | because you were overpopulated? |
| 9 | A No. |
| 10 | Q Do you know how many residents Bridgewater State |
| 11 | Hospital was designed to hold in 2004 at one |
| 12 | time? |
| 13 | A I mean, that's a commonly-known fact, but |
| 14 | sitting here right now, I can't answer that. I |
| 15 | don't know what the design capacity is. |
| 16 | I mean, the problem at Bridgewater is if |
| 17 | someone shows up with a court order from a judge |
| 18 | saying to admit, it really doesn't matter what |
| 19 | the design capacity is. We have to figure out a |
| 20 | way to house the person. And -- |
| 21 | Q Have you ever been in a situation where you were |
| 22 | faced with the fact somebody has been committed |
| 23 | by court order, has presented a problem in |
| 24 | housing? |

| 43 | |
|---|---|
| 1 | A We've had problems like that where we've |
| 2 | wondered where we were going to put people, |
| 3 | depending on how many admissions we've got on a |
| 4 | particular night, we've been very high. |
| 5 | Q What's the solution been? |
| 6 | A Well, we were never that I can recall in a |
| 7 | situation where we had to make a bed, so to |
| 8 | speak. |
| 9 | Other institutions have been in that |
| 10 | situation where they've had to put mattresses on |
| 11 | floors or something like that, but we never had |
| 12 | to do that where we had to put mattresses on |
| 13 | floors. |
| 14 | The problem became more — I don't want to |
| 15 | say — the issue became more problematic when we |
| 16 | reduced the number of beds in the institution, |
| 17 | and we did that probably in around '98 or so, in |
| 18 | order to comply with an ACA standard for the |
| 19 | number of beds per toilet and showerheads. |
| 20 | Q ACA, is that the American Correctional |
| 21 | Association? |
| 22 | A Yeah. |
| 23 | Q Was there ever an occasion where a person might |
| 24 | be held in ITU or the infirmary as a consequence |

| 44 | |
|---|---|
| 1 | of having no place to put them despite their |
| 2 | evaluation for placement? |
| 3 | A I don't believe so. Not that I can think of. |
| 4 | Q Has there ever been an occasion where a person |
| 5 | admitted to Bridgewater State Hospital was |
| 6 | placed in a unit other than that recommended for |
| 7 | placement because of problems with housing |
| 8 | capacity? |
| 9 | A Yes. |
| 10 | Q How is that dealt with? |
| 11 | A Well, it's primarily with inmates or patients |
| 12 | that require seclusion and if the ITU has been |
| 13 | full, then they've been housed on seclusion |
| 14 | status in other areas of the institution, either |
| 15 | in the max units, Max 1 or Max 2, or at least |
| 16 | for probably the last three or four years they |
| 17 | were housed on the B-1 unit in what's called |
| 18 | seclusion or overflow. |
| 19 | Occasionally there have been situations |
| 20 | where an inmate or patient has needed to be |
| 21 | admitted to the infirmary for medical reasons, |
| 22 | there were no beds in the infirmary, so the |
| 23 | inmate was transferred to an infirmary in |
| 24 | another institution. |

| 45 | |
|---|---|
| 1 | On occasion there have been situations |
| 2 | where an inmate has been in an outside hospital |
| 3 | and could not be discharged back to the |
| 4 | institution because of the lack of infirmary |
| 5 | beds. |
| 6 | We've had a delay on occasion of people |
| 7 | coming back in because of the lack of bed space |
| 8 | in the infirmary. |
| 9 | Q Could you describe the physical appearance of |
| 10 | the seclusion area of ITU? |
| 11 | A It consists of 14 single rooms. They all have |
| 12 | solid steel doors. They have observation |
| 13 | windows, and there's a larger room that's |
| 14 | referred to as the restraint dorm, even though |
| 15 | there's only one bed in that particular dorm. |
| 16 | That's essentially the housing area. |
| 17 | Q Is the restraint dorm an area for physical |
| 18 | restraint with ankle bracelets and wrist |
| 19 | bracelets? |
| 20 | A Yes. |
| 21 | Q That differs from the seclusion, which is a room |
| 22 | or cell that's actually housed with a particular |
| 23 | person? |
| 24 | A Restraint can also be done in the seclusion |

12 (Pages 42 to 45)

Kenneth W. Nelson 5-21-2008
William Mosher v. Kenneth Nelson, et al.

46

1    rooms, but the restraint dorm can only be used
2    for restraint.
3  Q  Are there steel doors on the restraint rooms in
4    the ITU, I mean seclusion rooms in the ITU?
5  A  Yes.
6  Q  Were they steel doors back in 2004?
7  A  Yes.
8  Q  Can they be opened or unlocked by residents
9    housed in that particular room?
10 A  No.
11 Q  And in Max 2, are there areas that are used for
12    seclusion if it's necessary?
13 A  At that time, yes, but currently I don't believe
14    that Max 1 or Max 2 would be used for seclusion
15    overflow. It could be the B-1 unit.
16 Q  Back in 2004, did they have a room or rooms with
17    steel doors in Max 2 that could be used for
18    seclusion?
19 A  No.
20 Q  They'd use the rooms with the wooden doors that
21    you've described earlier?
22 A  Yes.
23 Q  If someone were held in seclusion overflow at
24    Max 2 back in 2004, would they be able to unlock

47

1    the door and exit the door, exit the room?
2  A  No, they'd be locked in.
3  Q  Would an officer be assigned to monitor the room
4    while the person is in seclusion?
5  A  Most likely, no. It would be a mental health
6    worker. But when a person would be housed in a
7    room on seclusion status that was without a
8    camera, the person would have to be under
9    one-to-one constant observation.
10 Q  By security or by mental health?
11 A  By a mental health worker. There's a provision
12    in the statute or a requirement in the statute
13    that individuals that are on seclusion status
14    have to be observed by what's called a specially
15    trained observer, and the mental health workers
16    also function as STs or specially trained
17    observers.
18 Q  Does the statute designate a specially trained
19    observer must have some kind of mental health
20    training?
21      MR. CROMACK: Objection.
22 Q  If you know?
23 A  The statute has language in it that says that
24    the individual must be able to afford therapy

48

1    and counseling, but there's no requirement for
2    any training, per se.
3  Q  Did any of the correction officers assigned to
4    Max 2 unit in 2004 have any specialized training
5    in mental health?
6  A  None.
7  Q  Did you require that any of your correction
8    officers undergo any kind of training in mental
9    health in 2004?
10 A  For a very long period of time, correction
11    officers prior to working within the DOC must
12    complete the basic training class, and that
13    basic training class for a very long period of
14    time has had a component regarding mental
15    health, mental illness, suicide prevention.
16 Q  Did that preexist 2004?
17 A  Yes.
18 Q  Is it safe to assume then that corrections
19    officers that were occupying or assigned to Max
20    2 unit in August of 2004 at least had some
21    training in their background regarding mental
22    health?
23 A  Yes, it's a safe assumption, but I can't tell
24    you that, yes, they did, but I think it's a very

49

1    safe assumption.
2  Q  How many correction officers were assigned to
3    the Max 2 units on August 28, 2004?
4  A  On the day shift? I'm assuming that's the day
5    in question.
6  Q  Yes, for the purposes of my questioning of you,
7    make the assumption that Mr. Mosher was
8    strangled to death by Mr. Bradley Burns on
9    August 28, 2004, at or about 11:40 AM.
10 A  Yes, I believe there were three officers or one
11    sergeant and two correction officers assigned.
12    There may have been four, but I believe -- I
13    know there were at least three.
14 Q  Was Lieutenant Stephen Studley one of them?
15 A  I don't recall.
16 Q  Sergeant Rebui, R-E-B-U-I, was he --
17 A  I believe he was assigned to the unit, yes.
18 Q  Officer Russell Kaeterle?
19 A  Russell Kaeterle, I don't recall.
20 Q  Office James Machado?
21 A  That's correct.
22 Q  Officer Robert Stanley?
23 A  I don't recall.
24 Q  Do you recognize the term as it was used in 2004

13 (Pages 46 to 49)

Kenneth W. Nelson 5-21-2008
William Mosher v. Kenneth Nelson, et al.

58

1  insure that there was no miscommunication on
2  where a particular resident might be?
3  A  Well, there's a regulation called inmate
4  accountability that affects all sites, and while
5  there's some variation from site to site, it
6  describes in detail procedures that are followed
7  when changes are made within an institution,
8  either with people leaving the institution to go
9  out on trips, people being discharged, people
10  being admitted, internal housing reassignments,
11  movement within the facility, say from the
12  commons building to the visiting room, to
13  minimize a bad count.
14  Q  Is that regulation identified by anything other
15  than what you've described?
16  A  It's called inmate accountability. It's in the
17  500 series, and sitting here right now I can't
18  tell you specifically what the number is, 103
19  CMR(5) something, and it's something I should
20  know, but I can't remember the number right now.
21  Q  Was there ever an occasion at or around 2004
22  where any of these regulations were reviewed as
23  a consequence of a mess-up or miscommunication
24  on the whereabouts of a particular patient or

59

1  resident at Bridgewater State Hospital?
2  A  Not that I'm aware of.
3  Q  If there was an occasion where there appeared to
4  be a missing resident or patient housed at
5  Bridgewater State Hospital, would you be advised
6  of that?
7  A  It depends.
8  Q  What would it depend on?
9  A  Well, I'll give you an example. This is the
10  most typical case.
11  If we were supposed to have 300 patients in
12  the institution and the total count was 300, but
13  an individual unit count was off, for instance,
14  A-1 was missing a person, but A-2 was over one
15  person, that was the typical scenario. One unit
16  would be up and one unit would be down.
17  What probably had occurred was that someone
18  had moved from one unit to another, and while
19  they were taken off the sending unit's count,
20  they weren't put on the receiving unit's count.
21  That's the typical scenario.
22  So I mean, you know, when the count
23  started, I mean, I wouldn't be called at home if
24  there was a bad count unless it really looked

60

1  like we were missing somebody. And I don't
2  think I ever recall -- I can't recall ever in
3  over 13 years being called at home because it
4  looked as if we were missing somebody.
5  But I do recall a number of occasions when
6  I'd be in my office or out walking around and
7  the count would start, and 25, 30 minutes after
8  the count started, it still hadn't been
9  cleared. That would indicate that there was
10  something wrong with the count.
11  So in a case like that, either I'd be
12  notified by the shift commander or Deputy
13  Superintendent, or I would call the Deputy
14  Superintendent and I'd say: What's going on
15  with the count? Why haven't we cleared yet?
16  Q  Is it safe to assume, at least during your
17  tenure, there was never an escape from
18  Bridgewater State Hospital?
19  A  That's correct.
20  Q  During your tenure, to your knowledge, were any
21  residents ever classified as escape risks?
22  A  Well, everyone is consider an escape risk.
23  Actually, I think security risk is the term
24  that's used. And there are different levels of

61

1  risk that people present. Level A, Level B,
2  Level C risk.
3  But that's more used for how the individual
4  will be managed when they're taken out of the
5  institution as opposed to when they're housed
6  inside the intuition.
7  Q  Why is that?
8  A  Well, because of the physical security that
9  exists within the institution, particularly with
10  respect to the perimeter. I think, I believe
11  that there is an excellent chance that we would
12  be able to detect an escape before a person was
13  actually able to breach the perimeter to the
14  outside.
15  It's of much more concern when a person is
16  transported out of the institution, on a court
17  trip, to an outside hospital trip, something
18  like that.
19  Q  Are you familiar with the term, quote, eyeball
20  watch, unquote, as used in 2004?
21  A  Yes.
22  Q  What is that?
23  A  It's a one-to-one observation by a staff member
24  on a patient.

16 (Pages 58 to 61)

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

## William Mosher v. Kenneth Nelson, et al.

Transcript of the Testimony of:

# Kenneth W. Nelson

# May 28, 2008

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

Cindy M. Falcon   29672

Kenneth W. Nelson 5-28-2008
William Mosher v. Kenneth Nelson, et al.

34

1      room?
2   A  Typically it gets mailed in and --
3   Q  Is there a screening process for mail?
4   A  Yes, but sometimes magazines are mailed in, that
5      based on the magazine title, you wouldn't expect
6      the contents to include pictures of nude
7      individuals, but it happens.
8          Or there could be an article in a magazine
9      about bomb making or firearms making which, you
10     know, this isn't specific.
11  Q  Just generally, I'm trying to get a sense.
12  A  I'll give you an example.  Field & Stream, for
13     instance, it's a hunting magazine, but there are
14     all kinds of articles in Field & Stream about
15     weapons and ammo that's not necessarily things
16     we want to have inmates reading in their rooms.
17     So that might be considered contraband,
18     depending on the contents of the magazine.
19  Q  What about contraband, you mentioned
20     contraband.
21         Are you talking about narcotics?
22  A  Anything that -- could be prescribed
23     medication.  Patients at Bridgewater State
24     Hospital are not allowed to have medications in

35

1      their possession, so it could be medications
2      that they've horded and they're keeping in their
3      rooms.
4   Q  In 2004 during any of these searches, were any
5      items like cocaine, crack cocaine, heroin,
6      marijuana, any of those substances found in
7      patients' rooms on Max 2?
8   A  I can't recall.
9   Q  Would it be -- I'm sorry, strike that.
10         In your memory as Superintendent, was crack
11     cocaine, cocaine, heroin, marijuana ever found
12     in a room in the Max 2 unit?
13  A  Not that I can recall.
14  Q  What about in the facility at large?
15  A  Yes, there's been, there have been street drugs
16     found in the institution.
17  Q  Did you have any training at all prior to August
18     of 2004 in identifying items that could be
19     fashioned into weapons by patients or inmates at
20     facilities such as Bridgewater State Hospital?
21  A  It's possible that I've had that training.  I
22     mean, I have knowledge of it.  I'm not sure how
23     I came about that knowledge, if it was through
24     training or through my experience.

36

1   Q  Prior to August 2004, could you explain to me
2      what your knowledge was about items that could
3      be fashioned into weapons?
4   A  Well, typically my understanding of it was that
5      steel, steel from anything, everything from a
6      bracket that supports a mop ringer, a bracket
7      could be ripped off.  It could be scraped or
8      worked is the term that we use, so it would make
9      a nice point where you could take a flat piece
10     of steel, which is referred to as flat stock.
11         The piece of steel that you would take off
12     of a mop ringer, for instance, could be
13     typically referred to as a pick type weapon,
14     whereas a flat piece of steel that had been
15     broken off of something and worked would be
16     referred to as a flat stock weapon.
17         Plastic could be used as a weapon,
18     Plexiglas that could be broken.  Pens could be
19     used as weapons, toothbrushes, the ends of
20     toothbrushes, patients could sharpen them by
21     rubbing them.
22  Q  What about weapons that could be fashioned that
23     would be considered ligatures?
24  A  Well, unfortunately, ligatures can be made out

37

1      of virtually anything, and --
2   Q  There's some limit --
3   A  Yeah.  I can't recall a ligature being used as a
4      weapon against another person except for this
5      incident.
6          My main concern with ligatures was the
7      ability of inmates or patients to use the
8      ligatures on themselves as either part of a
9      suicide attempt or some type of self-injurious
10     behavior.
11  Q  But you were aware in 2004 that that was a
12     concern, the use of ligatures, whether it be for
13     self-inurious behavior or suicide or some
14     fashion like that?
15  A  Could you repeat that?
16  Q  You were aware in 2004 that there was a danger
17     associated with the use of ligatures for
18     self-injurious behavior and suicide?
19  A  That's correct.
20  Q  Had you been exposed prior to August of 2004 to
21     any instances where an inmate had strangled
22     another inmate, whether it be by ligature or by
23     arm or any other method?
24  A  I don't recall.  I don't believe so.

10 (Pages 34 to 37)

Kenneth W. Nelson 5-28-2008
William Mosher v. Kenneth Nelson, et al.

38

1  Q  Were you aware in 2004 that there was at least
2     some potential that there could be fashioned a
3     ligature from any number of items that could be
4     used by one patient or an inmate on another
5     patient or inmate to strangle?
6  A  I don't believe that was my orientation. My
7     orientation was that ligatures were dangerous,
8     that they could be fashioned from virtually
9     anything, but that they would be used
10    exclusively for someone to inflict harm on
11    themselves.
12 Q  As opposed to inflicting harm on another
13    patient?
14 A  Yes.
15 Q  Why was that your orientation?
16 A  Because my experience had been, based on suicide
17    attempts and successful suicides over the years,
18    that with perhaps one or two exceptions, it was
19    typically done by hanging or choking, people
20    would tie, take a ligature, put it around their
21    neck, and then tie it off.
22 Q  Well, is it safe to say that in 2004 you were
23    aware that you as Superintendent of Bridgewater
24    State Hospital had an obligation to provide a

39

1     safe environment for the patients that were
2     housed at this facility?
3        MR. CROMACK:  Objection.
4  A  Yes.
5  Q  Included within that understanding, was it also
6     your understanding that you were obligated to
7     provide a safe environment concerning
8     patient-on-patient violence?
9        MR. CROMACK:  Objection.
10 A  Yes.
11 Q  You understood that patients certainly could
12    fashion weapons if they were given the
13    opportunity to access the materials that you
14    described such as the flat metal stock and the
15    like, correct?
16 A  Yes.
17 Q  You also understood in 2004 that a ligature
18    could be fashioned from any number of items,
19    correct?
20 A  Yes.
21 Q  But your orientation as you testified was that
22    the concern was that the ligature would be used
23    for self-injurious behavior and/or suicide?
24 A  Yes.

40

1  Q  But not for homicide?
2  A  That was something I hadn't considered, yes.
3  Q  And you hadn't considered it because -- just
4     correct me if I'm wrong on this. I'm just
5     trying to get it in my mind.
6        You hadn't considered it because your
7     exposure in the past had been solely to the use
8     of ligatures by patients on themselves?
9  A  That's correct.
10 Q  Had anybody involved with the security at the
11    facility, Bridgewater State Hospital, ever
12    advised you that your orientation with respect
13    to the use of ligatures by patients on
14    themselves was too limited and that it should be
15    expanded to the use of ligatures on other
16    patients by patients or for homicidal --
17 A  No, not that I can recall.
18 Q  And do you have any memory prior to the death of
19    Mr. Mosher considering -- strike that.
20       In 2004, prior to the death of Mr. Mosher,
21    had the subject of homicide associated with
22    ligature use by a patient on another patient
23    ever been part of a consideration of policy or
24    site-specific standard?

41

1  A  I don't believe so.
2  Q  Is the reason for that because there was a
3     general orientation that ligature, generally the
4     danger associated with ligature was
5     self-injurious behavior by patients?
6  A  Yes, I believe so.
7  Q  Since the death of Mr. Mosher in 2004, has there
8     been any consideration about developing policies
9     or customs or practices intended to prevent the
10    use of a ligature by a patient on another
11    patient to commit a homicide?
12       MR. CROMACK:  Objection.
13 A  I don't believe so. Ligatures are bad, and when
14    we conduct searches, staff are on the alert to
15    find items that either are ligatures or look as
16    if they're ligatures that are being made, such
17    as a sheet that's been ripped and there are
18    strips of a sheet.
19       A ligature may not have been formed yet
20    with a noose and knots, but it's certainly
21    material that appears to be altered in such a
22    way so that a ligature can be made, and that's a
23    very serious cause for concern.
24 Q  Would that also include observation of a torn

11 (Pages 38 to 41)

Kenneth W. Nelson 5-28-2008
William Mosher v. Kenneth Nelson, et al.

62

1  2004, did you cause to be increased the number
2  of corrections officers assigned at Max 2
3  immediately after the murder?
4  A  I can't recall.
5  Q  Did you yourself appear at Max 2 on August 28,
6  2004, after it was reported to you that Mr.
7  Mosher had been murdered?
8  A  I don't believe so.
9  Q  Why not?
10 A  Because it was a crime scene, and I would bring
11 no value to going to a crime scene.
12 Q  How were you notified about the murder?
13 A  By cell phone.
14 Q  Were you at the facility?
15 A  No, I was doing grocery shopping at the time.
16 Q  What did you do when you were contacted about
17 the murder by cell phone?
18 A  I immediately left the store I was at and I
19 drove home.  I was inappropriately dressed to go
20 to work.  I think I had like cutoffs and a tee
21 shirt on.
22    I put on a shirt and pair of pants and
23 shoes and got in my car, and I drove to the
24 institution.  It took me I would say

63

1  approximately an hour from the time I was called
2  to get from the store to my house to
3  Bridgewater.
4  Q  What information did you learn between the time
5  you were first notified in the store and the
6  time you were at Bridgewater State Hospital
7  about what had occurred?
8     MR. CROMACK:  Objection.
9  A  I believe when I was initially called, the shift
10 commander told me that we had had a
11 patient-on-patient assault and it looked as if
12 the victim might be dead when he left.  I
13 believe at that point he either was in the
14 process of leaving or had already left.
15    So I told the shift commander that, you
16 know, I think I asked for the names of the
17 individuals involved, where it had occurred.  He
18 may have told me that, and I told him that I'd
19 get there as soon as I could.
20    And I believe I was in transit to the state
21 hospital — I made a number of phone calls while
22 I was in transit, received a number of phone
23 calls, and I believe I was in transit when the
24 shift commander told me that Mr. Mosher had been

64

1  pronounced dead at Brockton Hospital.  So when I
2  got to the institution, I was aware that he was
3  dead.
4  Q  What if anything did you know about Mr. Mosher
5  prior to his death?
6  A  That he was, I knew that he was a difficult to
7  manage individual.  He had been in and out of
8  the ITU, the Intensive Treatment Unit.  I
9  believe he had assaulted a nurse with urine and
10 feces.  That's about all I knew.
11 Q  What if anything did you know about Bradley
12 Burns before the murder?
13 A  I don't have any recollection of knowing
14 anything about Bradley Burns prior to the
15 murder.
16 Q  Did you at any point after the murder ask
17 anybody at Bridgewater State Hospital who's
18 Bradley Burns?
19 A  At any point, did I ask that?
20 Q  Well, relatively soon after the murder, did you
21 inquire about who Bradley Burns was?
22 A  Yeah, not to be — it's not funny.  I mean, I'm
23 laughing, but it's not funny.  Yes, I did.
24 Q  Why did you ask that question?

65

1  A  Because I didn't know who he was, and in my
2  career, this was one of the most horrific
3  experiences I had ever had, and I wanted to know
4  who he was.
5  Q  If you can remember your first inquiry about who
6  Bradley Burns was, what information was given to
7  you?
8  A  I don't recall.  I mean, I've learned a lot
9  about Bradley Burns since the incident, but what
10 I learned when, I just don't recall.
11 Q  Was it uncommon that you would be unaware of a
12 particular person housed at Max 2, the reason
13 for commitment, whether or not they had a
14 history of violence, et cetera, et cetera?
15 A  I'm not going to sit here and tell you that I
16 review the admission of every single patient to
17 Bridgewater, but I review nearly all of the
18 admissions to Bridgewater.
19    However, there is a large volume of
20 admissions, and while I review those on a daily
21 basis, it's not unusual to get anywhere from
22 three, five, six admissions a day.  And over the
23 course of three or four weeks, that's a rather
24 large number of admissions.

17 (Pages 62 to 65)

Kenneth W. Nelson 5-28-2008
William Mosher v. Kenneth Nelson, et al.

66

1      I think annually there are approximately
2  650 to 750 admissions to Bridgewater State
3  Hospital.  So remembering every single
4  admission, the name of the patient, the section
5  of the statute under which they were admitted,
6  why they were admitted, their offense, no, not
7  unless there's something that's very outstanding
8  about the individual or the particular reason
9  for why they were admitted.
10  Q  In 2004, did you issue any directives or orders
11     to your security personnel that they were to be
12     advised about the admission of any particular
13     patient by court order who had a history of
14     violence, person-on-person?
15  A  Well, nearly everyone that's admitted to
16     Bridgewater State Hospital has a history of
17     violence.
18  Q  Against other people?
19  A  Yes.
20  Q  So you're aware that pretty much everybody in
21     there presented in the past some level of danger
22     of violence, personal violence upon another
23     person?
24  A  Well, a judge -- all admissions to Bridgewater

67

1  State Hospital are by judicial order, and the
2  threshold that's typically used is that the
3  judge sending the person to Bridgewater believes
4  that they require either observation or
5  treatment under conditions and strict security.
6      And typically it's because either the
7  persons have just been accused of committing a
8  violent crime or they've been in a place of
9  detention and have acted out violently either
10  against someone else or against themselves.
11  Q  So in response to my question, did you issue any
12     directives or orders to the security personnel
13     that they needed to be notified if a particular
14     patient was being admitted that had a history of
15     violence against other persons?
16  A  Well, I mean, that was I believe a routine part
17     of the admission process.
18  Q  Did you inquire after Mr. Mosher was murdered
19     whether or not any of the security personnel at
20     your facility had been advised that Bradley
21     Burns had been admitted by court order and had
22     committed a number of attempted strangulations
23     by ligature against other individuals?
24     MR. CROMACK:  Objection.

68

1  A  Could you repeat that, please?
2  Q  Were you advised at any point after the death of
3     Mr. Mosher that your security personnel were
4     aware Mr. Burns was admitted by court order
5     because he had committed acts of strangulation
6     against other persons?
7     MR. CROMACK:  Objection.
8  A  I can't recall.  I mean, I did learn that fact,
9     but I don't recall when I learned it.
10  Q  Is that the type of information that you would
11     expect your security personnel to have been
12     advised about with respect to Mr. Burns?
13     MR. CROMACK:  Objection.
14  A  Not necessarily, specifically.
15  Q  Why?
16  A  Because it's the major -- the major concern is
17     the level of threat that a person presents in a
18     structured environment like Bridgewater State
19     Hospital, not necessarily the means by which
20     they present that threat.
21  Q  Well, then, would it not make sense that
22     information associated with Mr. Burns' attempt
23     to murder other individuals by ligature prior to
24     being admitted to Bridgewater State Hospital

69

1  would be fairly important to know from a
2  security standpoint?
3     MR. CROMACK:  Objection.
4  A  No less so I think than anyone else that was
5     admitted to Bridgewater State Hospital for
6     murder or attempted murder or manslaughter or
7     killing someone, whether it was with their bare
8     hands, with a weapon.
9      I mean, there's an approach that I take
10  that I think can best be described as universal
11  precautions in the sense that everyone that's at
12  Bridgewater State Hospital is a high-risk
13  individual, and you have to take universal
14  precautions and treat everyone as if they
15  present a high risk of harm either to themselves
16  or someone else.
17  Q  And that was a perception back in 2004 that was
18     employed?
19  A  Yes.
20     (Recess.)
21  Q  After you were advised of the death of Mr.
22     Mosher, did you inquire of anybody what had
23     happened?
24     I'm talking about within a reasonable time

18 (Pages 66 to 69)

Kenneth W. Nelson 5-28-2008
William Mosher v. Kenneth Nelson, et al.

70

1    after the murder, not months and months later.
2    A  Yes.
3    Q  Were you advised of what had been drawn
4        together, you know, in the aftermath of the
5        murder?
6    A  Yes.
7    Q  What were you advised of?
8    A  Bradley Burns had lured Mr. Mosher into his
9        room, I believe he had asked him if he wanted a
10       cup of tea, and that Mosher went into his room,
11       and Mr. Mosher had turned his back to Burns,
12       Bradley Burns, and that Bradley Burns used that
13       opportunity to strangle Mr. Mosher using as I
14       recall a tee shirt that he had in his
15       possession.
16           And Burns then exited the room and I
17       believe went to Sergeant Reddy and said:  You
18       better go check my room, I think there's a dead
19       person in it.  And Sergeant Reddy went down to
20       the room and observed Mr. Mosher on the floor
21       and called using his radio or directed someone
22       else to call it in as an emergency.
23   Q  Did you inquire of how it could have happened?
24   A  I mean, I asked -- I don't know exactly the

71

1        words I used, but I wanted to know what
2        happened.  And I think that by the end of that
3        day, I had a fairly good idea of what had
4        occurred.
5    Q  Let me be a little bit more pointed.
6           Did you inquire in the reasonable aftermath
7        of the murder as to how it came about Mr. Burns
8        had the opportunity to commit the murder?
9    A  Well, because at the time, during that period of
10       time in the day, after the count was cleared,
11       but before the patients left the unit for chow,
12       there was an opportunity for patients to
13       intermingle in a way that was less controlled
14       than they were allowed to intermingle at other
15       times during the day.
16   Q  That was for a short period of time between the
17       event of the major count and lunch?
18   A  Yes.
19   Q  Were you advised of how long a period of time
20       that was on that day?
21   A  I'm sure, I'm positive that I was.
22   Q  Do you have a memory specifically about how much
23       time that was that they were allowed to
24       intermingle between the end of a major count and

72

1        lunch on that day?
2    A  Not right now, no.
3    Q  Were you told -- strike that.
4           Was it explained to you how long, how much
5        time expired between the last observation of
6        Bradley Burns in his room during the major count
7        and Bradley Burns exiting the room and saying to
8        Sergeant Reddy:  There's a dead guy on the floor
9        in my cell?
10           MR. CROMACK:  Objection.
11   A  I think by the end of the day I knew that.  My
12       concern when I got there was I knew there had
13       been a homicide.  The State Police were either
14       already there or on their way in.  I did not
15       want to interfere with the investigation of a
16       homicide by asking my own questions, going to
17       the crime scene.
18           It was basically -- my role as I saw it was
19       to make sure that everyone that needed to be
20       there got there, that the appropriate
21       notifications were made, and we also had 340,
22       350 other people that had to be fed, medicated,
23       et cetera.  So that's primarily what I was
24       thinking of.

73

1    Q  I understand that.  I'm just trying to get from
2        you your understanding of how much time
3        transpired between when Mr. Burns was last seen
4        in his room at major count and he came out of
5        the room and said:  There's a dead guy in my
6        cell.  Just your understanding.
7    A  It was, you know, relatively short.  I'd say
8        minutes probably.  I just don't recall.
9    Q  Did you issue any orders or directives with
10       respect to Mr. Burns' custody immediately in the
11       aftermath of the murder?
12   A  Yes.
13   Q  What were those directives or orders?
14   A  I believe that I directed that he be made a
15       temporary Level A escape risk.
16   Q  Is there a particular reason why you had him,
17       ordered him designated as a Level A escape
18       risk?
19           Is that just a method of getting him into
20       custody?
21   A  No.  It would be to ensure that he would either
22       be taken out by the high-risk transportation
23       unit or by at least four correction officers
24       when he was -- that's a way to flag an

19 (Pages 70 to 73)

Kenneth W. Nelson 5-28-2008
William Mosher v. Kenneth Nelson, et al.

| 74 | 76 |
|---|---|
| 1 individual so that you can have either the HR, | 1       EXAMINATION BY MR. CROMACK: |
| 2 the high-risk transportation unit or HRT take | 2 |
| 3 the trip or have four individuals go out with | 3   Q  I just have a real quick question. |
| 4 the patient. | 4       You were asked earlier, you said earlier |
| 5   Q  But he was held at Bridgewater State Hospital. | 5 that there was theoretically no limitation on |
| 6 He wasn't transferred from the facility, right? | 6 your ability to assign overtime. In the |
| 7   A  No, couldn't do that. | 7 non-theoretical world, was there any limitation |
| 8   Q  Was there any policy or custom or rule or | 8 on your ability to assign overtime? |
| 9 regulation that provided that, should mental | 9   A  Overtime is tracked on a daily basis by |
| 10 health units be advised that there has been | 10 headquarters, and realistically if I used what |
| 11 demonstrated difficulties between two patients, | 11 would be perceived as an excessive amount of |
| 12 that they were to advise the security personnel | 12 overtime on any given day, I could probably |
| 13 at the facility? | 13 expect either an e-mail or a phone call |
| 14       MR. CROMACK: Objection. | 14 regarding it, questioning why I had hired so |
| 15   A  I don't think — I don't understand the | 15 much overtime on a particular day. |
| 16 question. | 16   Q  Is that budgetary reasons, when you say home |
| 17   Q  Let me try to do it as pointedly as possible. | 17 office or headquarters? |
| 18       If the mental health team, an individual on | 18   A  Yes. |
| 19 a mental health team observed two inmates or two | 19       MR. CROMACK: I don't have anything |
| 20 persons or two patients grappling with each | 20 else. |
| 21 other, was there a policy or procedure or rule | 21    (Whereupon, the deposition was concluded at |
| 22 or regulation that provided the mental health | 22 12:00 p.m.) |
| 23 person who saw that, made that observation, was | 23 |
| 24 to report that to security personnel? | 24 |

| 75 | 77 |
|---|---|
| 1   A  Yes. | 1   COMMONWEALTH OF MASSACHUSETTS |
| 2   Q  Was that in existence in 2004? | 2 MIDDLESEX, SS |
| 3   A  I believe so. | 3 |
| 4      (Discussion off the record.) | 4     I, Cindy M. Falcon, a Notary Public duly |
| 5   Q  Was this policy that we just discussed in force | 5 commissioned and qualified in and for the |
| 6 in 2004? | 6 Commonwealth of Massachusetts, do hereby certify |
| 7   A  Yes, I believe so. | 7 that there came before me the person |
| 8   Q  Were you ever made aware of whether or not any | 8 hereinbefore named and was by me duly sworn to |
| 9 member of the mental health team reported to any | 9 testify to the truth of his knowledge concerning |
| 10 security personnel at Bridgewater State Hospital | 10 the matters in controversy in this cause; that |
| 11 that prior to the murder, two days prior to the | 11 he was thereupon carefully examined upon his |
| 12 murder of Mr. Mosher, there had been some | 12 oath and his examination reduced to typewriting |
| 13 discourse, argument or difficulties between Mr. | 13 under my direction; and that the deposition is a |
| 14 Mosher and Mr. Burns? | 14 true and accurate record of the testimony given |
| 15   A  No, I don't recall that. | 15 by the witness. |
| 16   Q  Do you recall ever learning that prior to the | 16     I further certify that I am not |
| 17 murder of Mr. Mosher, that there was a problem | 17 interested in the cause of this action. |
| 18 with another patient concerning spiders or | 18     IN WITNESS WHEREOF, I have hereunto set |
| 19 spider bites or anything like that? | 19 my hand this     day of June, 2008. |
| 20   A  Prior to the murder of Mr. Mosher? Yeah, I | 20 |
| 21 don't know. I can't recall. | 21 |
| 22      MR. BALLIRO: I have nothing further | 22     Notary Public |
| 23 at this time. Gentlemen? | 23 My Commission Expires: |
| 24 | 24 June 25, 2010 |

20 (Pages 74 to 77)

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

## William Mosher v. Kenneth Nelson, et al.

Transcript of the Testimony of:

# Kathleen M. Dennehy

# May 14, 2008

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

Cindy M. Falcon  28971

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

6

1  Q  What's your position at the Sheriff's Office?
2  A  Superintendent.
3  Q  And did you go from Commissioner of the
4     Department of Corrections directly to the
5     Bristol County Sheriff's Office?
6  A  Correct, yes.
7  Q  You became employed with the Department of
8     Corrections in 2004 or 2003 as the Commissioner?
9  A  As the Commissioner, I was named Acting
10    Commissioner, I believe it was December 1, 2003,
11    2003.
12 Q  And your appointment was by Secretary Flynn?
13 A  Yes.
14 Q  Had you been employed with the Department of
15    Corrections prior to your appointment by
16    Secretary Flynn?
17 A  Yes.
18 Q  What was your position prior to that?
19 A  Deputy Commissioner.
20 Q  How long were you a Deputy Commissioner?
21 A  I believe I was appointed to that position in
22    August of '97.
23 Q  Who was Commissioner when you were appointed?
24 A  Michael Maloney.

7

1  Q  Did he remain the Commissioner until your
2     appointment by Secretary Flynn December 1, 2003?
3  A  Yes.
4  Q  So your tenure as Commissioner of the Department
5     of Corrections was from December 1, 2003, until
6     May 6 of 2007?
7  A  Yes.
8  Q  Would you tell me your academic or educational
9     background starting at college and forward?
10       What college did you go to and what degree
11    did you graduate with?
12 A  Wheaton College, the one in Norton,
13    Massachusetts— there are two — government
14    major, BA.  Suffolk University School of
15    Management, MPA, master's in public
16    administration.  And currently at Brandeis
17    University at the Heller School of Social Policy
18    pursuing a PhD.
19 Q  Do you have any other accreditations,
20    certificates, any other academic achievements
21    since college, your public administration
22    degree?
23 A  No.
24 Q  Did you take any programs associated with the

8

1     Department of Corrections or any other
2     employment that you've had?
3  A  I've been to a variety of training sessions as
4     offered by either the American Correctional
5     Association or the National Institute of
6     Corrections.
7  Q  As best you can, can you give me an idea of when
8     those programs were that you attended, what
9     years, what month and years if you can?
10 A  I think just about, we train — every meeting
11    that I attended for the National Association of
12    State Correctional Administrators had some
13    training component.  Frankly, I couldn't begin
14    to list all of them.
15       But in general terms, the trainings would
16    be about any new legislation that were to pass,
17    particularly I would say at the federal level,
18    particular programs around prisoner reentry.
19 Q  I'm sorry?
20 A  Particular programs around prisoner reentry,
21    which is a major initiative with the federal
22    government.
23 Q  When you say prisoner reentry, addressing issues
24    like recidivism and return to the system?

9

1  A  Yes, and programs that would be geared towards
2     reducing recidivism, what actually works and
3     what doesn't work.
4  Q  Are you identifying that particular issue
5     because it was a major component of these
6     programs or education component of these
7     meetings you attended, or is it because that is
8     a component that you recall rather than other
9     components?
10 A  That's the major thrust of corrections right now
11    in terms of all grants and pretty much
12    legislation.
13 Q  When you say right now, are you speaking about
14    during 2003 to —
15 A  2003, 2004, that would be the major initiative
16    as reflected in legislation and funding and
17    training programs as run by the federal
18    government.
19 Q  So these components, educational components
20    associated with these meetings, were taught by
21    agents of the federal government in informative
22    sessions given to you by the federal government
23    as opposed to the state?
24 A  Probably better characterized briefings, but

3 (Pages 6 to 9)

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

10

1     certainly billed as training, but I think it
2     would probably be better characterized as
3     briefings for state correctional administrators
4     generally in the context of the state
5     Association of Correctional Administration.  If
6     a new statute were to pass, there would be some
7     type of briefing.
8   Q  What statute was it that this was all concerned
9     about?
10 A  You know, I couldn't give you the citation, but
11     certainly in the last four to five years, there
12     have been several initiatives.
13       I believe actually, I think President Bush
14     mentioned reentry in an inaugural address, so I
15     couldn't give you the statutory citation, but
16     it's been the springboard for many granting
17     initiatives that have come down to statutes.
18   Q  Did you understand that participation in
19     whatever programs or legislation passed by the
20     state was mandatory?
21 A  Sorry?
22   Q  Were you being briefed on mandatory provisions
23     of new legislation that was expected to be
24     passed on the state?

11

1 A  I don't have that recall as to what the specific
2     curriculum was.
3   Q  But did you understand that you were being
4     briefed for some particular purpose on that new
5     legislation?
6 A  For the most part, those briefings were to
7     really help state administrators get a handle on
8     what kinds of monies were available at the
9     federal level that the states might be eligible
10     to apply for.
11   Q  Okay.  When you say that, are you speaking about
12     compliance issues associated with federal
13     government requirements that would then qualify
14     the state for funding through some of these
15     grants?
16 A  More these are new initiatives and money was
17     available for demonstration projects, more
18     demonstration.
19   Q  Demonstration projects within the state, you
20     mean?
21 A  Yes.
22   Q  So that you go back and you would construct or
23     provide information or educational sessions to
24     other members of the Department of Corrections

12

1     or the state?
2 A  No.
3   Q  I'm trying to get a sense of what the actual
4     funding was for.
5       In other words, if the federal government
6     were to give you funding consistent with the new
7     legislation, what would you use the funding for?
8 A  Perhaps for a new vocational educational
9     program, to enhance substance abuse treatment
10     programs.
11       Any programmatic initiative that had been
12     demonstrated by research to reduce recidivism
13     generally would be something that the federal
14     government would support in terms of a
15     demonstration project.
16   Q  Was it your understanding that any of that
17     funding was earmarked or could be used to
18     enhance the treatment of mentally ill patients
19     within the Department of Corrections?
20 A  It wasn't so much directed at patients as the
21     category of offenders.  It was more directed at,
22     for lack of a better term, mainstream
23     corrections, the offenders who possibly were
24     doing 20 to 40 years, a sentence actually

13

1     committed, criminally committed offenders, and
2     enhancing the vocational opportunities,
3     particularly at prerelease and minimum level
4     custody.
5   Q  But unassociated with those offenders who also
6     had mental health issues or associated with
7     offenders who had mental health issues?
8 A  No.
9   Q  When you say no, what you're describing is that
10     the focus would not be on those offenders who
11     had mental health issues?
12 A  Correct, the focus was not on those offenders.
13   Q  Can you describe to me your duties as
14     Commissioner of the Department of Corrections in
15     the period 2003 to 2007?
16 A  As the Chief Executive Officer of the Department
17     of Corrections, it was an agency with
18     approximately 11,000 offenders, I believe about
19     5,300 employees, not including contract
20     employees, which I couldn't give you an
21     estimate, but it's considerable.
22       Overall responsibility for the budget, for
23     the overall management of the state correctional
24     system as distinct from the county.

4 (Pages 10 to 13)

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

14

1  Q  Did you have any hiring or firing discretion of
2     any of the employees within the DOC?
3  A  Yes, both hiring and firing.
4  Q  Were there limits on that discretion?
5        Were there limits on who you could hire and
6     who you could fire?
7  A  In terms of hiring state line employees, to the
8     extent that an individual was civil service
9     eligible, certified, much of the hiring in the
10    Department of Correction, I'd say about 4,000 of
11    the 5,000 positions or so are civil service,
12    that were filled via civil service as opposed to
13    non-civil service.
14       So much of the hiring is done via the civil
15    service system, examination, certification, by
16    civil service and the establishment of lists, so
17    it's pretty routine, the hiring piece.
18  Q  Under the rubric of management in your job
19    description, could you break that down a little
20    further?
21       Would the hiring and firing be part of the
22    management duties that you've described?
23  A  Overall oversight and management.  Under me was
24    a Deputy Commissioner, under them, an Associate

15

1   Commissioner for Administration.
2       And if you sort of see it as an
3   organizational chart, myself as Commissioner,
4   Deputy Commissioner, an Associate Commissioner
5   for Administration and Associate Commissioner
6   for Health Services, Classification and
7   Treatment.
8       Under the Deputy Commissioner were three,
9   and then it was reduced to two, Assistant Deputy
10  Commissioners who had operational
11  responsibility.
12      When you look at that portion chart, the
13  director of human resources fell under the
14  Associate Commissioner for Administration.  So
15  through the Associate Commissioner for
16  Administration, the overall -- pretty much the
17  pace of hiring would be determined at the
18  Commissioner's level, looking at the overall
19  budget, could we afford to bring on another
20  training class.
21      Those were the types of personnel decisions
22  vis-a-vis hiring that were made at the
23  Commissioner's level.  I did not review the
24  individual hiring of each officer.  That was a

16

1   delegated function.
2  Q  You said that's because it was a what, a Deputy
3     function -- I'm sorry, I didn't hear you.
4  A  Delegated, it was delegated, so as Commissioner
5     I did not see individual hiring packages with
6     the exception perhaps of a management position,
7     at maybe the Superintendent's level.
8        Other than that hiring at that level, it
9     would fall to the human resource department
10    under the supervision of the Associate
11    Commissioner for Administration.  There's an
12    enormous amount of hiring that goes on in the
13    Department of Correction.
14  Q  That hiring structure that you've described, is
15    that as a consequence of a regulation within the
16    DOC?
17  A  Certainly policy, practice, and much of the
18    hiring that is done within the Department of
19    Corrections, as I said, is driven by civil
20    service.  So there's very little discretion.
21    It's pretty much the score, subject to conduct
22    of the background, assuming there's no bar to
23    hiring, much of the hiring is done by civil
24    service exam and certification.

17

1       And the director of health services for the
2   Department of Correction works in tandem with--
3   I'm not sure of the title, but a comparable
4   position at the secretariate level -- to
5   effectuate the approval of hiring.  Those
6   decisions are much less about the individual
7   application because it's driven by exam and
8   civil service, as it is about the number and the
9   sustainability within the budget for those
10  positions.
11  Q  Bridgewater State Hospital, that's under the
12    umbrella of the DOC, correct?
13  A  Yes, it is.
14  Q  When you described that you might have more
15    discretion and/or input into the hiring of
16    managerial positions, does that mean that the
17    Superintendent of Bridgewater State Hospital
18    would be within the managerial hiring discretion
19    you had?
20  A  Yes, it would.
21  Q  Did you have any input into the hiring of Mr.
22    Nelson as Superintendent of Bridgewater State
23    Hospital?
24  A  The hiring decision as to a Superintendent or

5 (Pages 14 to 17)

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

---

**18**

1    top management positions, pretty much from
2    Deputy Superintendent and above, is the purview
3    of the Commissioner.
4         I was not Commissioner at the time, so I
5    did not have a role in selecting —
6    Q  Was it Mr. Maloney that appointed him; do you
7       know?
8    A  I believe it was Mr. Maloney.  It may have
9       predated it, but I believe it was Commissioner
10      Maloney.
11   Q  What was your relationship with Mr. Nelson while
12      you were Commissioner of the DOC?
13   A  He was one of 18 Superintendents, someone that I
14      would see periodically at management meetings.
15      He reported to me through two other levels in
16      the organization, as did all managers
17      ultimately.
18          When you look at the organization chart,
19      Commissioner, Deputy Commissioner, and an
20      Assistant Deputy Commissioner, each of the
21      Superintendents were divided into sectors and
22      reported to an Assistant Deputy Commissioner.
23      So he reported to an Assistant Deputy
24      Commissioner.

---

**19**

1          So in terms of day-to-day routine, I would
2     not have contact with Superintendents.
3    Q  Is it safe to assume that if there was a
4       critical issue or problem at Bridgewater State
5       Hospital, you'd be apprised of that through the
6       Deputy Commissioner?
7    A  Generally through the Deputy Commissioner.
8       Generally, I mean, obviously, it's not a hard
9       and fast rule.  But for the most part, it's a
10      very chain-of-command-oriented organization.
11   Q  Would there be occasion where Mr. Nelson would
12      pick up the phone and dial you directly, say --
13   A  It would not be unheard of, but that's not the
14      routine.  It's not prohibited.  Put it that
15      way.  It's not prohibited, but that is not the
16      routine.  It's very chain of command.
17   Q  I'm trying to get of sense of why it is a policy
18      or custom.
19          Is it because there is a chain of command
20      and that chain of command need be followed, or
21      is it because there's a regulation that
22      prohibits him reaching out for you directly?
23   A  It's a very chain of command, it's ann uniformed
24      organization, so it is very much chain of

---

**20**

1    command oriented in culture and in practice.
2         And reporting relationships are outlined in
3    an organization chart, and the organization
4    chart reflects that flow of information.
5    Q  Well, would Mr. Nelson necessarily suffer a
6       reprimand or sanction as a consequence of not
7       following the chain of command and reporting
8       something to you directly?
9    A  Certainly not a sanction or a reprimand.  I
10      think any manager, any supervising manager would
11      probably want to know why they had not been
12      apprised of the situation, particularly if they
13      were ready and available.
14          If they happened to be in their office and
15      had been bypassed in information and information
16      had not been shared with them in a timely
17      manner, I could envision a supervising manager
18      making an inquiry as to why that happened.  But
19      sanction or reprimand; no.
20   Q  Or a consequence of any kind?
21   A  I would imagine not, other than, you know, a
22      frank discussion as to:  Why did you bypass me?
23      I have responsibility and you bypassed me.
24   Q  So is it your sense that there would be a

---

**21**

1    certain amount of offense taken by the Deputy
2    Commissioner if Mr. Nelson reached out for you
3    directly as opposed to going through the Deputy
4    Commissioner?
5    A  I wouldn't characterize it as offense.  Again,
6       it's very much the custom, practice, culture.  I
7       would not, I personally would not liken it to
8       the military, though often I think that
9       comparison is made, particularly in police
10      departments, fire departments, in any uniformed
11      organization, particularly a large one.
12          There's a reason for a chain of command in
13      terms of sharing information and crossing all
14      your T's and dotting your I's in terms of making
15      sure that folks are apprised, and
16      Superintendents do report, their first level of
17      report is an Assistant Deputy Commissioner, and
18      the Assistant Deputy Commissioner reports to the
19      Deputy Commissioner.
20          Is it forbidden to have the communication
21      outside of that chain of command?  No, but that
22      is normally how information is communicated.
23   Q  What is your understanding back in 2004, what
24      was your understanding of the reason why the

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

---

22

1   chain of command need be followed other than
2   what you explained so far?
3   A  Simply just what I've explained so far.
4   Q  Are there or were there particular forms that
5      needed to be filled out, say by Mr. Nelson, if
6      you were to report some problem at Bridgewater
7      State Hospital?
8         Did he have a form in his office that
9      needed to be filled out and faxed over to the
10     Assistant Deputy Commissioner, the chain of
11     command, so the chain of command would be
12     followed?
13  A  Mm-hmm.  There was a form, and I hope I'm using
14     the right term, referred to as an urgent
15     matter.  It's a means of communicating emerging
16     issues that -- it's a form that's been in use
17     probably going back to Paul Cellucci's
18     administration.
19        It is a form whereby, if there is a
20     critical incident -- perhaps I should rephrase
21     that.  It doesn't necessarily have to rise to
22     the level of a critical incident, but if it's
23     something that the Secretary or the Governor
24     might receive an inquiry about, if it were a

---

23

1      pressing issue at the local level, at the
2      Superintendent's level or at a department head
3      level, an urgent matter would be compiled to be
4      submitted through the chain of command to the
5      Secretary's office.
6         But other than that, I can think of no
7      other form.
8   Q  Was there ever an occasion during your tenure as
9      Commissioner of the Department of Corrections
10     that Mr. Nelson or one of his subordinates would
11     contact the Commissioner's office either through
12     the Assistant Deputy or the Deputy herself, with
13     regard to a specific inmate or patient at
14     Bridgewater State Hospital?
15  A  Rare, on very rare instances.
16  Q  Why was it rare that that would happen?
17  A  Well, the Commissioner's position does not have
18     day-to-day supervision over that level of the
19     organization.
20        As I've explained, there's an organization
21     chart where there's a Commissioner, Deputy
22     Commissioner, and the structure is in place for
23     the Assistant Deputy Commissioners to be the
24     primary supervision over the various

---

24

1      institutions, pretty much divided by mostly
2      geography.
3         To your question, again, communication is
4      not forbidden, but the general practice would be
5      through that, communication through that chain
6      of command.
7   Q  And is that a consequence more of just deference
8      to Mr. Nelson's position as Superintendent of
9      Bridgewater State Hospital, or is it as a
10     consequence of a sense that the Commissioner's
11     office ought not to interfere with the ongoing
12     internal operation of Bridgewater State
13     Hospital?
14        MR. CROMACK:  Objection.
15  A  I'm not sure I understand the question.
16  Q  Well, if you can, describe to me Superintendent
17     Nelson's duties during your tenure at the
18     Department of Corrections.
19  A  During my tenure as Commissioner?
20  Q  Mm-hmm.
21  A  He was the Superintendent of the Bridgewater
22     State Hospital, so he was the Chief Operating
23     Officer for Bridgewater State Hospital with
24     budgetary responsibility, administrative

---

25

1      oversight, and overall management of the
2      Bridgewater facility.
3   Q  The management also included security issues?
4   A  Correct, yes.
5   Q  Would you suggest that that was a very large
6      part of his managerial duties at the facility?
7   A  One of his major responsibilities, yes.
8   Q  And was it the office of the Commissioner's
9      perception that decisions related to the
10     operation of the Bridgewater State Hospital were
11     left to Mr. Nelson, Superintendent Nelson?
12  A  Overall, overall.  The overall running of the
13     facility was the Superintendent's responsibility
14     under the supervision of the Assistant Deputy
15     Commissioner.
16  Q  What were his obligations to report to the
17     Commissioner's office on decisions that he made,
18     let's say with respect to security at the
19     facility?
20  A  Responsibilities to report to the Commissioner's
21     office directly?  None.  That communication
22     would be made through the assistant.  He would,
23     any Superintendent would have regular, perhaps
24     daily contact with their Assistant Deputy

---

7 (Pages 22 to 25)

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

30

1    experience, I can't imagine not having stressed
2    to them the increasing number of mentally ill
3    individuals coming into the criminal justice
4    system, not just in Massachusetts, but
5    nationally, and the costs that are associated
6    with that, the need to build the infrastructure
7    to sustain the budget to ensure the monies are
8    there down the road because of the health-care
9    consumer price index rising, the need to create
10   appropriate diversions to keep individuals out
11   of the criminal justice system.
12        Sort of front-end solutions, if you will,
13   as well as building better capacity in the
14   community for prisoner reentry to have the
15   after-care services available in the community.
16        Think of it as a continuum. The need to
17   build pre and post and also have systems in
18   place to really ensure that the correctional bed
19   space is allocated by the court system to those
20   that truly need it.
21   Q   Did you identify to the Commission any concerns
22       or problems or areas of focus that you believe
23       were important to the proper operation of the
24       Bridgewater State Hospital?

31

1    A   In general, I'm sure that there was some
2        dialogue and discussion around the statutes and
3        general -- I'm not a lawyer. I can't sit here
4        and quote the statutes to you, but around the
5        statutory requirements of Bridgewater.
6            Bridgewater is at once a hospital and a
7        prison. It functions rather differently from a
8        mainstream prison, much of it by statute.
9            For example, there is no segregation unit
10       at Bridgewater, and that can become a
11       significant barrier to those that are running
12       Bridgewater State Hospital. It does not have a
13       segregation unit the way other correctional
14       facilities in the Commonwealth do. So I'm
15       certain that that came up in my testimony.
16   Q   Why is that a concern?
17   A   As a practical matter, if someone, if an inmate
18       at Walpole State Prison goes to Bridgewater
19       State Hospital for observation, not for
20       commitment but for observation, perhaps that
21       individual at Walpole had been in the department
22       disciplinary unit, which is the high-end
23       disciplinary confinement setting in the
24       department, reserved for those that have the

32

1    most egregious actions while incarcerated.
2        That individual while housed at Walpole or
3    Cedar Junction would have no contact visits,
4    would have very restricted movement, would be
5    subject to classification, would be subject to
6    disciplinary regulations. A disciplinary report
7    could be written, and the individual could be
8    secured in a segregation unit for the protection
9    of staff and inmates and the general
10   environment.
11        Once that individual goes to Bridgewater
12   State Hospital for a period of observation, and
13   then subsequently perhaps commitment, but that
14   initial stage is observation, while there, that
15   individual has contact visits. There is no
16   segregation, there is no classification system,
17   and there is no disciplinary system, all by
18   statute. So it's a very different environment.
19        So to the extent that individuals coming
20   from within the correctional system could access
21   Bridgewater, the concern upon occasion was an
22   individual would come to Bridgewater, and then
23   within a relatively short period of time, the
24   forensic examination would be conducted, and the

33

1    person would return back to Cedar Junction.
2        But while at Bridgewater, you can imagine
3    the secondary gains that could be accorded that
4    offender, creating a very challenging
5    environment to manage without the toolbox that
6    Superintendents in the other facilities have.
7    Q   Did these deficiencies exist in 2004 that you
8        just described?
9    A   Yes.
10   Q   Well, the report came out from the Governor's
11       Commission on Correction Reform in June of 2004;
12       is that accurate?
13   A   Yes, it did.
14   Q   How soon after were the recommendations in that
15       report implemented by the Department of
16       Corrections?
17   A   Actually, we had developed preliminary action
18       plans in advance of the report coming out in
19       February because much of the preliminary work
20       that had been done really guided the Commission
21       in the identification of systems issues.
22            So much of the work was already in motion,
23       particularly as it related to the administrative
24       responsibilities, the first chapter around

9 (Pages 30 to 33)

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

38

1  that were ultimately compiled into the executive
2  summary that you've identified?
3  A  Yes.
4  Q  Did some of those recommendations deal with
5  Bridgewater State Hospital?
6  A  I couldn't speak to that.
7  Q  Was there a general approach to inmate reentry
8  that dealt with a step-down process of
9  incarceration during your tenure?
10 A  Yes.
11 Q  Where inmates might over a period of time be
12 given more responsibilities in an effort and
13 more programs in an effort to try to reenter
14 them into the community?
15 A  Through the classification system, yes.
16     MR. CROMACK:  Are you talking about
17 Bridgewater or generally?
18 Q  Generally, within DOC.
19     My next question, was that whole step-down
20 process applied to Bridgewater State Hospital?
21 A  Bridgewater, the classification does not occur
22 at Bridgewater by statute, no.
23 Q  I want to try and formulate that question in my
24 mind so it makes some sense.

39

1  A  That's appreciated.
2  Q  I'm trying to adopt the language that I'm
3  unfamiliar with.
4     Are there certain levels, given the
5  facilities under the umbrella of the DOC, that
6  identify their security levels or the security
7  concerns?
8  A  There are security designations for facilities,
9  yes.
10 Q  Would you describe what those designations are
11 and how that hierarchy operates?
12 A  The -- I keep struggling to not call it
13 Walpole-- Cedar Junction by statute is
14 designated as a state prison, so in effect that
15 becomes the maximum security facility for the
16 Commonwealth because it has the statutory
17 designation as the max security state prison for
18 men.
19 Q  Is that given a certain level, number, letter or
20 something else, or is it just called maximum?
21 A  It's vacillated over the years.  I believe when
22 I was Commissioner, it was called a No. 6.
23 Q  Okay.
24 A  It was called a No. 6, designating it as the

40

1  upper-limit maximum.
2  Q  What would be the consequence of that level of
3  classification?
4     In other words, what would that facility
5  have that a facility with less level of security
6  would not have?
7  A  Well, it's a consequence and it's an outgrowth.
8  It's both.  Much of a security designation is
9  driven by the perimeter, the construction of the
10 perimeter, the type of fencing, the depth of the
11 fencing into the ground.
12     All of that speaks to, in general, the
13 security of the perimeter, the ability to
14 isolate and contain.  Are there towers, is it a
15 double-coiled fence, how many, is it Constantine
16 or wire, how many roles of wire?
17     Much of a security designation has to do
18 with the ability of the perimeter to contain
19 because facilities are in effect classified
20 based upon their architecture and their design.
21     So perimeter, a maximum-security facility
22 would have a different level of weaponry in
23 their tower than say a minimum or a medium
24 facility.  So that's first and foremost.  That

41

1  speaks to the physical plant.
2     The other part of your question is about
3  internal movement.  For example, at Walpole,
4  would there be high-level machine shops running
5  as a vocational program at a maximum-security
6  prison?  Probably not, given the security
7  setting.
8     So there are decisions made around
9  programming, around vocational programming.
10 Would you have a work crew coming out of
11 Walpole?  No.
12     So to a certain extent, you try to match
13 the right inmates via classification to the
14 right physical plant, if that helps.
15 Q  Level 6, then if MCI Walpole, Cedar Junction is
16 Level 6, do the designations of levels then
17 decrease or increase?
18 A  Decrease.
19 Q  Decrease, all the way down to Level 1?
20 A  1.
21 Q  1 would be what kind of facility?
22 A  1 was a special type of prerelease setting, and
23 there was only one of them.  It was a contract
24 prerelease setting for women out in -- run by

11 (Pages 38 to 41)

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

42

1    Spectrum in Worcester for pregnant and
2    postpartum women who were prerelease eligible
3    weeks, months away from stepping down and out
4    through the system. They're via classification,
5    so that would be the opposite end of the
6    continuum.
7    Q  Bridgewater State Hospital in 2004, what was it
8       designated as?
9    A  I believe it was a 4.
10   Q  What are the reasons it was a Level 4?
11   A  Pretty consistent architecturally with the other
12      medium-security facilities throughout the
13      Commonwealth, very different perimeter, very
14      different physical plant.
15   Q  So the big gates you have to walk through is an
16      issue associated with a Level 4, they buzz you
17      in at Bridgewater?
18   A  Any Level 4 would have a perimeter.
19   Q  A sally port inside?
20   A  It would have a lobby, but every one would have
21      a perimeter -- some levels would have a
22      perimeter, but some might not. But all mediums
23      would.
24   Q  In 2004, what were the different segments of

43

1       population inside? How were those designated?
2          Let me put it to you this way. You had a
3       Max 1, you had a Max 2, you had ITU, A-1 and
4       A-2.
5          Where did those come from? Was that by
6       statute, the Commissioner's office? How did
7       those different designations come about?
8    A  I could not give you a definition as to which
9       each is. That is an internal management system
10      used to sort and house at Bridgewater State
11      Hospital. It's not by statute.
12   Q  Do you have any knowledge as to how those were
13      created, those different designations or levels
14      were created within Bridgewater?
15   A  Historically, when Mike Maloney was
16      Commissioner, there had been considerable
17      discussion around the creating of a max unit,
18      and as I recall, that discussion centered around
19      trying to give clinicians and correctional staff
20      both some mechanism that was not clearly the
21      equivalent of segregation because segregation is
22      prohibited by statute at Bridgewater, but some
23      measure of a different level of observation and
24      supervision.

44

1    Q  Okay. You've stated that segregation is
2       prohibited by statute at Bridgewater State
3       Hospital.
4          Define what you mean by segregation.
5       Physically, what does that mean?
6    A  Isolation and seclusion.
7    Q  In a cell for 23 hours a day, essentially?
8    A  Yes, and I can't give you the specifics, but
9       it's -- I don't know if that's appropriate to
10      say it's more or less restrictive than that.
11         The standard is containing anyone at
12      Bridgewater for a period of time less than 23
13      hours, isolated and secluded, is a problem.
14      It's not you get to the threshold of the 23
15      hours and then that's the problem, because that
16      is what is understood to be the segregation
17      standard in a correctional environment.
18         In a routine segregation unit, 24 hours, 23
19      hours lockdown, one out, far less than that
20      would cause concern in practice at Bridgewater
21      as I understand it.
22   Q  As of the date that you left as Commissioner of
23      the Department of Correction in May of 2007,
24      were there any practices of exclusion and

45

1       segregation at Bridgewater State Hospital at
2       all?
3    A  I couldn't answer the technical legal question
4       regarding the seclusion-restraint statute, but
5       as for a segregation unit, there was no
6       segregation unit, no.
7    Q  Why can't you answer the issue about
8       seclusion-restraint?
9    A  Because I'm not an attorney.
10   Q  No, you misunderstood my question.
11         My question is: As far as you know, was
12      there any exercise of seclusion and restraint at
13      Bridgewater State Hospital as of the date you
14      left?
15   A  Only within, I don't believe -- I think when we
16      use the words seclusion and restraint, they have
17      a very particular legal meaning, and that's why
18      I'm sort of hesitating. I'm not so sure I fully
19      understand.
20   Q  Let me try to put it directly. I have about
21      three Banker's boxes of reports of seclusion and
22      restraint on Mr. Burns who is currently housed
23      at Bridgewater State Hospital.
24         How is it in your understanding that those

12 (Pages 42 to 45)

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

46

1 documents could be created if he wasn't
2 subjected to seclusion and restraint?
3 A Because there's a time limit, and I couldn't
4 tell you what the time limit is off the top of
5 my head, but it's limited to just hours.
6 It's sort of akin, as I understand it, it's
7 sort of akin to a time-out. It's clinically
8 driven. A clinician would remove an individual
9 for therapeutic reasons and try to contain them
10 in a short period of time.
11 That is a therapeutic response as opposed
12 to seclusion and restraint from the more
13 traditional security definition in a segregation
14 unit. The use of segregation, moving someone
15 into a segregation unit for disciplinary report
16 and going through some due process for hearing,
17 et cetera, that does not exist. That piece of
18 the toolbox operation does not exist at
19 Bridgewater.
20 To the extent that there is removal or
21 seclusion or use of restraints, it's driven by a
22 clinical response as opposed to a security
23 response.
24 Q Okay.

47

1 A I think that's --
2 Q You understand, we are here today because there
3 is an allegation that seems to be strongly
4 supported that Mr. Burns strangled William
5 Mosher to death in his cell at Bridgewater State
6 Hospital on August 28 of 2004? You understand
7 that?
8 A Yes.
9 Q Are you saying then that any action taken
10 immediately after Mr. Burns was subdued or taken
11 into custody after he killed Mr. Mosher was a
12 clinical decision to put him away from the
13 population?
14 A No, it's not as simple as that. Bridgewater by
15 statute is at once a hospital and a prison. It
16 does not operate as a mainstream prison would,
17 again, because it doesn't have classification,
18 disciplinary or segregation unit. It doesn't
19 have any of those basic correctional practices
20 and systems.
21 There is a medical director who is
22 appointed by the Commissioner of Correction
23 subject to the approval of the Commissioner of
24 Mental Health. That, I think, right there the

48

1 statute recognizes that in effect there are two
2 individuals with primary roles in deference to
3 the unique mission that Bridgewater plays in the
4 criminal justice system.
5 So the expectation would be that security
6 and treatment are dialoguing, are working
7 together, are developing appropriate responses
8 to behavior, all the ranges of behavior that
9 they see at Bridgewater. In an emergency,
10 obviously, security would respond.
11 I'm talking in terms of the development of
12 treatment plan as it goes to housing, as it goes
13 to housing restrictions. Unlike a traditional
14 prison, the therapist, the clinicians would have
15 significant input, significant input into the
16 ultimate placement of an offender, unlike sort
17 of mainstream corrections, because it is at once
18 a hospital and prison.
19 Q So there are places that you can put in
20 Bridgewater, you can put an inmate or a patient
21 who has murdered somebody else, physically put
22 them to keep them away from everybody else, but
23 it's not part of the treatment plan by statute?
24 You can't have segregation as part of the

49

1 treatment plan, correct?
2 A You cannot have -- segregation doesn't exist at
3 Bridgewater.
4 Q What would you do with a Bradley Burns that just
5 murdered somebody?
6 You take him into custody. Where do you
7 put him at Bridgewater if he can't be
8 segregated?
9 A That's a question better directed to Mr. Nelson.
10 Q As far as you know --
11 A I couldn't tell you, no.
12 Q Do you have any understanding of what the ITU or
13 Intensive Treatment Unit is at Bridgewater State
14 Hospital in 2004?
15 A That again, in my understanding, is that that
16 emerged out of a long-term discussion with then
17 Commissioner Maloney to develop some level, some
18 measure of intensive treatment, intensive
19 supervision, as a vehicle to -- I don't want to
20 use the word segregate because it's not
21 segregated, but to temporarily reposition a
22 patient within Bridgewater for a period of more
23 intensive treatment and supervision.
24 So sort of skirting and never crossing the

13 (Pages 46 to 49)

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

50

1    bar to segregation, but creating a different
2    type of unit for more intensive treatment and
3    supervision.
4    Q  Is it safe to say that there's a certain amount
5        of tension created within Bridgewater State
6        Hospital between issues associated with security
7        and issues associated with treatment?
8    A  Within any correctional environment.
9    Q  Is it your understanding that the clinician that
10       evaluates inmates and/or patients at Bridgewater
11       State Hospital has complete discretion on the
12       placement of the inmate or patient at
13       Bridgewater State Hospital?
14   A  I would not characterize it as complete
15       discretion.  My understanding is not that it is
16       complete discretion.
17   Q  Is there any way for you to characterize the
18       amount of input Mr. Nelson might have in a
19       decision for the placement of a particular
20       individual in any of the units at Bridgewater
21       State Hospital?
22   A  I could not characterize it other than to
23       generally say the expectation would be that it
24       is collaborative and done in close concert with

51

1    the medical director.
2    Q  If you could, give me an understanding of what
3        the process would be for someone who has been
4        accused of murder in the first degree and has
5        been put in Bridgewater for an evaluation of
6        competency.
7            What's the process for that particular
8        person?
9    A  I couldn't describe it in detail.
10   Q  Would the expectation be in your understanding
11       that he would be allowed access to other inmates
12       at some point during that evaluation process?
13   A  My expectation based upon the physical plant is
14       that there would be some interaction, yes.
15       There would be some level of interaction.
16   Q  When you speak about the lack of segregation,
17       you're not speaking about levels of vigilance in
18       overseeing particular patients or inmates at
19       Bridgewater State Hospital; that's accurate,
20       right?
21   A  I'm sorry?
22   Q  When you speak about the lack of segregation
23       unit or the segregation of inmates or patients
24       by statute that's prohibited at Bridgewater

52

1        State Hospital, you're not speaking about the
2        level of vigilance by staff officers or other
3        employees of Bridgewater State Hospital over a
4        particular patient or offender, correct?
5    A  I'm speaking of a security, physical plant,
6        cells that lock appropriately, that do not have
7        open bars, an appropriate physical setting to
8        remove someone from the mainstream housing
9        situation for a short period of time subject to
10       due process, and with that may come a different
11       staffing pattern for increased supervision.
12           But essentially, it's a different kind of
13       physical plant and a different kind of lockup.
14   Q  But there's no prohibition by statute over
15       assigning a particular staff officer or employee
16       to watch over a particular inmate or patient
17       that there may be some security concern about,
18       correct?
19   A  I'm sorry --
20   Q  There's no prohibition by statute that says you
21       can't assign a staff officer to an individual
22       patient to watch over constantly, in whatever
23       environment, whatever unit it is, because that
24       person poses a security risk?

53

1    A  I'm just -- it's hard for me to answer that
2        question, not being familiar intimately with the
3        management of the facility, sort of the routine
4        protocols for housing.
5            My sense is that there would be, probably
6        be an entirely revised treatment plan if it got
7        to the point where folks, the staff felt that it
8        had to be one-on-one supervision, because
9        clearly staffing would not permit that.  The
10       prisons, both on the therapeutic side and on the
11       security side, it is not one-to-one staffing
12       ratio.
13           So if it were to get to the point where it
14       were, someone recommended a one-to-one
15       supervision, a close supervision as you
16       described in your question, my instinct tells me
17       there probably would be a completely revamped
18       treatment plan that that.
19           The outcome, the solution would not be a
20       one-on-one because it's not really practical in
21       that environment.  So my sense is the clinical
22       team and the security team would get together
23       and revisit that.
24   Q  Let's take the instance of Mr. Burns.  He's

14 (Pages 50 to 53)

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

54

1    murdered another patient at Bridgewater State
2    Hospital.  He's been indicted for first-degree
3    murder.  He is pretty much in everybody's
4    opinion seriously mentally ill.  I have
5    seclusion and exclusion reports, boxes full of
6    them.
7         But your understanding is that is on a
8    limited basis during the day, there's only a
9    certain amount of time he can actually be
10   secluded.
11        Based on experience and knowledge, what
12   would you expect would be done with Mr. Burns
13   for the rest of the day?
14        MR. CROMACK:  Objection.  You can
15   answer.
16  Q  If he can't be held in seclusion, he's going to
17   be accessing other inmates?
18  A  I didn't limit my comment to the day.
19  Q  Either night or day.
20  A  My point is that it is not the equivalent of
21   segregation and from, as a correctional
22   administrator, what's really needed in a
23   situation such as that is placement in a bona
24   fide segregation unit.

55

1         Having no bona fide segregation unit at
2    Bridgewater, the Superintendent developed a
3    variety of different housing responses in
4    conjunction with the treatment staff, one of
5    them being intensive treatment, placement in the
6    Intensive Treatment Unit.
7         As to the details for the level of
8    management and response by either therapy or
9    therapeutic staff or security staff, those
10   questions are better directed to the
11   Superintendent.
12  Q  Fair enough.  Let me be a little more direct.
13        Mr. Burns murdered Mr. Mosher during your
14   tenure as Commissioner of the Department of
15   Corrections.
16  A  Yes.
17  Q  Obviously, that was a fairly significant event
18   in your tenure as Commissioner of the Department
19   of Corrections?
20  A  Yes.
21  Q  You were advised that the murder occurred pretty
22   soon after the murder occurred?
23  A  Yes.
24  Q  Did you physically go to Bridgewater State

56

1    Hospital to interact with Mr. Nelson or any
2    other person once you had heard the murder
3    occurred?
4    A  I did not that day.  I believe it was a weekend.
5     No, I did not.
6    Q  Soon thereafter, did you?
7    A  I went into central office that day.  I went
8     into the Milford central office.
9    Q  Did you have any input in how it was his family
10    was to be notified, Mr. Mosher's family was to
11    be notified that he had been killed?
12   A  No, other than I'm sure I confirmed or attempted
13    to confirm that the notification had been made.
14    The policies and procedures have that done at
15    the local level by the Superintendent or
16    designee.
17   Q  Did you have any discussions with Mr. Nelson or
18    any of his subordinates and any employees at
19    Bridgewater State Hospital about what was going
20    to happen with Mr. Burns after the murder?
21   A  More generally, my question would be:  Is he
22    contained?  Is he contained to the extent that
23    you can contain him within that environment?
24   Q  You said would be, but did you actually make

57

1    that comment or inquire about that?
2    A  I'm sure I did.  I don't have instant
3     recollection, but I'm sure I did.
4    Q  I'm not suggesting you need to.
5    A  I'm sure I did.
6    Q  You qualified it, so I'm trying to be more
7     direct.
8    A  Routine questions would be:  Was there a
9     weapon?  Has the weapon been secured?  Have we
10    notified the State Police?  Sort of going down
11    the check list that -- I'm sure every supervisor
12    between me and the Superintendent went through
13    the same check list.
14   Q  And as a consequence of that check list or going
15    through that check list, did you have an
16    understanding of where Mr. Burns was being held
17    soon after the murder?
18   A  I don't have recall as to what unit, but I had
19    been assured that he had been contained.
20   Q  Contained?
21   A  Yes.
22   Q  At Bridgewater State Hospital?
23   A  Yes.
24   Q  Did you understand that he remained, he was

15 (Pages 54 to 57)

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

70

1    Q   That that series of events had resulted in his
2        commitment?
3            MR. CROMACK:  You can answer.
4    A   Well after the fact.  I had no knowledge of any
5        patient at Bridgewater, maybe with the exception
6        of Richard Sharpe, totally unrelated.  Perhaps
7        with the exception of him, I would have had no
8        knowledge of any individual patient's names.
9            So that information, and not to that level
10       of detail, but some of that information I became
11       aware of after.
12   Q   You knew about Richard Sharpe because it was a
13       high-profile case?
14   A   Yes.
15           (Discussion off the record.)
16   Q   Were you made aware at some point in time that
17       the Department of Mental Health had initiated
18       investigations into both McLean's Hospital and
19       Arbour Hospital as a consequence of Mr. Burns
20       taking those hostages by strangulation and
21       breaking out of them?
22   A   I don't believe I was aware of that.
23   Q   Were you aware in 2004 of any prohibition or
24       restriction or limit on the Department of Mental

71

1        Health disclosing to the Department of
2        Corrections or Bridgewater State Hospital that
3        Mr. Burns, who was in custody at Bridgewater
4        State Hospital, had attempted to strangle and
5        murder three other people by strangulation
6        before he was committed at Bridgewater State
7        Hospital?
8    A   I'm sorry, I missed your very first sentence.
9    Q   Was there any prohibition that you understood or
10       limit or restriction on the DMH from telling you
11       that you have in custody a person that tried to
12       strangle three other people?
13   A   Again, I'm not an attorney, so if I say there is
14       something, I don't know what that something is,
15       if it's a statute, if it's a regulation.
16           My general impression has always been that
17       the Department of Mental Health is
18       understandably reluctant to release information
19       inasmuch as it may jeopardize their client's
20       confidentiality.
21           In my earlier discussions with Commissioner
22       Sudders, we were very much philosophically on
23       the same page, that there was a need for
24       continuum of treatment, and that opens the door

72

1        to an appropriate level of sharing information.
2    Q   Was the first time you became aware that Mr.
3        Burns was in custody of the Bridgewater State
4        Hospital when you were advised that he had
5        strangled Mr. Mosher to death?
6    A   Yes.
7    Q   So at that point, nobody, your Deputy
8        Commissioners or Assistant Deputy Commissioners
9        or Mr. Nelson, neither of those individuals had
10       informed you that they had in custody a person
11       who had attempted to strangle other people and
12       was committed for observation?
13   A   No.
14   Q   Were you given any information related to -- I
15       don't know how to put that -- the level of
16       mental illness or mental health of any of the
17       inmates or patients at Bridgewater State
18       Hospital on a regular basis?
19   A   No, with the exception of, again, something
20       really high profile.
21   Q   Like Dr. Sharpe?
22   A   No.  Other than that, no.
23   Q   Is that as a result of custom or policy or
24       protocol that you wouldn't be informed about the

73

1        mental health of any particular person in
2        custody at Bridgewater?
3    A   For the most part, in an organization that big,
4        the Commissioner has their responsibilities, and
5        there are two or three levels between the
6        Commissioner and the Superintendent, the level
7        of Superintendent.
8            And my philosophy was always they need to
9        do their work.  There's no point in having
10       supervisors if they don't supervise.
11   Q   So was it an individual choice on your part to
12       say or to operate under a philosophy that Mr.
13       Nelson is in control of Bridgewater State
14       Hospital, and whatever he says goes?
15   A   No, he was in charge, certainly by statute, he's
16       a creature of the statute with enumerated
17       responsibilities in charge of Bridgewater State
18       Hospital under the direct, almost daily
19       supervision of an Assistant Deputy
20       Commissioner.
21           Any major initiative, any major discipline,
22       anything that a Superintendent would be engaged
23       in for that day's activity or long-range
24       planning would be done under supervision and in

19 (Pages 70 to 73)

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

| 74 | 76 |
|---|---|
| 1    consultation with his Assistant Deputy | 1    intimately involved with Mr. Nelson's decision |
| 2    Commissioner. | 2    making or administrative duties, managerial |
| 3         The Assistant Deputy Commissioner in turn | 3    duties, with respect to Dr. Sharpe at any time? |
| 4    seeks guidance and supervision from the Deputy | 4    A  I would not characterize it as managerial. |
| 5    Commissioner.  So -- | 5         Did we have conversations goes regarding |
| 6    Q  Would anyone seek guidance from you, direction | 6    Mr. Sharpe?  Yes. |
| 7    from you? | 7    Q  Why did you have conversations regarding Mr. |
| 8    A  If need be, yes, if need be.  So it's really -- | 8    Sharpe? |
| 9    there's enough infrastructure there.  I mean, | 9    A  May I consult? |
| 10   most of these folks have 30-plus years of | 10   Q  Yes, if it's an issue of confidentiality, I have |
| 11   correctional experience at that level. | 11   no problem with that. |
| 12        There's enough experience and background, | 12        (Discussion off the record.) |
| 13   and these Deputies and Assistant Deputy | 13        (Question read back.) |
| 14   Commissioners have actually run facilities.  So | 14   A  This is, it's a little embarrassing, not to me, |
| 15   it wouldn't be the norm to just, oh, I think | 15   but to some elected officials.  Mr. Sharpe had |
| 16   I'll call the Commissioner and ignore my two | 16   a-- in that you're representing him, you're |
| 17   bosses.  I think I'll just get into the habit of | 17   probably aware of this -- had been previously |
| 18   calling the Commissioner every day to see what | 18   represented by an attorney, couple of attorneys |
| 19   she would like me to do. | 19   down in Texas, a man and a wife, and they were |
| 20        That's not how organizations, particularly | 20   significant political players.  I think they |
| 21   chain of commands in large organizations | 21   were rather wealthy financial backers, as |
| 22   function. | 22   evidenced by the plane, the private plane that |
| 23   Q  Are you prohibited from issuing directives to | 23   they would use to fly up to interview Mr. |
| 24   Mr. Nelson directly? | 24   Sharpe. |

| 75 | 77 |
|---|---|
| 1    A  No, but again, respecting the chain of command, | 1    Q  I know what you're talking about, yeah.  But |
| 2    because it creates confusion, if people choose | 2    continue, I need it for the record. |
| 3    to go up that side of the chain of command and | 3    A  And they would, it was not uncommon for them to |
| 4    come down that side and then everybody doesn't | 4    show up unannounced.  I think initially there |
| 5    have the same information, it really kind of | 5    was some confusion as to whether they were even |
| 6    ties people's hands trying to do their jobs. | 6    attorney of record. |
| 7         So I would try to be respective and go | 7         I mean, you know, I hope you understand |
| 8    through the chain of command. | 8    that if you're not attorney of record, then you |
| 9    Q  Were there ever any occasions that you issued | 9    don't get the privileges that are accorded an |
| 10   any directives to Mr. Nelson during your tenure | 10   attorney. |
| 11   through your Deputy Commissioner or Assistant | 11        But when you have an attorney with that |
| 12   Deputy Commissioner at any time? | 12   level of connections, they're going to stamp |
| 13        Did you issue any directives? | 13   their foot and pout, so there was a lot of |
| 14   A  I don't recall any.  I wouldn't say I didn't, | 14   stamping of the foot and pouting with that law |
| 15   but nothing -- I can't think of anything. | 15   firm. |
| 16        Again, it wasn't a prohibition against | 16        And whenever -- frankly, this is the piece |
| 17   speaking to these individuals.  It certainly was | 17   that is embarrassing because if it turned out |
| 18   not the norm. | 18   not to be true I wouldn't want to ruin |
| 19   Q  Let's take Dr. Sharpe as an example. | 19   somebody's reputation -- there were some serious |
| 20        I mean, it was brought to your attention | 20   concerns about what exactly was the nature of |
| 21   that he was in the system, correct, because he | 21   the relationship between Richard Sharpe and the |
| 22   was high profile? | 22   female attorney.  She was coming up regularly on |
| 23   A  Yes. | 23   her own, handling his appeal, but doing an |
| 24   Q  Did you issue any directives or become more | 24   inordinate amount of advocating, and every other |

20 (Pages 74 to 77)

102

1   A   Mm-hmm.
2   Q   Or prohibited altogether?
3   A   Yes.
4   Q   Did you have any input into the legislation that
5       created the statute providing for either a
6       prohibition against segregation at Bridgewater
7       State Hospital or some kind of restriction on
8       how long a person may be segregated?
9           Did you have any input into that
10      legislation?
11  A   May I ask a clarifying --
12          MR. CROMACK:  Is your question to me
13      or him?  If it's about confidentiality or
14      something, it's for me?
15  A   Are you talking about the '70s Jack Backman
16      laws?
17  Q   I don't know.  I don't know how recent that
18      segregation --
19  A   No, no input into those.
20  Q   Did you ever voice or did you ever have an
21      opinion with respect to the efficacy of the
22      statute regarding segregation at Bridgewater
23      State Hospital?
24  A   Yes.

103

1   Q   What was that?
2   A   I believe on at least two occasions as
3       Commissioner, it's customary for cabinet
4       members, and I presume it comes from the
5       Governor, to ask on an annual basis:  Are there
6       any statutes out there that you think are
7       contradictory, outdated?  Any reports that are
8       being generated that haven't been needed for 20
9       years?  Anything you would like to see changed
10      or would you like to float a suggestion for some
11      technicalities?
12          Under my tenure, I know I did at least
13      once, and I may have done it twice, floated the
14      suggestion that there be some creation of a
15      segregation unit at Bridgewater to enable the
16      administrators of Bridgewater in their
17      day-to-day management decisions to have a fuller
18      range of options.
19  Q   Floated means -- that sounds like it's agency
20      speak, and I need to know what you mean by
21      float.  Is that a memorandum or just --
22  A   A memorandum, through counsel, though the --
23      they would take a look at it in terms of
24      proposed language, basically the people in the

104

1       field.
2           The Commissioners would come up with the
3       ideas, attorneys would take a stab at trying to
4       craft some legislation, and then that would go
5       to the respective cabinet member.  And beyond
6       that, I don't know what the machinations look
7       like.
8   Q   Did you also keep Mr. Nelson in the loop when
9       you floated those ideas?
10  A   Generally, once a year, just as I would with a
11      budget, if I were to say to all the -- it's
12      something I would do in a Superintendent's
13      meeting with all department heads.
14          Okay, it's that time of year, we are
15      looking for any budget suggestions.  Got any
16      ideas how we can save money?  Got any ideas
17      about new programs we should be running?  Are
18      there any regulations we need to be looking at?
19      Are there any issues that can be addressed
20      either via budget or legislation, because a good
21      part of my job is the external environment, what
22      issues do I need to bring to the Secretary that
23      we believe would enhance the operation.
24          So I couldn't tell you if Ken was in the

105

1       room that day or not, you know, I wouldn't have
2       that level of recall.  But that's generally how
3       it's done, to the group, saying:  Okay, now, get
4       your legislative proposals to our legislative
5       liaison, give them the due date, ask for budget,
6       get any budget adjustments that you want made to
7       the budget person by such and such a day.
8           And then my more senior staff, we'd sit at
9       a table like that, say there are so many
10      competing interests and so little money, we as a
11      group will look at what bills do we want to
12      advance and put together a package and then
13      submit it.
14  Q   Are you aware of any state statute, law, rule or
15      regulation that confines the determination of
16      placement of an inmate or patient at Bridgewater
17      State Hospital to the clinical therapist and the
18      clinical therapist only?
19  A   I don't believe so, no.
20  Q   And if there were one, would that seem to be in
21      opposite to the general mission statement of the
22      DOC, which is that placement is in the least
23      restrictive environment, but you take into
24      consideration security issues as well?

27 (Pages 102 to 105)

Kathleen M. Dennehy 5-14-2008
William Mosher v. Kenneth Nelson, et al.

106

1  A  As an administrator, I wouldn't form a first
2      impression.  I'd want to see the full context.
3      I'd want to see the full document, and I'd want
4      to consult with an attorney as to what's the
5      intent here, what's the fuller picture.
6  Q  Did you ever make a statement that you had been
7      calling on management for six months prior to
8      the death of Mr. Mosher to increase staffing at
9      Bridgewater State Hospital?
10 A  No.
11 Q  Had you been calling on management for the six
12     months prior to the death of Mr. Mosher to
13     increase staffing at Bridgewater State Hospital?
14 A  What management would I call on?  I don't even
15     understand that from an organizational
16     perspective.
17 Q  Did you ever make a statement that some 50
18     officers were then on leave due to injuries on
19     the job, most of them in confrontations with
20     inmates or patients at Bridgewater State
21     Hospital?
22 A  I don't recall that, no.  That is not to say
23     that there aren't some officers, obviously, that
24     would be a higher risk placement to be out.

107

1  Q  If Mr. Kenneway represented to the press that he
2      had been calling on management for six months
3      prior to the death of Mr. Mosher to increase
4      staffing at Bridgewater, would that be in your
5      mind an accurate statement?
6  A  I would never presume to speak for Mr. Kenneway,
7      nor assess the relevance, truthfulness or
8      accuracy of anything.
9  Q  As far as you know, had he, as far as you know
10     in your personal knowledge, do you have any
11     basis for believing or disbelieving that he had
12     been calling on management to increase staffing
13     at Bridgewater for six months?
14 A  He had been calling on the legislature and the
15     media, not so much management, to replace,
16     rather than getting the officers back to work,
17     just replacing them with new officers.
18 Q  Okay.  I'm going to ask you whether or not you
19     believe that statement to be accurate or
20     inaccurate.
21        This is a statement attributed to Mr.
22     Kenneway, quote:  There are inmates who have
23     nothing but time to figure out how to do
24     something like that, i.e., murder in the

108

1      shortest possible period of time, he said.
2          Is there any basis in accuracy for that
3      kind of a statement?
4  A  I'm sorry, say that one more time.
5  Q  Quote:  There are inmates who have nothing but
6      time to figure out how to do something like that
7      in the shortest possible period of time.  He's
8      speaking about the murder of Mr. Mosher.
9          Is there any accuracy in your mind to that
10     statement?
11 A  I think -- I'm not quite sure what he's getting
12     at.  I think what he's rather poorly
13     communicating is that in a correctional
14     environment, you have 11,000 individuals who for
15     the most part made bad decisions.  Some of them
16     made them competently; some made them
17     incompetently.
18        But they made bad decisions, and as a class
19     of individuals, they tend to not think things
20     through well.  And officers are trained to
21     always have that in mind, that there's always
22     the potential for something to happen.  There's
23     always the potential for something to happen.
24        So obviously the system does not run on a

109

1      one-on-one.  It's not one officer for one
2      inmate.  But we always are reminded that there
3      are always risks, there are always risks.  So
4      I'm assuming that's what he's getting at.
5  Q  That being said, as you've just articulated,
6      that being said, does it seem like then there
7      has to be increased vigilance in an environment
8      where you have individuals who are competent and
9      made poor judgments that resulted in their being
10     committed and individuals with variant degrees
11     of mental illness that have resulted in their
12     decisions that have resulted in their
13     commitment, doesn't it seem logical then that
14     you would have to have an increased vigilance at
15     some environment that has combined both of those
16     types of offenders?
17 A  I think that's one of the reasons we asked for.
18     We tried advance support for a legislative
19     initiative to get a segregation unit.  That's
20     the more general, the broader level of the
21     problem.
22        I think at the more micro level, at the
23     line level, that the responses to mobility
24     restriction are driven by collaboration at the

28 (Pages 106 to 109)

# O'BRIEN & LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# William Mosher v. Kenneth Nelson, et al.

### Transcript of the Testimony of:

# Elizabeth Childs

# May 14, 2008

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

Cindy M. Falcon   28972

Elizabeth Childs 5-14-2008
William Mosher v. Kenneth Nelson, et al.

---

**6**

1   A  I do.
2   Q  And is it Elizabeth Childs, psychiatrist, or is
3       it under a formal business name?
4   A  It's Elizabeth Childs, MD, PC.
5   Q  Would you please give me a description of your
6       education starting at the college from which you
7       matriculated and the degree that you received?
8   A  I got an AB from Mt. Holyoke College in 1982. I
9       got an MD from the University of Cincinnati,
10      1986, and I'm currently enrolled at the Harvard
11      Kennedy School with an MPA for June 5 of '08.
12  Q  Do you have any certifications?
13  A  I am board certified in adult and child
14      psychiatry child and adolescent psychiatry.
15  Q  Do you have any awards or commendations that
16      you've received?
17  A  Yes.
18  Q  Could you describe those, if they're not too
19      onerous?
20  A  Let's see what's on my resume. I am, I was a
21      Sigma Psi in college. I was awarded a best
22      teaching award as a resident when I was doing my
23      residency.
24      I have received numerous awards in my

---

**7**

1   professional work for public sector psychiatrist
2   of the year from the Mass. Psychiatric Society.
3   I'm a distinguished fellow with the American
4   Psychiatric Association. I've received — let
5   me see. I think that's it. I'm trying to
6   think. That's kind of the summary.
7   Q  Other than the certifications that you
8       described, do you hold any licenses, local or
9       national?
10  A  I have a Massachusetts driver's license, and I
11      have a Massachusetts medical license.
12  Q  Have you been subjected to any complaints with
13      any certification or licensing boards during
14      your practice?
15  A  I had a complaint filed when I was a resident
16      in, it would have been in the late 1980s, which
17      was vacated by the Board of Registration in
18      Medicine.
19  Q  Would you describe your employment history?
20  A  I was, following medical school, I was employed
21      as a resident in internal medicine at the Good
22      Samaritan Hospital in Cincinnati, Ohio, for 12
23      months.
24      Following that, I was employed by the

---

**8**

1   Massachusetts Mental Health Center as an adult
2   psychiatric resident from 1987 to 1990. Then I
3   was employed by the Massachusetts Mental Health
4   Center as a child-adolescent fellow from 1990 to
5   1992.
6       I was employed by the Carney Hospital from
7   1988 until 2003. I was employed by Cambridge
8   Psychiatric, moonlighting psychiatrist from 1988
9   until approximately 1992. I was employed by
10  Winthrop Hospital.
11      I've been employed by Elizabeth Childs, MD,
12  PC, since 1988, I think, '88 or '89. I'm not
13  sure exactly. I've been employed by the
14  Department of Mental Health as the Commissioner
15  from 2003 to 2007. I've been employed by the
16  federal government for the National Institute of
17  Mental Health Advisory Council since — let's
18  see — 2006, I think, 2005, 2006, I believe. I
19  think that's it.
20  Q  And have you either published or jointly
21      published, individually or jointly, any
22      publications, books, or other trade type things?
23  A  Yes, I have.
24  Q  Could you describe those for me?

---

**9**

1   A  I've published in Surgery on
2   pancreatoduodenectomy. I've published in
3   Psychiatry in treatment of adolescent bipolar
4   disorder. I published in fiction and creative
5   short stories.
6   Q  What did you write in fiction?
7   A  I wrote short stories primarily around family
8   relationships.
9   Q  Do a lot of psychiatrists publish fiction?
10  A  No. I did write an undergrad thesis that I
11  never had formally published, although it is in
12  the library at Mt. Holyoke College.
13  Q  How did it come to pass that you were employed
14      as is the Commissioner of the Department of
15      Mental Health?
16  A  I was at the time the director and chief of
17  psychiatry at Carney Hospital and president of
18  the Massachusetts Psychiatric Society, and I
19  testified in front of the Secretary of Health
20  and Human Services at the time, Ron Preston,
21  regarding the Romney Administration's proposed
22  reductions to the mental health system in
23  Massachusetts and opposing them.
24      And the next day Secretary Preston called

---

3 (Pages 6 to 9)

# O'BRIEN&LEVINE

Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

## William Mosher v. Kenneth Nelson, et al.

**Transcript of the Testimony of:**

# Daniel W. Comiskey

# May 16, 2008

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

Cindy M. Falcon   29283

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

10

1  A  Okay.
2  Q  Your practice of psychiatry?
3  A  That would start, my residency was from '96 to
4     2000 at Brown University, then University of
5     Massachusetts from 2000 to 2001, again, graduate
6     fellowship in law and psychiatry.
7        And since that time, I've been employed at
8     Bridgewater State Hospital, majority of the time
9     as an attending psychiatrist, and since July of
10    2007 I've been the Deputy Medical Director
11    there.
12 Q  How do it come about that you were employed at
13    Bridgewater State Hospital?
14 A  A component of the fellowship in law and
15    psychiatry involved clinical placement at
16    Bridgewater State Hospital.  I was there for the
17    first half of the fellowship year, which would
18    be July through December of 2000.
19       I was there three or four days a week,
20    depending on the week, doing clinical work and
21    also forensic evaluations.  And based on my
22    experiences there and the opinions of the people
23    I worked with, I was offered a position there
24    before I left, actually to start when I

11

1     completed my fellowship.
2  Q  What year did you complete your fellowship?
3  A  2001.
4  Q  Who offered you a position at Bridgewater after
5     or as you came to the end of your fellowship?
6  A  I believe Ken Applebaum would be the chief
7     person, although Susan Skea, the Medical
8     Director, S-K-E-A, certainly was involved in
9     such a decision, but Ken Applebaum represented
10    Commonwealth Medicine, who had the contract for
11    providing psychiatric services there at that
12    point in time.
13 Q  At that time, what did you know about this
14    contract with Commonwealth Medicine?
15 A  Almost nothing, except that the University of
16    Massachusetts, through their Commonwealth
17    Medicine Division, was responsible for providing
18    these physician psychiatrist services at
19    Bridgewater.  That was during my fellowship
20    year.
21       They took over the forensic evaluation
22    service at the start of my employment there as
23    an attending psychiatrist, so in July of 2001,
24    and I'm trying to remember when they got the

12

1     contract for all of the medical and psychiatric
2     services in the Department of Correction.
3        I believe it was two years after that, but
4     it may have been one year.  I can't remember
5     when that contract began.
6  Q  Was it prior to 2004?
7  A  Yes.
8  Q  What were your duties when you were finally
9     employed after your fellowship by Bridgewater
10    State Hospital?
11 A  Primarily to provide evaluation and treatment
12    for individuals referred to Bridgewater State
13    Hospital for treatment.  I initially was working
14    on the Max 2 Unit.
15       I also do a variety of administrative work
16    as assigned by the Medical Director, involvement
17    in committees, such as Professional Executive
18    Committee, Forensic Training Committee, and I
19    also do some forensic evaluations for the
20    courts.
21       It wasn't a requirement of my role, but as
22    I had the training to do it, for several years I
23    was also doing those as well.
24 Q  Would you describe the hierarchy from Medical

13

1     Director down at Bridgewater State Hospital say
2     in 2004?
3  A  That was fairly clear.  There was a Medical
4     Director, and there was everyone else.
5  Q  The Medical Director once again was Ms. Skea?
6  A  Dr. Susan Skea.
7  Q  How do you spell the last name?
8  A  S-K-E-A.
9  Q  And there was no Assistant Medical Director or
10    Associate Medical Director or Deputy Medical
11    Director or anything like that?
12 A  No.  There had been previously, but at the start
13    of my employment that position was vacated, and
14    at some point I believe they removed it from the
15    matrix until the onset of MHM taking over the
16    contract in July of 2007.
17 Q  And how many individuals like yourself were
18    underneath the Medical Director in 2004?
19 A  I am not 100 percent confident of what the exact
20    FTE was, full-time equivalent was, as I was not
21    involved in such matters at that point in time.
22       I believe there were nine or ten
23    psychiatrists in addition to the Medical
24    Director.  I'm not sure if that was fully nine

4 (Pages 10 to 13)

Case 1:04-cv-12560-MLW    Document 68-6    Filed 08/15/2008    Page 3 of 24

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

14

1    or ten FTEs, but something in that ballpark.
2    **Q   What about medical support staff; was there**
3    **medical support staff as well?**
4    A   For physical health care, you mean?
5    **Q   Psychiatric health care, nurses and the like?**
6    A   Yes, nurses and social workers, and I don't
7    believe there were any -- there may have been
8    licensed mental health clinicians at that point
9    in time, which are master's level psychology
10   trainees.
11       I'm not sure the total number of
12   individuals of any of those categories at that
13   point in time.
14   **Q   In 2004 did you interact with any of the**
15   **individuals in those categories such as nurses**
16   **and clinicians and the like?**
17   A   Routinely, yes.
18   **Q   When you say routinely, how often per week?**
19   A   How many interactions per week? Nurses are --
20   let me see if I can bracket it in a logical
21   way.
22       With the exception of the B building, the
23   ITU, MedWest, and the infirmary.  Typically the
24   units would be a team of four individuals,

15

1    psychiatrist and three other clinicians.  One of
2    those clinicians usually would be a
3    psychologist, and two of them would be a social
4    worker, and that would be the entity referred to
5    as the treatment team or the core members of the
6    treatment team.
7        Those are individuals whom I would interact
8    with repeatedly on a daily basis, that we had
9    been working together for significant segments
10   of the day.  Different units operate
11   differently, so it's hard to give a global
12   answer that for that, but my experience is in
13   2004 on Max 2 where I would work in the same
14   room with them primarily in the morning and then
15   in the afternoon, with some degree of overlap.
16       Nurses at Bridgewater typically do not play
17   a central role in -- I don't want to say
18   providing treatment, but sort of in
19   assessments.  They usually are more a role of
20   assessing medical issues on the unit, referring
21   people to the medical clinic and dispensing
22   medications.
23       And those are some of the sort of
24   operational aspects of the system there such as

16

1    making sure records get from one place to
2    another, things along those lines.
3    **Q   Were you in a position to issue directives or**
4    **assignments to the support staff, the nurses and**
5    **other clinicians that were part of the teams?**
6    A   I apologize for the vagueness, but sort of.
7    Bridgewater is not set up and the culture there
8    is not such that it's analogous to the way other
9    hospitals have a strict medical hierarchy of
10   physician at the top of the pyramid and other
11   people sort of fall in at some subordinate role
12   to that.
13       Clearly as the person on the treatment team
14   with the, you know, greatest training and
15   educational level, you know, I was the person
16   who, if there were disagreements about what to
17   do, my opinion would carry much greater weight.
18       But it was never really a scenario where I
19   would need to issue directives or unilaterally
20   make a decision.  And the reason for that is in
21   a facility such as Bridgewater, it makes more
22   sense for decisions to be made by groups rather
23   than individuals.
24       I do have influence over people such as,

17

1    you know, if I write an order, nurses have to
2    comply with whatever I wrote as long as it's
3    medically appropriate and reasonable.  And
4    certainly I was afforded some seniority by
5    virtue of relationships I might establish with
6    people or the fact that I was the physician
7    there.
8        But people would not be assigned as
9    subordinate to me in a formal employment or
10   reporting way.
11   **Q   You touched on in your testimony a description**
12   **of the physical layout of Bridgewater,**
13   **identifying different units perhaps in different**
14   **buildings.**
15       **Could you give me a better understanding of**
16   **the actual physical structure and division of**
17   **the units and buildings at Bridgewater State**
18   **Hospital?**
19   A   I'll try.  There are a number of different
20   units, and maybe I'll describe them and you can
21   add them up when I'm done so I get the number
22   right.
23       There are three minimum security units.
24   A-1, A-2, and C-1 are how they are referred to.

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

| 18 | | 20 | |
|---|---|---|---|
| 1 | Q  More specifically, if you could identify -- I | 1 | infirmary is the one other unit where you might |
| 2 | don't know if it's changed, but my area of | 2 | have patients who are on seclusion status or |
| 3 | interest is 2004, obviously. | 3 | perhaps even restrained. |
| 4 | So if you could restrict your comments to | 4 | And lastly, a unit called MedWest, which at |
| 5 | that period of time, it would be helpful. | 5 | that point in time I'm not sure if technically |
| 6 | A  All right.  What I've said so far is consistent | 6 | it had been closed or not.  But even when it was |
| 7 | with that. | 7 | closed, it still seemed to have a small |
| 8 | Q  Okay. | 8 | population living there.  And that's a unit for |
| 9 | A  Those units are committed patients, typically | 9 | patients who are lower functioning, for example, |
| 10 | more stable, showing greater behavioral | 10 | patients for whom mental retardation might be a |
| 11 | stability, approximately 50 to 55 patients on | 11 | significant confounding variable such that they |
| 12 | each. | 12 | might be at risk of victimization on other units |
| 13 | There are and were two maximum security | 13 | or might not be capable of living as |
| 14 | units, Max 1 and Max 2.  At that point in time | 14 | independently as would be necessary if they were |
| 15 | the census on those units I believe typically | 15 | going to be housed on another unit. |
| 16 | would range from 20 to 25, although those units | 16 | And occasionally high-profile individuals |
| 17 | can accommodate up to 32 or so patients. | 17 | might be housed on MedWest in a sort of |
| 18 | There also are -- the B building is | 18 | quasi-protective, custody-like status.  For |
| 19 | considered one unit, although technically it's | 19 | example, I can recall one priest accused of |
| 20 | two, B-1 and B-2.  That's the admissions unit, | 20 | child molestation who was housed on MedWest. |
| 21 | patients who are not committed and who have been | 21 | Obviously, it was not a good idea to mix him in |
| 22 | sent for evaluation, as long as the nature of | 22 | with the rest of the population. |
| 23 | their illness and behavior is sufficiently | 23 | There is one other unit there that's not |
| 24 | stable that they can be in population, those are | 24 | patients, C-2, referred to as inmates live |

| 19 | | 21 | |
|---|---|---|---|
| 1 | the units where they would be housed. | 1 | there, not patients.  And it's referred to as |
| 2 | B-1 is the more restrictive of those two | 2 | cadre, that population of individuals, and they |
| 3 | units, and typically that is where a patient | 3 | are individuals in the custody of the Department |
| 4 | would start.  And they could be moved to B-2 if | 4 | of Correction but who live at Bridgewater to |
| 5 | they showed that they would be able to | 5 | provide supportive services and basically do |
| 6 | appropriately manage themselves in a | 6 | work there.  I believe that's up to about 50 |
| 7 | less-restrictive setting, and B-2 is a | 7 | patients as well.  It's the same size as the |
| 8 | less-restrictive setting than B-1. | 8 | three minimum units. |
| 9 | There are also more specialized units, the | 9 | Q  So C-2 is for inmates who are assigned some kind |
| 10 | most noteworthy and perhaps relevant to your | 10 | of supportive maintenance services to the |
| 11 | concerns, the Intensive Treatment Unit, | 11 | facility? |
| 12 | otherwise known as the ITU.  That's the unit | 12 | A  Right.  They might clean, they might have skills |
| 13 | where seclusion and restraint typically occur, | 13 | as a plumber, things like that occasionally get |
| 14 | that a patient would not be in the ITU if they | 14 | people in.  They help with the operations. |
| 15 | were not at least secluded, and some patients | 15 | Q  But they're not committed as a consequence of |
| 16 | might in fact be restrained if that was | 16 | some mental illness or development disability or |
| 17 | medically necessary for their safety. | 17 | something? |
| 18 | That unit, I believe it could hold up to | 18 | A  There is no mental health issue with them, |
| 19 | 16, and I'm not sure if that number has gone up | 19 | although they can develop mental health needs |
| 20 | or down a little bit since 2004. | 20 | and get treatment for it.  But they are not |
| 21 | There is an infirmary for patients who are | 21 | assigned to Bridgewater through the |
| 22 | medically unwell or in need of closer medical | 22 | court-ordered mechanism of all the people that |
| 23 | monitoring than can be provided for on any of | 23 | are patients there and are kept there. |
| 24 | the other units, including the ITU, so the | 24 | Q  Is it accurate that there are different phases |

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

22

1    of the max units?
2    A  Yes.
3    Q  Well, first, let me go back to my original
4        question.
5            Do each of the units that you described,
6        are they each housed in separate buildings?
7    A  Well, separate units.  A number of the buildings
8        have two floors.
9    Q  Okay.
10   A  A-1, A-2, B-1, B-2, C-1, C-2, those buildings
11       are two floors.  The floors, there's a stairwell
12       in the middle and I believe on the ends.  The
13       units are kept separate from each other.
14       There's no sort of general commingling.
15           Functionally, the patients who are on A-1
16       and patients on A-2, they might as well be in
17       separate buildings in terms of any degree of
18       mingling that they might have within the
19       building itself.
20   Q  Are there gates on the stairways and stuff?
21   A  Exactly.  The end stairwells are just fire code
22       type things, but they're kept locked.  The
23       stairwell in the middle is the means by which
24       patients get to their unit, you know, they go up

23

1        the stairwell, and at the top is an entry with a
2        sliding door, controlled access.
3            They don't go through that door unless it's
4        at a point in time where they have permission to
5        do so, and they would be leaving the building.
6        They wouldn't be going downstairs to A-1.  So
7        the same building in terms of how it operates,
8        it might as well be a separate building.
9            The only way they see each other is if
10       they're both off the unit at the same time and
11       ended up at a hospital where they might mingle.
12   Q  As far as A-1 and A-2, they're separated whether
13       or not they are in the same building.  There's
14       no access between them.
15           C-1, is that a separate building?
16   A  C-1 and C-2 is a carbon copy of B, although
17       they're separate floors, they are considered
18       separate units.  The one difference that B
19       building has is that, since it's primarily
20       evaluation patients housed there whose needs are
21       in all likelihood more acute, there's a larger
22       treatment team, and the treatment team from the
23       perspective of a patient.
24           B-1 and B-2 are separate units.  From the

24

1        perspective of the treatment team they aren't.
2        They might be providing treatment to a patient
3        on B-1, they go to B-2, they continue to provide
4        care for them.  The treatment teams, there's no
5        barriers between them.  We continue to follow
6        our patients regardless of whether they're at
7        B-1 or B-2, and that is the only circumstance in
8        which a patient would move to a different unit
9        but not also move to a different treatment
10       team.
11           Otherwise, the patient's housing unit
12       defines who is providing care for them, and when
13       they move to a new unit, it would necessarily be
14       a new team.
15   Q  As far as Max 1 and Max 2, are they separated
16       units?
17   A  Mm-hmm.  They are not two-story units.  They are
18       one-story units, entirely separate buildings.
19   Q  And ITU?
20   A  It is a separate unit contained within the
21       medical building.
22   Q  MedWest building?
23   A  Well, the medical building contains the ITU,
24       contains sort of medical offices, a room for

25

1        getting X-rays, things like that, phlebotomist
2        area, then a separate unit which is the
3        infirmary, and a separate unit which is
4        MedWest.
5            The strange thing, MedWest and the
6        infirmary are actually contiguous units.  They
7        are two wings of an L-shaped corridor, and there
8        is no physical barrier between them.
9    Q  There is or is not?
10   A  Is not.  So probably the only two units in which
11       there's no physical barrier erected between
12       patients who are considered MedWest patients and
13       patients who are considered infirmary patients.
14   Q  ITU is separated?
15   A  ITU is the most controlled unit of any of them
16       by nature of its function, providing seclusion.
17   Q  I was going to ask you the hierarchy of secured
18       units, and that would start with the Intensive
19       Treatment Unit?
20   A  Yes.
21   Q  Is that essentially because it provides for
22       seclusion and restraint?
23   A  Yes.
24   Q  You said that the restraint was for the safety

7 (Pages 22 to 25)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

| 26 | |
|---|---|
| 1 | 'of the patient? |
| 2 | A  Patients would be restrained for any of the |
| 3 | reasons they might be restrained at any |
| 4 | psychiatric facility or any medical setting, |
| 5 | safety of patients, safety of others. |
| 6 | Q  If there is a step down from ITU, what would be |
| 7 | the next most secure unit at Bridgewater State |
| 8 | Hospital? |
| 9 | A  That would be one of three units.  Could be Max |
| 10 | 1 or Max 2.  It could be B-1.  B-1 is considered |
| 11 | a maximum security unit as well, and I believe |
| 12 | the majority of patients leaving the ITU would |
| 13 | be going to B-1. |
| 14 | The ITU's population is typically skewed to |
| 15 | patients on evaluation status.  Hopefully |
| 16 | patients who have been committed would within |
| 17 | some reasonable time frame have achieved greater |
| 18 | clinical stability such that they wouldn't be |
| 19 | residing in the ITU for long periods of time |
| 20 | with certain individual exceptions, but talking |
| 21 | about populations and general tendencies of how |
| 22 | the facility usually operates. |
| 23 | Q  Is ITU the only unit at Bridgewater State |
| 24 | Hospital that precludes contact with other |

| 27 | |
|---|---|
| 1 | inmates and/or patients at Bridgewater by an |
| 2 | inmate or a patient? |
| 3 | A  You mean where an inmate would not have |
| 4 | opportunity to contact another? |
| 5 | Q  Mm-hmm. |
| 6 | A  The infirmary is a unit where you might also |
| 7 | have that degree of separation for different |
| 8 | reasons.  A person might be secluded in the |
| 9 | infirmary or restrained in the infirmary, and |
| 10 | obviously that would preclude other patients |
| 11 | having access to them. |
| 12 | They also might be isolated in the |
| 13 | infirmary, most typically if there is a question |
| 14 | of tuberculosis, they could be in the |
| 15 | negative-pressure room, and that again is |
| 16 | analogous to any medical facility, although |
| 17 | strictly speaking the door isn't locked when a |
| 18 | person is in isolation for that reason. |
| 19 | Certainly the role of the staff on the unit |
| 20 | is to insure that a patient on protocol like |
| 21 | that doesn't come into contact with other |
| 22 | patients. |
| 23 | Q  Now, in the ITU you've described using two |
| 24 | words, seclusion and restraint.  I need to know |

| 28 | |
|---|---|
| 1 | whether or not those are contemporaneous terms. |
| 2 | In other words, if somebody is secluded, |
| 3 | they are physically restrained? |
| 4 | A  If a person is secluded, they are in a room, in |
| 5 | a cell, by themselves, and the door is locked. |
| 6 | That's the definition of seclusion. |
| 7 | Q  Okay. |
| 8 | A  Restraint would be a person actually being |
| 9 | restrained to a bed, typically using either |
| 10 | leather or occasionally metal restraints if |
| 11 | leather restraints were inadequate to contain |
| 12 | them. |
| 13 | Restraint is a more restrictive clinical |
| 14 | status than being secluded.  There are some |
| 15 | defenses in how the unit operates.  A patient |
| 16 | who is restrained by state law needs to be on |
| 17 | constant observation, and an individual would be |
| 18 | sitting outside the door of their cell.  The |
| 19 | door would in fact be unlocked and ajar so they |
| 20 | could observe the person. |
| 21 | Q  On restraint? |
| 22 | A  That the person is restrained, correct. |
| 23 | Q  How about seclusion?  I mean, is there someone |
| 24 | who's assigned to sit outside the locked door of |

| 29 | |
|---|---|
| 1 | the cell when an individual has been secluded |
| 2 | but not restrained? |
| 3 | A  When an individual is secluded, the way they are |
| 4 | monitored or -- two different mechanisms I can |
| 5 | think of offhand. |
| 6 | There are clinical individuals referred to |
| 7 | as mental health workers who are members of the |
| 8 | nursing department, probably the least senior |
| 9 | member of the department, whose role is to make |
| 10 | rounds periodically and observe them and make a |
| 11 | notation on a clipboard, and also provide them |
| 12 | with things such as toilet paper or something |
| 13 | like that if they have a need for that. |
| 14 | So that's sort of anecdotal observation, |
| 15 | and I'm not quite sure what the formula is as to |
| 16 | how frequently they need to be making a mark as |
| 17 | the patient is observed.  I believe it's a |
| 18 | component of the O'Sullivan decree -- Sullivan |
| 19 | or O'Sullivan, I'm not sure -- which was prior |
| 20 | to my time at Bridgewater by quite a bit. |
| 21 | But my understanding of one provision of |
| 22 | that agreement was how we also monitor patients |
| 23 | in seclusion, that there are cameras in each |
| 24 | room up in the corner of the cell, and an |

8 (Pages 26 to 29)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

30

1  officer is assigned to monitor the images from
2  those cameras.
3      They sit in front of a bank of screens
4  showing each cell, and there's a formula for how
5  many officers you need to monitor a certain
6  number of cells. And again, I believe that was
7  a component of that consent decree. The details
8  of that I can't testify to as I don't know it,
9  haven't read it, but that's the constant
10 observation that they get.
11 Q  How often would individuals be secluded in cells
12    and/or restrained within the ITU or infirmary?
13 A  It's too general a question to give an answer.
14 Q  On an annual basis, how many patients would you
15    expect or individuals did you expect?
16 A  I'm not sure.
17 Q  You're not sure.
18     During the last six months of 2004, can you
19  give me any number of individuals who were
20  either secluded or restrained within ITU?
21 A  Not to a degree of accuracy I think appropriate
22  to the circumstance.
23 Q  In August of 2004 when Mr. Mosher was murdered,
24    can you give me an idea if anybody was secluded

31

1     or restrained in the ITU or the infirmary?
2  A  I'm confident there were people in seclusion.
3  Once or twice maybe, in the almost nine years
4  now that I've been there, the ITU has had no
5  occupants.
6      But for the most part, the ITU always has
7  patients in it, sometimes more than it can
8  contain.
9  Q  In seclusion?
10 A  Yeah, or some of them might be restrained. The
11  ratio of that, the seclusion is a much more
12  common event than restraint, I can't quantify
13  it, but restraint is comparatively rare.
14 Q  Are you aware of whether or not in the latter
15    part of 2004 there was a problem with or an
16    issue associated with the amount of room at the
17    ITU for the admission of patients or inmates?
18     MR. BELLO: Objection. Go ahead,
19  answer.
20 A  I can't pinpoint whether or not the ITU was
21  full. When the ITU does get full, which happens
22  at times, patients continue to be secluded; but
23  they have to be held on a different unit.
24     And during that period of time, I believe

32

1  they would be overflowed, is the term that's
2  used for that population, into the B building on
3  B-1. They made sure that a number of the single
4  rooms on that unit were sufficiently safe and
5  secure that secluded patients could be housed in
6  that, and also with video equipment available so
7  that an officer could monitor them in an
8  analogous fashion to what would happen in the
9  ITU.
10 Q  In B-1 would those individuals be secluded, or
11    would they have access to other patients?
12 A  Secluded. Different unit, same statutes, same
13  privilege, same mechanism of monitoring.
14 Q  So B-1 had actually provided facilities for the
15    seclusion of patients and/or inmates as well as
16    the ITU under certain circumstances?
17 A  When necessary.
18 Q  And is that also accurate for B-2?
19 A  No.
20 Q  Would it be accurate for any other units other
21    than ITU and B-1?
22 A  I don't know what was the written policy at that
23  point in time, but the max units previously
24  would be the units to which secluded patients

33

1  could be overflowed to, and they still retain
2  that ability.
3      And also the infirmary can accommodate
4  patients on seclusion status as well. So those
5  three other units have the capability of housing
6  patients whose clinical status is seclusion.
7  Q  Okay. So we have infirmary, ITU, B-1, and
8    potentially both Max 1 and Max 2?
9  A  Mm-hmm.
10 Q  That back in 2004 from what your understanding
11    had the capability of providing secluded
12    facilities for inmates and/or patients?
13 A  I might choose different verbiage, but yes, sir.
14 Q  Please put it in your own words.
15 A  Patients whose clinical status was seclusion
16  could be housed on any of those units safely, as
17  those units had the mechanism to provide the
18  level of monitoring that is necessary for a
19  patient who is secluded.
20 Q  Other than what you've described, were there any
21    other parts of Bridgewater State Hospital that
22    could house somebody with a clinical assessment
23    of seclusion?
24 A  No.

9 (Pages 30 to 33)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

34

1    Q  Okay.  I had asked you about the various phases
2       of Max 1 and Max 2.  We got off of that, and I
3       apologize, but I ask questions tangentially as
4       they come into my head.
5          Can you describe for me if there were
6       actual phases on Max 1 and 2, what they would
7       be?
8    A  At that point in time, there were three phases,
9       three clinical phases, Phase 1, Phase 2, and
10      Phase 3.
11         Phase 1 was the most restrictive status or
12      phase of the three.  A patient who had just been
13      transferred under the maxes would start out on
14      Phase 1, and as they demonstrated that they
15      could conduct themselves appropriately, in a
16      safe manner, then the design is that they would
17      move forward in the phases.
18         Phase 1 required that a patient would stay
19      on the corridor where their cell was.  The maxes
20      are laid out with three corridors, two going in
21      opposite directions, which were perpendicular,
22      A, B, and C corridors.  The C corridor is not
23      used, so the patients are on the A and B
24      corridors.

35

1          There's a gate at the end of the corridors
2       that can be closed and locked.  A patient on
3       Phase 1, the expectation is they would remain on
4       the corridor and not break the plane of where
5       the gate is.  The gate isn't closed.  The gate
6       is kept open.
7    Q  Okay.
8    A  If you're familiar with other psychiatric
9       facilities, it probably has some loose
10      similarity to an open-door seclusion status that
11      another psychiatric facility might use where, if
12      you come off the corridor, an officer or
13      clinician would tell you to get back on it.  But
14      there was no physical restraint or barrier to
15      keep you there.
16         Phase 2 -- Phase 1, you also remain on the
17      unit except at those times when the unit as a
18      group leaves and goes to the chow hall, goes to
19      the pavillion for recreation, goes to the
20      library for their access to the law library,
21      things like that.
22         Phase 2 you can move around on the unit at
23      will during those periods of time when patients
24      are able to be out of their rooms, that you're

36

1       not restricted to the corridor, but nonetheless
2       you still remain on the unit itself, except for
3       those times when you as a group all leave the
4       unit.
5          Phase 3 is the least restrictive, and that
6       means that during the periods of time when
7       patients may leave the minimum units and go down
8       to the commons or pavillion area, you can leave
9       the unit and go down there as well.  So somewhat
10      analogous to the privilege level that a patient
11      would have on a minimum unit.
12   Q  Are those phases applicable for both Max 1 and
13      Max 2?
14   A  Yes.
15   Q  But those units are separated, correct?
16   A  Yes.
17   Q  And they're separated by a gate or a security --
18   A  The units themselves?
19   Q  Yes.
20   A  Separate buildings.
21   Q  Separate buildings.
22   A  Separated by space and two brick walls.
23   Q  Which out of those two, Max 1 and Max 2, would
24      you say is the more secure of the units?

37

1    A  Both.
2    Q  So there's no reason, other than the fact that
3       there are two of them, that they're called Max 1
4       and Max 2?
5    A  Right.
6    Q  1 doesn't designate more severe restrictive --
7    A  No.
8    Q  And 2 doesn't designate less restrictive?
9    A  No.  Different treatment teams, different
10      patient populations, different units, but they
11      occupied the same role, how a patient could be
12      managed at Bridgewater.
13         You can't have just one unit of any given
14      status because patients have enemies, so part of
15      managing patients is two patients get in a
16      fight, they come from whatever unit they come
17      from, that they've declared each other enemies.
18      You don't want to put them back on the same
19      unit.
20   Q  So it's in deference to the potential for
21      violence at the facility between patients and/or
22      inmates?
23         MR. BELLO:  Objection.  You can
24      answer.

10 (Pages 34 to 37)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

38

1  A  That's one circumstance where it's most clear,
2     the necessity for having separate housing units
3     for equal level of restriction and equal
4     clinical status.
5        The numbers of patients there alone who
6     require housing on a maximum security setting
7     would also dictate how many facilities you have
8     to house them there.
9  Q  So room, room is another consideration?
10  A  Yeah, and wanting to compartmentalize patients
11     that's a maximum security unit of 300 patients
12     would be a very bad idea.
13        Breaking patients up into manageable-sized
14     groups based on what the issues are with their
15     clinical statutes, that's also part of the
16     formula. I don't have a hand in establishing
17     that, but after having worked at Bridgewater for
18     as long as I have, I can appreciate why that is.
19  Q  Why do you say that?
20  A  Minimum security unit can house up to 55
21     people. Those people are in better behavioral
22     control, more stable. A maximum security unit
23     can house 25 to 30. That makes sense, smaller
24     groups of people, because they demand closer

39

1     monitoring.
2  Q  Why would they demand closer monitoring?
3  A  Because they're less stable.
4  Q  When you say less stable, are you referring to
5     their behavioral characteristics?
6  A  That can be one dimension of it. It also may be
7     they're more unstable or more ill, from a
8     strictly psychiatric status. They could be more
9     psychotic. They may in fact be unmedicated for
10     periods of time if we're waiting for a court to
11     give us the authority to do that.
12        That one piece of the population in a
13     maximum security unit might be patients who are
14     refusing treatment, clearly need it, but their
15     level of symptomotology is such that they don't
16     require, seclusion but they are psychiatrically
17     unwell and require more close monitoring and a
18     more structured environment, and the maximum
19     security units provide that resource.
20  Q  But would a component of what you've just
21     described as behavioral issues associated with
22     individuals housed in Max 2 be that there's a
23     recognition that in these psychotic states they
24     could turn violent to themselves and others?

40

1        MR. BELLO: Objection.
2  A  Any patient admitted to Bridgewater, there has
3     to be an issue of strict security being raised
4     and recognized by the court that sent them
5     there, so that's intrinsic in what got you
6     through the door.
7        Otherwise, the Department of Mental Health
8     could provide services for your psychiatric
9     needs.
10  Q  Okay. If we can go back to a description of
11     your duties at Bridgewater -- once again I went
12     off on a tangent. I apologize. I'm not trying
13     to trick you into testifying. I'm not too
14     linear in my thought process.
15        Did you, in 2004, did you treat any
16     patients other than those who were at
17     Bridgewater State Hospital?
18  A  No.
19  Q  How was it that you know that you or had to
20     become part of either assessment, evaluation or
21     treatment of a particular person that was housed
22     at Bridgewater State Hospital?
23        How would you know that this person --
24  A  Who would I get new patients?

41

1  Q  Yes, good.
2  A  The units I worked on, Units B-1 and B-2, I was
3     part of the team that provided care for patients
4     on those two units.
5        A new patient would arrive on B-1, you
6     know, they would have been in the ITU and
7     cleared, or they would have been admitted to the
8     hospital and sent directly to B-1 because that
9     was a reasonable decision. Their name would
10     appear on the board under a list of new
11     patients.
12        Some of the time we would just grab
13     patients ourselves from the list there, and we
14     would meet as a team in the morning and do
15     rounds. And typically admissions to Bridgewater
16     happen during the evening. It's just the nature
17     of how a court issues an order to send somebody
18     there, that they tend to preferentially arrive
19     after-hours.
20        So we would come in and see how many new
21     patients had arrived, how many patients each of
22     us had, speaking of us as the physicians working
23     there, and we would divvy them up. Occasionally
24     I might be assigned a patient directly by the

11 (Pages 38 to 41)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

46

1  position, so people who do that were paid
2  separately to do that.  And it tended to be a
3  group of individuals who worked there who were
4  willing to do that, and I don't know the
5  rotation.  They sort of worked it out among
6  themselves.
7  Q  You didn't do that?
8  A  No.
9  Q  But you were definitely on call?
10  A  During the day the doctor on call -- doctor on
11  call is just a daytime label.
12  Q  I see.
13  A  Although after 5:00, the doctor on call is the
14  moonlighter, just to make it confusing.  After
15  10:00 at night, there isn't a psychiatrist
16  there.  The internist is there, seven by 24.
17  There's always an internal medicine trained
18  physician on-site.
19      After 10:00, the majority of our admissions
20  would have already arrived, so 10:00 was the
21  cut-off.  The psychiatrist who is doing the
22  evening shift would leave.  We still get
23  patients coming in after ten.  We'll get
24  patients coming in at one AM at times, but those

48

1  Q  Mr. Nelson?
2  A  Yes.
3  Q  Did you ever have any interaction with Mr.
4     Nelson?
5  A  Anecdotally on multiple occasions.
6  Q  Do it relate to patient care, treatment or
7     security?
8  A  It could.
9  Q  In 2004, did you have any interaction with Mr.
10     Nelson on issues of security involving patients
11     other than obviously the death of Mr. Mosher?
12  A  That's a very broad question.  As I said before,
13     in addition to just providing care, I would
14     function on various committees or things like
15     that.
16      At times, if the Medical Director was away,
17     I might function as her designee to fulfill the
18     role of Medical Director while she was not
19     there.  And certainly during periods of time
20     where I was filling that role, I would be
21     interacting more closely with the Superintendent
22     during morning meetings.
23      There's a risk meeting every morning from
24     nine, typically nine to 9:30.  I can't say for

47

1  are less common.  The internist would do those
2  assessments.
3  Q  Okay.  Let's try it this way.
4      In 2004, were you being paid a salary plus
5  hours for overtime or moonlighting?
6  A  I have not done any moonlighting, certainly not
7  during 2004.
8  Q  Okay.  So you were paid by salary?
9  A  I worked during the day.  I was paid a salary.
10  Q  Who paid you?
11  A  My employer, University of Massachusetts.
12  Q  So the checks said University of Massachusetts
13  on them?
14  A  I believe so.
15  Q  Has that ever changed?
16  A  Well, it changed as of July of this year when
17  MHM took over the contract, and now I'm an
18  employee of them.
19  Q  But as far as you know, you were never
20  compensated for your services directly from
21  Bridgewater State Hospital?
22  A  No.
23  Q  Did you know the Superintendent in 2004?
24  A  Yes.

49

1  sure that during 2004 I covered for Susan or
2  not.  I didn't keep track of the number of times
3  or when I do, but I was one of the people who
4  might do that.  I certainly knew the
5  Superintendent and had a comfortable
6  relationship with him.
7      So if I were in the room that he was in at
8  the same time, we were there for some common
9  task, you know, I would participate to whatever
10  degree, and I would suspect that at some points
11  in time that issues related to security
12  certainly come up.
13      So to try and answer your question
14  accurately, yeah, but it's kind of a lot of
15  minutiae and background detail.  I don't
16  remember any focal large projects where I had a
17  formal interaction around that.
18  Q  Did you actually have an office at Bridgewater
19     State Hospital at any time?
20  A  Yes.  I shared an office with one other
21  psychiatrist at that point in time.
22  Q  That was provided by Bridgewater State
23     Hospital?  It was actually at the facility,
24     right?

13 (Pages 46 to 49)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

---

50

1  A  It was within the facility in a region where
2     patients are not, do not go, sort of an
3     administrative building.
4  Q  But you didn't contribute to any overhead
5     associated with that office financially?
6  A  No.  We enjoyed the lovely state-supplied
7     furniture.
8  Q  Were you required by your employment to see a
9     certain number of patients or inmates on a
10    weekly basis?
11 A  There was no algorithm.  The patients who
12    arrived and needed treatment on the unit would
13    need to be taken care of by however many people
14    there were there to do it.
15       So my contributions were based on how many
16    others there were and what share of the whole
17    was what I needed to pick up to insure the
18    patients got cared for.
19 Q  You mentioned risk meetings, daily risk
20    meetings.
21       What was your understanding of what a risk
22    meeting was?
23 A  Daily meeting chaired by the Superintendent
24    attended by the Deputy Superintendents, the

---

51

1     Medical Director, Director of Nursing, hospital
2     adminstrator, a representative from the
3     Forensics or Evaluation Department, and
4     miscellaneous other people who might attend,
5     analogous I believe to the daily meetings that
6     occur in all of the prisons in the Commonwealth,
7     where they would review the incidents of the
8     prior day, incident reports, and address any
9     issues that were raised in them or assign any
10    role in following up on them, primarily
11    correctional issues, correctional problems and
12    such.
13       But as it's a hospital, clinical issues and
14    correctional issues would both sometimes come up
15    where there would be overlap between the two.
16    For example, if somebody gets in a fight, gets
17    secluded, there's an incident report because a
18    fight happened.
19       So clearly there's a clinical element,
20    too.  Where is the patient now?  What are we
21    going to do with them?  How are they now?
22 Q  So certainly this was a kind of a different
23    environment than a strict hospital because it
24    had correctional aspects associated with it?

---

52

1  A  Bridgewater is a unique environment in that it's
2     largely correctional but also a hospital.
3  Q  This is a secure facility.  I mean, I go to
4     Bridgewater, there's a big gate, you have to
5     buzz a button that opens up to let you.  There's
6     a sally port in the front.  You have to fill out
7     the paperwork.
8        That indicates that it has a strong
9     correctional component.
10 A  Its proper name is MCI Bridgewater.
11 Q  Mass. Correctional Institution at Bridgewater?
12 A  At Bridgewater State Hospital.
13 Q  Do the Medical Director actually see any
14    patients or inmates at Bridgewater State
15    Hospital?
16 A  In 1994 --
17       MR. BELLO:  2004.
18 Q  2004.
19 A  Sorry.  Not that I'm aware of.
20 Q  Do the Medical Director --
21 A  When you say see patients, you mean --
22 Q  I'm going to go into it in detail if I can get
23    my mind to work.
24 A  I'm sure she saw them, but I think you meant a

---

53

1     different verb.
2  Q  Do she conduct evaluations or assessments of
3     patients?
4  A  Not that I'm aware of.
5  Q  Do she approve or have any supervisory role over
6     any assessments or evaluations or treatment
7     plans that were approved for patients or inmates
8     at Bridgewater State Hospital?
9  A  Her involvement was not a routine or required
10    part of establishing treatment plans and
11    providing treatment.
12       However, she is the chief medical officer
13    there and certainly has a supervisory role, and
14    on a regular basis that would require her to
15    meet with the clinical staff to discuss the care
16    of a patient and what the plan would be for
17    them.  Case conference is the typical mechanism
18    that that would occur.
19       Also, technically speaking, for a patient
20    to be committed to Bridgewater, she would need
21    to sign the petition to the court requesting
22    their commitment.  That in no way would mean she
23    had any specific knowledge about that patient,
24    unless it happened to be someone who had come to

---

14 ()

14 (Pages 50 to 53)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

---

**58**

1      The final decision of course would always
2   be a security decision, but the circumstances of
3   making a final decision over other people's
4   objections is something that may not have
5   occurred ever in 2004.
6   Q   Did you know back in 2004 of any state law or
7      regulation that prohibited the Superintendent
8      from making a decision on the placement of any
9      patient or inmate in any unit at Bridgewater
10     State Hospital?
11         MR. CROMACK:  Objection.
12   A   That's outside my area of expertise.
13   Q   I'm just asking factually if you're aware of any
14     state law or regulation that required that the
15     Superintendent would defer to the medical units
16     or psychiatric units on placement, if you're
17     aware.
18         MR. CROMACK:  Objection.
19   A   The only thing I'm aware of, and I couldn't cite
20     the statute, for a patient to be secluded,
21     that's a clinical decision.
22   Q   I'm sorry?
23   A   For a patient to be secluded, that's a clinical
24     decision.

---

**59**

1   Q   Secluded or segregated, or are they the same?
2   A   There is no segregation at Bridgewater.
3   Q   As far as you understood in 2004, there was some
4      regulation or rule or some binding law that
5      regulated seclusion of a patient or inmate?
6   A   Seclusion of a patient is a medical decision, so
7      the statutes that allow for that all reference
8      medical individuals making the decision.
9   Q   Is it your understanding that the Superintendent
10     could not order the seclusion of an inmate or a
11     patient at Bridgewater State Hospital?
12         MR. CROMACK:  Objection.
13   A   The Superintendent is neither a doctor nor
14     nurse.  Only a doctor or nurse can order the
15     seclusion of any patients in any hospital in the
16     Commonwealth.
17   Q   So if in fact a patient or inmate exhibited
18     violence towards another patient or inmate and
19     the Superintendent was apprised of it, what
20     would the process be for reacting to that
21     particular inmate or patient?
22         MR. CROMACK:  Objection.
23         MR. BELLO:  Objection.
24   Q   As you understand in 2004.

---

**60**

1   A   If a violent event occurred, is that what
2      you're -- patients would be, patient or patients
3      would be brought over to the medical building,
4      probably brought into the ITU, although there
5      are some assessments outside of the ITU.
6          They could be placed in -- they would be
7      assessed by a clinician and a decision made
8      about whether they need to be secluded.  If they
9      had just been involved in violence, it's highly
10     likely that they would be, but sometimes people
11     are the aggressor and sometimes people are the
12     victim.  And when information was available that
13     would clarify that, a person who came for
14     assessment might not be secluded, could well be
15     sent back to where they came from if they were
16     assaulted.
17   Q   Who at Bridgewater State Hospital would
18     intervene on an ongoing violent incident;
19     medical staff?
20         MR. BELLO:  Objection.
21   Q   Or staff officers?
22   A   Security is the responsibility of officers.
23   Q   If there was an ongoing violent incident, you
24     certainly wouldn't expect medical staff to come

---

**61**

1      in and try to separate the two guys?
2   A   That would be strongly discouraged.
3   Q   So that would be a component of the security end
4      of the facility?
5   A   Yes.
6   Q   And yet they could not, from what you're telling
7      me, the staff officers could not take these two
8      individuals, separate them, and bring them over
9      to ITU or the infirmary?
10         They would have to call medical and have
11     medical come down and intervene and do an
12     assessment of the unit?
13         MR. BELLO:  Objection.
14   A   The security staff would escort the individuals
15     over to the ITU or ITU area, place them in a
16     holding area, and the individual would be
17     assessed by a clinician once they're safe and
18     secure.
19   Q   Okay.  Was there ever an occasion in 2004 where
20     the Superintendent or Superintendent's office to
21     your knowledge addressed with the medical team
22     or the Medical Director a particular patient or
23     inmate's placement?
24         MR. CROMACK:  Objection.

16 (Pages 58 to 61)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

**74**

1 you've marked it that's fine. It doesn't hurt
2 to have the DOC numbers, but that's fine.
3    MR. BELLO: Is there a question?
4 **Q  Does that fill the pages that we're missing on**
5 **the other one?**
6 A  It includes more than that. It includes the
7 pages that were missing from the admission
8 assessment, and it also includes the personal
9 de-escalation plan. It's a separate document.
10    MR. BALLIRO: Could we have the second
11 one marked.
12    (Exhibit No. 2 marked for identification.)
13 **Q  I'll show you now Exhibit 1 and Exhibit 2, and**
14 **I'll ask you if you could identify more**
15 **particularly the purpose of these records that**
16 **have been filled out.**
17    **You can go through them individually or as**
18 **a package. It doesn't matter to me. I'm trying**
19 **to get a sense --**
20 A  This is two separate things. One is admission
21 assessment Part 2: That document is what is
22 completed when a patient arrives on the unit,
23 where they're going to reside, and the treatment
24 team does their evaluation.

**75**

1    The other document is a personal
2 de-escalation plan, which is a document
3 completed by the case administrator typically,
4 identifying his complete involvement with the
5 patient, identifying types of behaviors or
6 triggers for such behaviors where they might
7 become at risk of acting violently or losing
8 control of themselves or getting quite
9 distressed, I believe, and what types of
10 interventions might help a patient under such
11 circumstances calm down or regain better control
12 of themselves.
13 **Q  And the purpose of the record is to do what?**
14 A  Which record?
15 **Q  Both of these exhibits, all these records, the**
16 **de-escalation plan and assessment Part 2, what's**
17 **the purpose of having those records?**
18 A  They're two different documents, so I'm not sure
19 I can give a global answer to both.
20 **Q  Tend to each one as you see is fit.**
21 A  The admission assessment Part 2 is the document
22 that is completed in the course of doing a more
23 thorough assessment of a new patient's problems,
24 aspects of their history, current symptoms, and

**76**

1 the initial intervention plan as part of their
2 treatment.
3    The personal de-escalation plan, I believe
4 its purpose is largely what I described earlier,
5 making an effort to determine what types of
6 circumstances or what type of circumstances a
7 patient might be at increased risk for
8 problematic or violent behavior and
9 interventions that might be appropriate to offer
10 at such a point in time to help them regain
11 better control over themselves and calm down.
12 **Q  Is this a purely clinical tool or is it also**
13 **used for evaluation of security at the facility?**
14    MR. CROMACK: Objection.
15 A  The admission assessment Part 2 is a part of the
16 medical report, and therefore it is, like any
17 medical record, confidential information.
18    I believe the criteria is that the
19 Superintendent or their designee can review a
20 patient's record if there's a need to know, that
21 that authority is granted the Superintendent by
22 law, although I'm not sure exactly where it's
23 contained in there, but that's my
24 understanding.

**77**

1    The personal de-escalation plan is filed in
2 the patient's record, and as is indicated at the
3 top of it at the check box there next to the
4 phrase this plan may be shared with staff,
5 including correctional staff, so that although
6 this is filed in the record, a copy of it may
7 also be shared with custody staff, and that
8 would mean the security staff.
9 **Q  And these are the records that were generated**
10 **pursuant to the evaluation and treatment plan**
11 **for Bradley Burns when he was admitted to**
12 **Bridgewater State Hospital; is that accurate?**
13 A  These were generated not on the day he was
14 admitted, but these were generated toward the
15 beginning of his course of admission, the day
16 when he arrived on B-1, which is August 10.
17 **Q  Do you know where he had been prior to arriving**
18 **in B-1?**
19 A  He had been in the ITU, and I can't recall off
20 the top of my head which date he arrived at the
21 hospital. It looks like the 8th, according to
22 the mark on the record.
23    But his admission was not entirely
24 straightforward in that he arrived at

20 (Pages 74 to 77)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

**78**

1   Bridgewater, was held overnight, and then went
2   back out to court I believe for his arraignment
3   and then was sent back by the court. The first
4   night he was at the hospital was under one
5   section of the law, but his subsequent return
6   was for, you know, a different type of
7   evaluation. So it was a return on a different
8   legal status.
9   Q   And the second time of his return, you
10  understood he was there for what reason?
11  A   Section 15-B evaluation.
12  Q   You need to explain for the record your
13  understanding of what 15-B is.
14  A   MGL Chapter 123, Section 15, Paragraph B is an
15  evaluating of a patient's competence to stand
16  trial, individual's competence to stand trial
17  and/or criminal responsibility.
18  Q   If we look at the Bridgewater State Hospital
19  personal de-escalation plan, you've already
20  indicated that there's a box checked off, this
21  plan may be shared with staff, including
22  correctional staff, correct?
23  A   Mm-hmm.
24  Q   Did you check that box off?

**79**

1   A   No.
2   Q   This was done by a licensed medical health
3   clinician?
4   A   Mental health clinician.
5   Q   Mental health, I'm sorry. Can you make out who
6   that signature is? I couldn't.
7   A   Mourning Fox.
8   Q   That's the person's name, Mourning Fox?
9   A   Yes.
10  Q   You will note that if we go down to assault
11  targets under this de-escalation plan, a box is
12  checked off, other patients?
13  A   Mm-hmm.
14  Q   Is it your understanding that what is intended
15  to convey by checking off that box, other
16  patients, is that Bradley Burns is at risk for
17  assaulting other patients at Bridgewater State
18  Hospital?
19  A   That the form was completed with the involvement
20  of Mr. Burns and also could include other
21  collateral information as available, and it was
22  Mr. Fox's opinion that other patients might be a
23  target of assault.
24  Q   Okay. What information did you have prior to

**80**

1   your starting your assessment of Mr. Bradley
2   Burns?
3   A   I would have had his medical record or the
4   information contained in his Bridgewater State
5   Hospital medical record, and I do not have much
6   collateral information.
7       My recollection of what was available to me
8   was a medical record from Boston Medical Center
9   that referred to other events which had
10  transpired in the community and at other
11  facilities.
12  Q   Do you recall being debriefed after the murder
13  of Mr. Mosher by investigators or detectives
14  connecting with either Bridgewater State
15  Hospital or some other prosecutorial arm, and in
16  your debriefing you recalled to that detective
17  that you had, at the time you were evaluating
18  Mr. Burns, you had the Boston Medical Center
19  psychiatric evaluation dated August 8, 2004?
20      Is that consistent with what your memory is
21  now?
22  A   That's consistent with what I had.
23  Q   And the prisoner data sheet dated August 8,
24  2004, is that consistent as well?

**81**

1   A   I can't picture the prisoner data sheet, but if
2   I provided that information then, which was much
3   more proximal to when I had seen the patient, I
4   would assume it to be accurate.
5   Q   I'll show you this document here. Let's try and
6   do it this way. It makes more sense.
7       Do you recognize that record?
8   A   I do.
9   Q   And is that the prisoner data sheet that you
10  were referring to when you were speaking to the
11  detectives briefing you after the murder of Mr.
12  Mosher and just recently your testimony?
13  A   I assume it must be as it's titled prisoner data
14  sheet. Again, I don't recall looking at this
15  one four years ago, but that's probably what
16  occurred.
17  Q   If you could identify for me what the Boston
18  Medical Center psychiatric evaluation was, is
19  that something you can identify as a common
20  document that you would see or --
21  A   What I can recall of it was it was -- I can't
22  recall if it was more than one piece of paper or
23  not, but something generated from the ER at
24  Boston Medical Center which made reference to

21 (Pages 78 to 81)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

| 82 | 84 |
|---|---|
| 1  other, to events which had transpired which were | 1  about safety. |
| 2  relevant to why the patient had been brought to | 2  Q  Safety of Mr. Burns and safety of others in the |
| 3  BMC. | 3     institution? |
| 4          MR. BALLIRO:  This prisoner data | 4  A  Yes. |
| 5  sheet, why don't we have it marked. | 5  Q  Did you consider this at the time you were |
| 6      (Exhibit No. 3 marked for identification.) | 6     reading it a confidential document? |
| 7  Q  Looking at Exhibit 3, what you've identified as | 7  A  I don't consider it to be a confidential |
| 8     the prisoner data sheet, what was your | 8     document, so I can't -- it would be unlikely at |
| 9     understanding in 2004 when you saw this of how | 9     the time I read it I considered it |
| 10    this was generated? | 10    confidential.  It's a petition to the court.  I |
| 11 A  To try and be as specific, and I'll answer your | 11    believe it's public record. |
| 12    question, I don't recall what I was thinking in | 12 Q  Did you have any thought, if you recall, at the |
| 13    2004 when I looked at this, nor can I distance | 13    time you were reviewing this record that it may |
| 14    myself from any greater appreciation of how the | 14    be wise to contact the Superintendent's office |
| 15    legal system operates or, you know, issues | 15    regarding Mr. Burns' placement in the unit, in |
| 16    relevant to how patients come to Bridgewater | 16    the facility? |
| 17    since then. | 17         MR. BELLO:  Objection. |
| 18     What I can describe it as now, that this is | 18 A  I don't recall having any concerns at the time I |
| 19    a Section 18 evaluation done by Maryanne Galvin | 19    was evaluating Mr. Burns that there was a need |
| 20    which was likely the document she filled out in | 20    for me to contact the Superintendent. |
| 21    pursuit of them petitioning a court to send Mr. | 21 Q  Was there anything on this record that you were |
| 22    Burns to Bridgewater for the first night he was | 22    reviewing, if you recall, back in 2004 that gave |
| 23    there, which was under Section 18-A. | 23    you concern that he might, Mr. Burns might be a |
| 24 Q  Okay.  Does it appear that based on the | 24    danger to other inmates or patients at the |

| 83 | 85 |
|---|---|
| 1     information that's contained in there, that | 1     facility? |
| 2     there was some discussion with Mr. Burns | 2  A  There's certainly information on this document |
| 3     contemporaneous with this record being created? | 3     that would cause me to have concerns,.  Again, I |
| 4  A  Dr. Galvin documents in quotes things that Mr. | 4     can't recall at the time running through those |
| 5     Burns said, so I would assume she must have had | 5     steps. |
| 6     a conversation with Mr. Burns. | 6         However, as my own write-up documented many |
| 7  Q  Can you tell from this record where that | 7     of those events, clearly I considered them |
| 8     conversation took place? | 8     important. |
| 9  A  It's not jumping out at me if it's on there. | 9  Q  If you could clarify for me a little bit more |
| 10 Q  But in any event, you believe you had this at | 10    what you mean by clearly you considered them |
| 11    the time you began your evaluation of Mr. Burns? | 11    important?  In what context did you consider |
| 12 A  It seems consistent with information I was aware | 12    them important? |
| 13    of at the time. | 13 A  Well, this document makes reference to behaviors |
| 14 Q  Did you take any of this information into | 14    Mr. Burns engaged in prior to when Dr. Galvin |
| 15    consideration when you were evaluating Mr. | 15    met with him, and they appear to have some |
| 16    Burns? | 16    relationship to the involvement of police, |
| 17 A  Yes. | 17    specifically eloping or escaping from two other |
| 18 Q  For what reason would you take this information | 18    hospitals, taking people hostage, and assaulting |
| 19    into consideration in evaluating Mr. Burns? | 19    someone at a McDonald's.  Those are all |
| 20 A  Because this documents the events or at least | 20    significant events. |
| 21    some of the events that transpired prior to his | 21 Q  Well, does the fact that there appears to be an |
| 22    being transferred to Bridgewater.  Those events | 22    establishment in the current mental status |
| 23    are important in making a determination of what | 23    portion of this form, he's homicidal and |
| 24    his psychiatric needs are and also any decisions | 24    suicidal because he believes it's a game, no one |

22 (Pages 82 to 85)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

---

86

1    will really die, do that have significance in
2    your evaluation where you might suggest placing
3    Mr. Burns at the facility?
4        Look at the last line of that section.
5    A  That would be something I would consider
6    important, but I can't comment on specifically
7    what weight I gave to that one line at the time
8    I do my assessment of him.
9    Q  Would reading your actual assessment assist you
10   in recalling what weight that you gave that
11   particular information in your assessment of Mr.
12   Burns back in 2004?
13   A  No. I'm fairly familiar with my own assessment
14   of him. At the time I saw him, which was two
15   days after this document, I was impressed with
16   the level of paranoia he was exhibiting at the
17   time.
18       But he also do not make statements to me
19   that he felt like he was likely to attempt to
20   assault himself or other people at that point in
21   time or proximal to it. So I believe in my
22   assessment the issues analogous to this is where
23   he denied homicidal or suicidal thinking.
24   Q  What weight did you put on his statements to you

---

87

1    that he was not homicidal or suicidal when you
2    were evaluating him?
3    A  His statements or indication of his status then
4    was important, but that was not the only
5    information that's important in making a
6    decision about what his risk to other people or
7    himself might be.
8        In particular, recently if he had engaged
9    in violent acts or had made statements to other
10   people that were not consistent with the
11   statements he made to me, then there's some
12   disagreement, albeit over at least a two- or
13   three-day time frame now, between information he
14   was providing now and what had transpired
15   earlier.
16   Q  So is it safe to say by your response that there
17   was some contention between the information you
18   were gaining from Mr. Burns and the information
19   contained on the resident data sheet in your
20   evaluation or assessment of him?
21   A  There was some contradiction.
22   Q  Contradiction, all right. Where ultimately did
23   you, I should say -- did you yourself suggest
24   placement of Mr. Burns within the facility in

---

88

1    any unit at all?
2    A  I'm not sure I can answer that. Do I suggest
3    placement in any unit or --
4    Q  Did you have him placed? How's that?
5    A  When I encountered Mr. Burns, he was on B-1 for
6    that evaluation, as is the case with any patient
7    I see, would see on B-1.
8        Part of the decision I make in meeting with
9    them and where to leave things, is it okay to
10   leave them here.
11   Q  And your decision was that it was okay to leave
12   him at B-1?
13   A  At that point in time, yes.
14   Q  And as you've indicated, B-1 would permit his
15   access to other patients at the facility?
16   A  Yes.
17   Q  What was the level of security at B-1 when he
18   was in B-1? Is there a way you can describe the
19   level of security?
20   A  I don't think that's something that I can answer
21   particularly well, no.
22   Q  Had you been on the B-1 unit at or about the
23   time Mr. Burns was there?
24   A  Mm-hmm.

---

89

1    Q  Were there staff officers on the unit?
2    A  Yes.
3    Q  Do it have secured gates and doorways accessing
4    stairwells and the like?
5    A  Doors leading off the unit are secured.
6    Q  Were there any staff officers actually on the
7    corridors of the B-1 unit?
8    A  Although I can't picture them in my mind now,
9    but the normal unit operations would be that
10   there would be several officers on the floor, an
11   officer in the trap, and that all of those
12   officers would be monitoring what was going on
13   with the patients.
14   Q  And you believe that that was how it was when
15   Mr. Burns was on B-1 as far as you could
16   understand?
17   A  As far as I can recall, it would be likely that
18   I probably would remember if there was any
19   significant variance, given the serious nature
20   of the events that ultimately transpired.
21       (Recess.)
22   Q  Looking at your assessment plan, I'm sorry, Part
23   2, admissions assessment and the other records
24   connected to it, could you tell me, were you

---

23 (Pages 86 to 89)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

| 90 | |
|---|---|
| 1 | possessed of any other information that was |
| 2 | contained on there about Mr. Burns' history |
| 3 | prior to your evaluation for his placement? |
| 4 | A  There's information in my description of the |
| 5 | history of present illness that I presume I got |
| 6 | from BU Medical Center documents that is not |
| 7 | before me right now. |
| 8 | Although it's consistent with the |
| 9 | information on the 18-A evaluation petition, |
| 10 | it's a little more specific in certain ways.  So |
| 11 | I assume I must have been citing off another |
| 12 | document for that. |
| 13 | Q  More specifically, can you tell me today whether |
| 14 | or not back when you were evaluating Mr. Burns |
| 15 | you had been advised that he had strangled |
| 16 | others prior to his admission? |
| 17 | A  Again, you know, my write-up indicates that, |
| 18 | patiently allegedly wrapped a ligature around a |
| 19 | person's neck and eloped and then attempted to |
| 20 | strangle an employee at McDonald's. |
| 21 | So given the verbiage I used, and that |
| 22 | isn't contained on the 18-A, I'm careful about |
| 23 | those things, so there must have been |
| 24 | information that was specific about that. |

| 91 | |
|---|---|
| 1 | Q  Would you have any memory of whether or not you |
| 2 | were advised that he had been, Mr. Burns had |
| 3 | been involved with several other courts other |
| 4 | than whatever apprised you of his presence at |
| 5 | Bridgewater State Hospital? |
| 6 | A  The events described in my write-up indicated |
| 7 | several discrete events that occurred, probably |
| 8 | would have been three, just to lump them, |
| 9 | something at McLean, something at HRI Arbour, |
| 10 | and something at a McDonald's. |
| 11 | Off the top of my head, I can't recall |
| 12 | whether I had any information in front of me |
| 13 | detailing the totality of charges and courts |
| 14 | that might have become involved in them.  Of |
| 15 | course, those facilities cover a decent amount |
| 16 | of real estate. |
| 17 | Q  I'll show you this record.  Take a look at it. |
| 18 | I'll represent to you, unless you believe it's |
| 19 | inconsistent, that relates to the McDonald's |
| 20 | event that you were just explaining. |
| 21 | But do you recall ever seeing that |
| 22 | particular document before? |
| 23 | A  I don't. |
| 24 | Q  Do you think you had that record in your |

| 92 | |
|---|---|
| 1 | possession at the time you evaluated or assessed |
| 2 | Mr. Bradley Burns back in August 2004? |
| 3 | A  Let me skim it quickly. |
| 4 | Q  Sure. |
| 5 | A  I'm confident I do not have this document. |
| 6 | MR. BALLIRO:  May we mark it, please? |
| 7 | (Exhibit No. 4 marked for identification.) |
| 8 | Q  I'll show you this record and ask you to take a |
| 9 | look at this one as well. |
| 10 | Same question, I'll ask you if it's |
| 11 | familiar to you and whether or not you believe |
| 12 | you had that in your possession when you |
| 13 | evaluated or assessed Mr. Bradley Burns in |
| 14 | August of '04. |
| 15 | (Discussion off the record.) |
| 16 | A  No, I do not have this document. |
| 17 | (Exhibit No. 5 marked for identification.) |
| 18 | Q  And as well, if you would look at this record, |
| 19 | and the same question, if you recognize it and |
| 20 | whether or not you believe you had it in your |
| 21 | possession when you evaluated Mr. Bradley Burns |
| 22 | in '04. |
| 23 | (Witness reviews document.) |
| 24 | A  I did not have this either. |

| 93 | |
|---|---|
| 1 | (Exhibit No. 6 marked for identification.) |
| 2 | Q  Finally this package.  Take a moment to take a |
| 3 | look at that. |
| 4 | (Witness reviews document.) |
| 5 | A  No, I do not have this. |
| 6 | Q  Or any portion of it? |
| 7 | A  No.  And in fact, I was not aware until now that |
| 8 | he had previously had a court-ordered evaluation |
| 9 | done. |
| 10 | Those tend to be helpful things, so I tend |
| 11 | to look for that if there's any history of it in |
| 12 | new patients, so — |
| 13 | (Exhibit No. 7 marked for identification.) |
| 14 | Q  With respect to No. 7, is there any reason you |
| 15 | can tell me why you might not have possessed |
| 16 | that at the time Mr. Burns was being evaluated |
| 17 | by you? |
| 18 | MR. CROMACK:  Objection. |
| 19 | A  This is a group of documents, one of which is a |
| 20 | petition for Mr. Burns' commitment.  I'm trying |
| 21 | to see under what section.  This was the civil |
| 22 | petition I would guess, 16-B, all right, and |
| 23 | also a 15-B evaluation done at the Lindeman |
| 24 | Mental Health Center, as well as a separate 15-B |

24 (Pages 90 to 93)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

94

1    report done at the court clinic dated quite a
2    bit before the 15-B evaluation at the Lindeman.
3        I don't know if they pertain to the same
4    event or not. I'd need to look at it in detail
5    to do that. Basically this looks like these are
6    records pertaining to some prior court-ordered
7    evaluations.
8        I don't see the judicial order, but done at
9    the South Boston Court Clinic and the Eric
10   Lindeman Mental Health Center. So those are not
11   necessarily records that would be made available
12   to Bridgewater unless the court that owns these
13   records saw fit to provide them to us.
14   Q  That's your understanding of why you might not
15   have had it at the time?
16   A  The only circumstances we would ever be provided
17   information like that at the start of a
18   patient's hospitalization would be really
19   anecdotally, if the patient was sent by the same
20   court that had ordered evaluations on him
21   previously and they were being unusually
22   helpful, that they might also choose to include
23   records they have about his treatment.
24       That falls in the category of almost never

95

1    does that occur, despite that being a nice idea.
2    Q  Why do you say it's a nice idea?
3    A  It's information about the individual.
4    Court-ordered evaluations are a rather thorough
5    assessment and documentation of a person's
6    history.
7    Q  Are you aware of any state statute or regulation
8    that would preclude your accessing that
9    information or that information being forwarded
10   to you?
11       MR. CROMACK:  Objection.
12       MR. BELLO:  Objection.
13   Q  If you're aware.
14   A  I'm not aware of there being a barrier to it.
15   My understanding is it's at the discretion of
16   the court, if they wish to share that, and if I
17   want it, sometimes I can call up and ask a clerk
18   to see if they would release it.
19       But that requires knowing it exists,
20   knowing which court, and the good will of a
21   clerk and a justice of the court to decide that
22   it's reasonable to share that information.
23   Q  And you hadn't been apprised that this
24   particular record marked as Exhibit 7 even

96

1    existed when you were evaluating Mr. Burns,
2    correct?
3    A  No.
4    Q  Had you been apprised when you were evaluating
5    Mr. Burns that the record marked as Exhibit 6
6    even existed?
7    A  No.
8    Q  Were you apprised that the exhibit which has
9    been marked No. 5 in this case existed at the
10   time you were evaluating Mr. Burns.
11       (Witness reviews document.)
12   A  I'm just looking at the dates to see what period
13   of time this covers. I'm not aware of knowing
14   this existed. I'm trying to figure out if it
15   pertained to one event or what.
16   Q  You testified that you had been apprised that
17   there had been an incident at McDonald's with
18   respect to Mr. Burns when you were evaluating
19   him, and I'll show you this Exhibit No. 4 and
20   ask whether or not you were apprised that there
21   was this record associated with the McDonald's
22   incident at the time you evaluated him.
23   A  I was not aware of the existence of this.
24   Q  At the time you evaluated Mr. Burns in August of

97

1    2004, were you aware of whether or not there was
2    a prohibition against sharing information
3    between the Department of Mental Health and the
4    Department of Corrections?
5        MR. CROMACK:  Objection.
6    A  You phrase that as a prohibition. My
7    understanding then, as is now, is that medical
8    information to be released by the Department of
9    Mental Health or released by the Department of
10   Corrections, to or from each other, requires the
11   same type of release of information as between
12   any other health-care institutions.
13   Q  Let me show you this exhibit and ask you to take
14   a look at it. I ask you if you recognize that,
15   if you've seen that before.
16   A  I don't believe so, no.
17       (Exhibit No. 8 marked for identification.)
18   Q  And take a look at this record, and I ask you
19   whether you've seen that before.
20   A  I don't believe I've seen it, no.
21       (Exhibit No. 9 marked for identification.)
22   Q  Were you aware at the time that you assessed or
23   evaluated Mr. Burns in August 2004 that he had
24   also been admitted for a stay at the Westborough

25 (Pages 94 to 97)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

| 98 | |
|---|---|
| 1 | **State Hospital?** |
| 2 | **Do you recall having that information?** |
| 3 | A  Well, he told me.  I see in my intake that I was |
| 4 | aware of that.  Arbour, McLean, Eric Lindeman, |
| 5 | Westborough, McLean again. |
| 6 | I can't confirm right now whether that was |
| 7 | information solely provided to me by the |
| 8 | patient.  The first two were clearly referenced |
| 9 | in the context of his referral to Bridgewater, |
| 10 | Arbour and McLean, but Eric Lindeman and |
| 11 | Westborough, either he shared that with me or |
| 12 | that must have been documented on some of the |
| 13 | paperwork that was available to me. |
| 14 | Q  **Based on that information, both either from Mr.** |
| 15 | **Burns or some other source, but obviously was** |
| 16 | **contained in your assessment, did you consider** |
| 17 | **reaching out to any of these hospitals and** |
| 18 | **inquiring about Mr. Burns in any capacity?** |
| 19 | A  We routinely fax requests for medical |
| 20 | information from hospitals that are identified, |
| 21 | particularly ones identified in this section of |
| 22 | the chart.  That of course requires the patient |
| 23 | to sign consent for release of information. |
| 24 | Off the top of my head, I'm not sure what |

| 99 | |
|---|---|
| 1 | Mr. Burns' willingness was.  Typically the case |
| 2 | administrators, when they meet with the patient, |
| 3 | would have them sign the release forms and fax |
| 4 | them off. |
| 5 | I do know we received some information from |
| 6 | McLean after the conclusion of the period of |
| 7 | time I was caring for him, so I assume a proper |
| 8 | release of information must have been sent to |
| 9 | McLean or they wouldn't have sent us the summary |
| 10 | on it. |
| 11 | Q  **Before the death of Mr. Mosher or after the** |
| 12 | **death?** |
| 13 | A  I wasn't involved in his care, so I don't know. |
| 14 | I know I had that when I was caring for him |
| 15 | because it was shared with me by the |
| 16 | investigators you made reference to before, and |
| 17 | that was the first opportunity I had had to |
| 18 | review it and, you know, it certainly contained |
| 19 | information that seemed important. |
| 20 | Q  **Did you submit an authorization to Mr. Burns for** |
| 21 | **execution for the release of medical records** |
| 22 | **from any of these institutions?** |
| 23 | A  I didn't, but again, typically the case |
| 24 | administrator is the one who fills that out with |

| 100 | |
|---|---|
| 1 | the patient and faxes them off.  Typically it's |
| 2 | not something that the treating psychiatrist |
| 3 | does. |
| 4 | Q  **As far as you're aware during your evaluation of** |
| 5 | **Mr. Burns and assessment of Mr. Burns in August** |
| 6 | **of 2004, you didn't have any medical records** |
| 7 | **from Lindeman, Westborough or McLean's?** |
| 8 | A  Correct. |
| 9 | Q  **I'm going to show you this record and ask you if** |
| 10 | **you can identify that.** |
| 11 | A  I can identify it from the title, IMS medical |
| 12 | intake sheet. |
| 13 | Q  **I guess that was a bad question.  Have you ever** |
| 14 | **seen that record before?** |
| 15 | A  No, I can't recall actually seeing a document of |
| 16 | this nature. |
| 17 | Q  **Do you have any familiarity with it at all?** |
| 18 | A  I can make some inferences about, you know, what |
| 19 | it must be for, but it doesn't appear to be |
| 20 | something which is used by clinical staff. |
| 21 | It says IMS medical intake sheet.  IMS is |
| 22 | the abbreviation for the Department of |
| 23 | Correction computer system inmate management |
| 24 | system, and this appears to document certain |

| 101 | |
|---|---|
| 1 | types of information. |
| 2 | (Exhibit No. 10 marked for identification.) |
| 3 | Q  **Describe the fullest extent of your involvement** |
| 4 | **in assessing or evaluating or treating Mr. Burns** |
| 5 | **while he was admitted as a patient at** |
| 6 | **Bridgewater State Hospital but before the death** |
| 7 | **of Mr. Mosher.** |
| 8 | MR. BELLO:  Objection.  You may |
| 9 | answer. |
| 10 | A  I met with Mr. Burns for the first time on |
| 11 | August 10, 2004.  I interviewed him, I reviewed |
| 12 | what records were available to me.  I made a |
| 13 | decision about what types of treatment to offer |
| 14 | him, specifically what medication to prescribe. |
| 15 | And as is the case with any new patient I'm |
| 16 | assessing, I also made a decision about whether |
| 17 | or not he was appropriate to remain on the unit |
| 18 | where I encountered him, B-1, which at that time |
| 19 | was that he seemed appropriate to remain on that |
| 20 | unit. |
| 21 | He remained my patient I believe for the |
| 22 | next three days.  He was transferred to another |
| 23 | unit on the 13th, I believe, and I was in |
| 24 | communication with Mourning Fox, his case |

26 (Pages 98 to 101)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

102

1  administrator, during that period of time about
2  his management, although I can recall only one
3  discrete conversation.
4  But again, it would be usual and ordinary
5  after each of us had seen him to have some
6  communications about what are we doing, what's
7  the nature of the situation we have here. This
8  other specific conversation I recall was the
9  afternoon of the 12th, the early afternoon.
10  The record indicates I spoke with his
11  father, which truthfully I don't recall
12  receiving a phone call, but I do remember
13  receiving some information. His family was
14  concerned about him and had contacted the
15  institution. I don't remember being a party to
16  a telephone call, but it may have happened.
17  But I do remember speaking with Mr. Fox
18  about would he be able to go speak with Mr.
19  Burns to assess how he was because his family
20  had communicated some concern, and I remember
21  that specifically because I had a meeting at
22  1:00 I needed to go to and I needed to either be
23  late to that or discharge responsibility on to
24  somebody else to assess the patient and see how

103

1  he was.
2  Again, reviewing the record, Mr. Fox
3  documented that he spoke with me, he assessed
4  the patient and made a determination about what
5  to do at that time.
6  Q  Did you enter into what's called a contract for
7  safety with Mr. Burns?
8  A  I used that phrase to document an agreement or,
9  essentially an agreement that I made with Mr.
10  Burns as part of my assessment, an agreement he
11  made with me I guess would be more proper.
12  Q  And for lack of a better term, we'll call it a
13  contract for safety.
14  What was the agreement that you had with
15  Mr. Burns?
16  A  The agreement was that if he felt that he were
17  at risk of being harmed or that he felt he might
18  act violently toward other people, that he would
19  speak to staff before doing anything,
20  essentially to alert people to how he was
21  feeling prior to engaging in any behaviors.
22  Q  Do that include the extremes like if, Mr. Burns,
23  if you feel like killing anybody, tell us about
24  it before you kill somebody?

104

1  A  That would certainly be well within such an
2  agreement, as it would require him to speak up
3  well short of reaching such an extreme.
4  Q  Based on your understanding of the circumstances
5  that unfolded in the death of Mr. Mosher, do you
6  have any information that he discussed killing
7  Mr. Mosher with any of the medical staff or
8  anybody at the facility prior to killing Mr.
9  Mosher?
10  MR. BELLO: Objection.
11  A  The death of Mr. Mosher occurred over two weeks
12  after I last had contact with Mr. Burn. Any
13  information I have about that is what I read out
14  of the record.
15  Q  So based on your understanding, you have no
16  information as to whether or not he spoke to
17  anybody before he killed Mr. Mosher?
18  A  I have no primary information on that.
19  Q  Now, how is it that it came about that you
20  utilized the agreement tool in the treatment of
21  Mr. Mosher?
22  A  Burns.
23  Q  Mr. Burns, I'm sorry.
24  A  The phrase contract for safety is shorthand for

105

1  essentially what I just described, an agreement
2  that a patient makes to speak up prior to
3  engaging in harmful behavior in the type of work
4  we do at Bridgewater where violence is a concern
5  for many patients.
6  So based on the history Mr. Burns came
7  with, I was certainly aware that he had the
8  capacity to act violently, assuming what
9  information was reported was accurate, which I
10  had no reason to doubt. And therefore, one of
11  my concerns was that where he was now, with the
12  external controls and structure of Bridgewater,
13  would he be in control of himself.
14  So that would be a routine thing to assess
15  and to come to an agreement with him about and
16  to have confidence that he could honor that
17  agreement.
18  Q  What were the factors that calculated into your
19  level of confidence, however high or low it was,
20  that Mr. Burns would abide by the verbal
21  agreement to speak to you or staff or somebody
22  if he felt like killing somebody?
23  A  One factor that, although to describe him
24  psychiatrically, the word paranoia would

27 (Pages 102 to 105)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

**106**

1  necessarily be used, he was a paranoid
2  individual worried about his safety, that he
3  wasn't reticent to discuss that with me.
4      He didn't come in the room the way many
5  paranoid patients do and not talk.  In fact, he
6  described how he felt and what he was worried
7  about, and it do not appear he was including me
8  in the pool of individuals from whom he felt he
9  was at risk, and he didn't seem to extend that
10 to clinical staff as well.
11     That's important.  If I'm going to ask him
12 to speak up, it's very helpful that he's
13 demonstrated to me over a certain period of time
14 that he can and he do and he would share all
15 sorts of information that, you know, pertains to
16 his acting violently.  He could communicate
17 accurately, that although his thinking was
18 disorganized, very peculiar beliefs, delusional
19 ones, when he spoke to me, his thought processes
20 were not so disorganized that you had trouble
21 figuring out what he was saying, which is
22 certainly a level of psychosis that can and does
23 occur and communications themselves become more
24 difficult.

**107**

1      I think those are two key factors that made
2  me more confident that he would be safe
3  remaining on the unit, and that if a situation
4  changed from where it was at when he was in
5  front of me talking, that he could and he would
6  speak up and let staff know.
7  Q  Did you suggest to him or did he suggest to you
8     a contract for safety?
9          MR. BELLO:  Objection.  You can
10     answer.
11 A  Probably the phrase was never uttered between
12 the two of us.  Contract for safety is shorthand
13 for the type of agreement we described.
14     It would -- I can't recall the specific
15 give and take of the totality of the
16 conversation I had.  That would typically be
17 something that would be at my instigation based
18 on the information he gave me, you're worried
19 about your safety, clearly a lot of the
20 information he told me, are you in control of
21 yourself.
22     What if you feel threatened on the unit,
23 what if you feel like you're in danger, can you
24 speak up and tell people?  What if you feel

**108**

1  you're losing your temper or you feel you need
2  to defend yourself against some threat, can you
3  tell staff?
4      Those would be ordinary types of questions
5  I might ask of someone with the type of symptoms
6  Mr. Burns was exhibiting.
7  Q  How long was your total assessment or
8     conversation with Mr. Burns at the time you were
9     doing this assessment?  How long were you
10    speaking with him?
11 A  I'm not sure.  I can make certain inferences
12 just from my own documentation of it and the
13 breadth of information we do cover, and in fact
14 some of the information that he shared with me,
15 like what meds he had been on before, things
16 like that, that it was not exceedingly brief.
17     It must have been I would estimate at least
18 15 or 20 minutes, although it certainly could
19 have been substantially longer.  Unfortunately,
20 four years, I can't recall with detail how long
21 it went on for.
22 Q  And this was the first time you had met Mr.
23 Burns?
24 A  Yes.

**109**

1  Q  Are there indicators, post this kind of contract
2     for safety or agreement that you would enter
3     into with a patient, are there indicators after
4     that agreement has been reached which would tell
5     you that the patient you've entered into the
6     agreement with is noncompliant with the
7     agreement?
8  A  Yes.
9  Q  What kind of indicators could those be other
10    than actually murdering somebody, obviously?
11 A  Assaulting someone without speaking up,
12 attempting to harm himself without speaking up,
13 assault, well, again being involved in a fight
14 likely would be.
15     But again, one would need to know the
16 context, whether somebody walked up and hit him
17 in the head or something like that and engaged
18 in a struggle, that would of course be a
19 different scenario if he was protecting
20 himself.  This was not something he can
21 anticipate occurring.
22     Those would be some of the more obvious
23 ways that he clearly do what he said he wouldn't
24 do without speaking up.

28 (Pages 106 to 109)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

**114**

1    Hospital, on Mr. Burns towards the bottom of the
2    page, and first if you could decipher for me the
3    first part, it looks like it said P, dash, new
4    patient station?
5    A  It's D, new patient status.
6    Q  What's the D?
7    A  Data.
8    Q  Data.  And the term new patient status, can you
9    further define what this means or --
10   A  Just what it sounds like.  It's not a formal
11   label.  It doesn't mean anything more than the
12   words themselves.
13   Q  So then this is a memorialization of the
14   interaction with a new patient, or is it a
15   memorialization of an interpreted status of a
16   new patient?
17   A  It's what the nurse chose to write as the first
18   line of her note.
19   Q  I'm just trying to get an idea of what you --
20   A  No, it is just the way she chooses to --
21   Q  Okay.  And you'll see, read along with me
22   because I'm not very good at reading these kinds
23   of notes, initially refused to take --
24   A  AM.

**115**

1    Q  AM Resperil?
2    A  Risperdal.
3    Q  Refused sign, appeared confused and --
4    A  Disoriented.
5    Q  Okay, thank you.  Later agrees to take immediate
6    medcaline [phonetic]--
7    A  Calmer now.
8         MR. BELLO:  Boy, you are bad.
9    A  I've had a lot of practice.
10   A  A, presents in control.  A is for assessment.
11   Q  I'm sorry, continue on.
12   A  P for plan, encourage med compliance and monitor
13   mental status.
14   Q  Okay.  What's the Risperdal?
15   A  Medication, antipsychotic medication.
16   Q  What's the expected result from administration
17   of Risperdal?
18         MR. BELLO:  Risperdal.
19   Q  Risperdal?
20   A  Reduction of psychosis.
21   Q  Refused to sign, what's your understanding of
22   what that means?
23   A  Refusal form, the form which I referred to in
24   answering your question earlier.  If the patient

**116**

1    refuses a dose of medication, it generates a
2    form that the nurse signs that the patient
3    signs.
4         Even if the patient doesn't sign, the form
5    still occurs and gets routed to the treating
6    physician.  That is the purpose of the form as
7    well as to document a refusal in a formal way in
8    the record.
9    Q  If you would look at DOC 0824 in that set of
10   records, do you see that note starting -- it
11   appears to be day, time and place, 8/13/04, 404,
12   5:45 PM, reading the first paragraph.
13        Is your understanding that that is somewhat
14   of a memorialization of his claim that he wanted
15   out of B-1 because he was threatened or felt
16   threatened?
17   A  Specifically what the writer said was that he
18   fears, he has fears of being raped or attacked.
19   Patient claims that others are threatening him,
20   says he has never had fears like this before.
21   Q  Is this at a point in time where you're no
22   longer involved in Mr. Burns?
23   A  This was probably most accurately described as
24   the cusp.

**117**

1    Q  The cusp?
2    A  This is the note that the clinician who saw Mr.
3    Burns and made a determination to move him to
4    another unit generated.  So technically
5    speaking, he's probably no longer my patient
6    because I'm sure she wasn't writing as she was
7    talking to him.  She wrote after she made the
8    decision and then documented her interaction and
9    decision.
10        So he had already been transferred down to
11   Max 2 or was in the process of being
12   transferred.
13   Q  Based on your experience up to that point in
14   time at Bridgewater State Hospital, is this a
15   common or uncommon claim by mentally ill
16   patients?
17        MR. BELLO:  Objection.
18   A  To claim that they fear they're going to be
19   attacked?  Not unusual.
20   Q  Was there any investigation as far as you're
21   aware into the accuracy of his claims, that he
22   felt like he was going to get raped or he never
23   felt, you know, this kind of threatening before
24   or fear before?

30 (Pages 114 to 117)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

118

1  A  I am not aware of what, of an investigation
2     specifically happening.  If a patient makes a
3     claim that they're being threatened or harassed,
4     it's routine for security staff to assess the
5     situation.  I suspect that's what happened here.
6  Q  Would you look at DOC 0828, please.  This is an
7     August, purports to be an August 24, '04, entry
8     into the progress notes of Bridgewater State
9     Hospital, and appears to be by a registered
10    nurse on the bottom there.
11 A  Registered nurse, clinical specialist.
12 Q  And that's Debra --
13 A  Clancy.
14 Q  Clancy.  Did you know Debra Clancy?
15 A  Yes.
16 Q  Is she still employed as far as you're aware at
17    Bridgewater State Hospital?
18 A  She is not.
19 Q  Directing your attention to the fourth line
20    midway, and read along once again to correct me
21    if I'm wrong.
22       It appears to say:  He informs me that he
23    has decided to stop his meds because I don't
24    believe that I have schizophrenia, and if I

119

1     don't take meds and I'm normal, you'll believe
2     me.
3        Does that appear accurate?
4  A  That would be how I would read that as well.
5  Q  And if you'd look at DOC 0829, following page, I
6     believe, it's August 25, '04, and there's
7     another, appears to be another entry into
8     progress notes regarding Mr. Burns, and you'll
9     see that in the first sentence it says PT, which
10    I assume is patient?
11 A  Yes.
12 Q  Asked, can you decipher the word?
13 A  Asked to be seen.
14 Q  This AM, presented very --
15 A  Dysphoric.
16 Q  What's dysphoric?
17 A  Sad.
18 Q  Tearful, admitted to --
19 A  AH, short for auditory hallucinations.
20 Q  So he was hearing things that no one else was
21    hearing?
22 A  Presumably.
23 Q  Both inside and outside his head.  I'm sorry,
24    what's that?

120

1  A  Next word?
2  Q  Yes.
3  A  Often.
4  Q  Often of a communal nature.
5        MR. BELLO:  Command.
6  Q  Command nature?
7  A  My guess would be command.
8  Q  Telling him it's not -- can you decipher that
9     word?
10 A  I would say telling him to not take his
11    medication.
12 Q  All people, continue on, to all people,
13    something, can you decipher any of this?  I'm
14    just going to suggest that you attempt to read
15    it for me and I'll follow along because I have
16    to trust you.  I can't read medical notes.
17       MR. CROMACK:  Objection.
18 Q  Please continue on if you could.
19 A  To all people racist names on the unit, all of
20    which he resists -- sorry -- to call people
21    racist names on the unit, all of which he
22    resists as a result --
23       MR. BELLO:  He feels in the middle.
24       THE WITNESS:  Yeah, I think that's

121

1     it.  They, looks like they --
2  Q  They're controlling me?
3  A  I never meant to hurt anyone, I'm programmed,
4     I'm a computer, I work for the government, I
5     want to do what the government says.  Ultimately
6     worried he will be here for a long time,
7     delusion fixed.  Aware team will respond by
8     stating his beliefs are a symptom of his mental
9     illness.  Discussed SI and passed re to the
10    situation, to the similar situation,
11    parentheses, command hallucinations to do things
12    he doesn't want to do.
13 Q  I just don't, I know it's something Phase 1.
14    Does that indicate a transfer to Phase 1 within
15    Max 2?
16       MR. CROMACK:  Objection.
17       MR. BELLO:  If you know what it is
18    without guessing, I'll allow him to answer, but
19    it doesn't seem to do anybody any good for
20    everybody guessing what it says.
21       MR. BALLIRO:  That's probably
22    accurate.
23 A  Yeah, I'm not sure what the first word is.
24 Q  If you look down at the bottom three lines,

31 (Pages 118 to 121)

Daniel W. Comiskey 5-16-2008
William Mosher v. Kenneth Nelson, et al.

126

1     actually kill somebody by ligature?
2          MR. CROMACK:  Objection.
3          MR. BELLO:  Objection.
4   A  He behaved violently on a number of occasions
5     using a ligature.  What his motivations were in
6     those first three events and what his motivation
7     was with Mr. Mosher sound to my perspective as
8     different.
9   Q  As what?
10  A  Different.  I don't know the details.  I haven't
11    reviewed the police records except to skim them
12    today, to try and identify what they were.  He
13    didn't kill anyone before.
14         It seemed like he was trying to get out of
15    somewhere, and it's not pro-social behavior.  It
16    certainly is significant behavior in terms of
17    being worried about his capacity to act
18    violently, but it wouldn't have led me to
19    believe that he would choose to, again, use a
20    ligature but in time kill someone.
21  Q  Well, I mean, you were somewhat aware at the
22    time you assessed him that his past history also
23    included delusional thoughts concerning his
24    being controlled by other forces in his mind

127

1     telling him it do things?
2   A  He made statements to that effect, yes.
3   Q  But you had no reason to disbelieve him that he
4     actually believed he was being controlled by
5     external forces?
6   A  I had no reason to disbelieve him as the rest of
7     his presentation is consistent.  Psychotic
8     people sometimes have beliefs like that.
9   Q  But you do not associate the fact that he had
10    reported to you that he believed himself to be
11    controlled and commanded by external forces
12    played any, had any influence in the
13    strangulation of the person at the McLean's
14    Hospital or Arbour Hospital or even at
15    McDonald's?
16         MR. BELLO:  Objection.
17  A  I wasn't aware of a connection between that.
18    I'm trying to recall at the time what knowledge
19    I might have had about which events that led to
20    criminal charges, his problems at Bridgewater
21    inferred that somewhere along the line somebody
22    gave him a charge for some of these things.
23         So at a matter of course, I will make note
24    of what the behaviors are, violent behaviors or

128

1     things like that, things in their recent
2     history.  But it is usually not appropriate to
3     be inquiring in detail as to what someone's
4     motivation is for an outstanding legal charge,
5     and that has to be a judgment call.
6          Sometimes it's important, but almost
7     never-- it's a generally reasonable rule of
8     thumb.
9   Q  As a general reasonable rule of thumb, you
10    wouldn't inquire as to whether or not Mr. Burns,
11    of Mr. Burns whether or not he took these
12    hostages by ligature because he believed he was
13    being told that he needed to do that in your
14    assessment of where he might be placed in
15    Bridgewater?
16  A  I don't recall asking him questions about that.
17    In fact, the information that came with him was
18    collateral, that was there, and the incidents
19    themselves do speak somewhat for themselves that
20    he acted violently and escaped.
21         My thinking at the time would be that that
22    was the goal, this was goal directed, not good
23    behavior, but he took someone hostage and he got
24    out.  And there was no report in there that he

129

1     continued to harm anyone or he took anyone with
2     him beyond the goal of getting out.
3   Q  Neither were there any reports of what was going
4     through his mind while he was doing these
5     things, whether or not he was being commanded to
6     do it?
7   A  No.
8   Q  You had none of that information at the time you
9     assessed him?
10  A  Just the information I think, you know, we
11    already discussed that he had made statements
12    that he felt like he was being controlled, and
13    he also communicated that that was not a welcome
14    experience.
15  Q  Just a few more questions.
16         Were you aware of whether or not during the
17    past instances that were reported to you about
18    Bradley Burns strangling people, were you aware
19    of whether or not he was under medication at the
20    time he strangled those people?
21         MR. CROMACK:  Objection.
22  A  To the best of my recollection, and this isn't a
23    scenario that I'm as confident about as other
24    questions I've answered, I believe my

33 (Pages 126 to 129)




*The Commonwealth of Massachusetts*

*Executive Office of Public Safety*

*Department of Correction*

*Bridgewater State Hospital*

*20 Administration Road*

*Bridgewater, Massachusetts 02324*

*www.mass.gov/doc*

**Mitt Romney**
Governor

**Kerry Healey**
Lieutenant Governor

**Edward A. Flynn**
Secretary

**Kathleen M. Dennehy**
Commissioner

**James R. Bender**
Acting Deputy Commissioner

**Kenneth W. Nelson**
Superintendent

TO:        All Concerned

FROM:    Kenneth W. Nelson, Superintendent

SUBJ:    103 BSH 651 Seclusion and Restraint

DATE:    June 17, 2004

----------------------------------------------------------------

Pursuant to 103 DOC 104, Internal Regulations, the Bridgewater State Hospital Seclusion and Restraint policy (103 BSH 651) is currently undergoing annual review.

In the meantime, however, the current BSH 651 policy which was last approved in June, 2003 is considered operationally sound and shall remain in force.


_____        6/21/04
Kenneth W. Nelson, Superintendent        Date


_____        6/22/04
Susan Skea, MD, Medical Director        Date

651AR.04

> EXHIBIT 4
> Dennehy
> 5·14·08  cc

DOC 8100

**(508) 279-4500**

# The Commonwealth of Massachusetts
## Executive Office of Public Safety
## Department of Correction
## Bridgewater State Hospital
## 20 Administration Road
## Bridgewater, Massachusetts 02324
www.mass.gov/doc

**Mitt Romney**
*Governor*

**Kerry Healey**
*Lieutenant Governor*

**Edward A. Flynn**
*Secretary*

**Michael T. Maloney**
*Commissioner*

**Kathleen M. Dennehy**
*Deputy Commissioner*

**Kenneth W. Nelson**
*Superintendent*

To:         All Concerned

From:       Kenneth W. Nelson, Superintendent

Re:         **PROPOSED CHANGES TO BSH SECLUSION AND RESTRAINT POLICY**

Date:       June 9, 2003

As a follow-up to the JCAHO survey the BSH Executive Committee has been studying proposed changes to our seclusion and restraint policy, 103 BSH 651. As a result of this review this policy has been significantly revised. The revised version of 103 BSH 651 is attached. **This new version of the policy will be effective on Monday, July 14, 2003 at 7:00 a.m.** The most significant changes to 103 BSH 651 are listed below. These proposed changes include:

1.  Adds language that it is the policy of BSH **"to prevent, reduce, and strive to eliminate the use of seclusion and restraint"** consistent with the mission of the institution and its commitment to provide a safe environment for staff and patients. This policy statement also notes that BSH is committed to the use of non-physical interventions when such interventions would be effective; training staff in the content of this policy and de-escalation techniques; and the need to preserve patient safety and dignity when seclusion and restraint are used.

2.  Adds language that requires staff, absent an emergency, to have a clinician (physician, registered nurse, social worker, psychologist) intervene with an agitated patient. From 5PM-9PM on business days a "crisis clinician" would be tasked with this intervention responsibility; if not available the doctor-on-call or nursing supervisor would be called. This clinical intervention will occur with the patient either at the site where the patient is or in the Infirmary treatment room.

3.  If an emergency does exist and de-escalation would not be effective, the policy requires that the patient be removed from the site of the emergency to the ITU where the patient will be assessed by a physician, registered nurse, or certified physician's assistant. If that clinician believes that the patient requires seclusion or restraint, s/he will write the One-Hour Initial Seclusion Order.

4.  Adds language that states that all staff interactions shall be focused on expediting the movement of patients out of seclusion or restraint.

DOC 8101

**(508) 279-4500**

Printed on Recycled Paper

**PROPOSED CHANGES TO BSH SECLUSION AND RESTRAINT POLICY**
June 9, 2003
Page 2

5. Adds language that requires that the STO making 10 minute checks in the ITU to immediately inform the unit nurse if a patient in seclusion appears to be calm and in control so that the nurse can assess the patient for discharge or take any other appropriate action. The current policy simply requires assessments every three hours as is required by the statute.

6. Adds language that lists factors that may indicate that a patient is ready for discharge from seclusion. These factors include: absence of struggling or agitation; absence of verbal or behavioral threats; compliance with or benefit from medications; compliance with staff direction; cooperation with ADL's; patient is sleeping. The current policy has no such list of factors.

7. Significantly shortens the time frame in which treatment teams must provide information to ITU clinical staff about a patient placed in seclusion (within one hour or next business day if placement occurred during non-business hours) and conduct a case conference about such patients (after a patient has been in seclusion for more than 12 hours).

8. Modifies the policy so that designated physicians, designated registered nurses, or designated certified physician's assistants can write 3-hour seclusion orders or discontinue such orders. By expanding the disciplines of staff who may write 3-hour seclusion orders the policy is now totally consistent with the provisions of MGL Chapter 123 s.21.

9. Eliminates the use of restraint in what is currently referred to as the "Restraint Dorm". All restraint will be done in individual rooms. One of the two existing beds in the Restraint Dorm will be removed; the remaining bed will be used for the administration of forced medications only. Also patient privacy will be increased in this newly configured dorm by frosting the lexan walls and placing a door in the doorway. In addition, the beds in the 14 seclusion rooms are being raised so that they are 12" above the floor and repositioned so that forced medications can be administered to patients already in restraint.

This completes a review of the most significant changes to the BSH seclusion and restraint policy.

KWN/amp
FRN:    03-57

DOC 8102



*The Commonwealth of Massachusetts*

*Executive Office of Public Safety*

*Department of Correction*

*Bridgewater State Hospital*

*20 Administration Road*

*Bridgewater, Massachusetts 02324*

www.mass.gov/doc

**Mitt Romney**
*Governor*

**Kerry Healey**
*Lieutenant Governor*

**Edward A. Flynn**
*Secretary*

**Michael T. Maloney**
*Commissioner*

**Kathleen M. Dennehy**
*Deputy Commissioner*

**Kenneth W. Nelson**
*Superintendent*

| | |
|---|---|
| **To:** | All Concerned |
| **From:** | Kenneth W. Nelson, Superintendent |
| **Re:** | New Seclusion and Restraint Policy |
| **Date:** | July 14, 2003 |

The new seclusion and restraint policy is being implemented today.

It is the policy of Bridgewater State Hospital to prevent, reduce, and strive to eliminate the use of seclusion at this institution. Under this policy seclusion is to be used only when there is an imminent risk of a patient physically harming himself or others. Bridgewater State Hospital is committed to the use of non-physical interventions, such as de-escalation or re-direction, rather than seclusion when these interventions would be effective. While any staff member can initiate the process by which a patient is assessed for seclusion, only licensed medical staff may write an Initial One-Hour Seclusion Order.

Many of you have attended training on this new policy and have received copies of it. Additional training sessions are being scheduled so that all staff will have the opportunity to receive this training. For those of you who have not attended this training yet, information regarding this new policy is posted on the Bridgewater State Hospital Bulletin Board adjacent to the time card rack in the Administration Building.

/KWN
FRN: 03-114

DOC 8103

**(508) 279-4500**

Printed on Recycled Paper

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION
BRIDGEWATER STATE HOSPITAL

103 BSH 651

USE OF SECLUSION AND RESTRAINT

## I.    PURPOSE

The purpose of this policy is to establish standards that will govern the use of seclusion and restraint at Bridgewater State Hospital (BSH) consistent with the requirements of M.G.L. Ch. 123, S 21. All patients will receive any necessary treatment in the safest and most appropriate manner while maintaining their dignity and ability to be moved to a less restrictive treatment setting as soon as it is clinically indicated.

## II.   DEFINITIONS

A.    <u>Superintendent</u> - the Superintendent of Bridgewater State Hospital or his/her designee.

B.    <u>Medical Director</u> - The Medical Director of Bridgewater State Hospital, or his/her designee.

C.    <u>Clinical Treatment Team member</u> - a physician, certified physician assistant, registered nurse, social worker, or psychologist.

D.    <u>Crisis Clinician</u> - Licensed mental health professional (e.g. psychiatrist, psychologist, clinical social worker) or other licensed staff who are deemed qualified and competent by the Medical Director and who is tasked with the responsibility of assessing patients 5:00 PM to 9:00 PM on business days.

E.    <u>Certified Physician Assistant</u> - A certified physician's assistant who is deemed qualified and competent and designated by the Medical Director to order restraint, examine patients in restraint, and discontinue orders for restraint.

F.    <u>Registered Nurse</u> - A registered nurse who is deemed qualified and competent and designated by the Medical Director to order restraint, examine patients in restraint, and discontinue orders for restraint.

G.    <u>Physician</u> - A medical doctor who is designated by the Medical Director to order restraint, examine patients in restraint,

1

DOC 8104

discontinue    orders for restraint, and provide coverage for
the Intensive Treatment Unit.

H.    Specially Trained Observer ("STO") - an employee who is
designated by the Superintendent or Medical Director, and who
has been provided with an orientation and training program in
clinical, administrative and legal issues regarding the use of
seclusion and restraint.

I.    Emergency - Imminent risk of harm to self or others such as
the occurrence or serious threat of extreme violence, personal
injury or attempted suicide.

J.    Restraint - Bodily physical force, mechanical devices,
chemicals, confinement in a place of seclusion other than the
placement of a patient in his room for the night, or any other
means which unreasonably limit freedom of movement. (M.G.L.
Ch. 123, S 1.)

   1.    Bodily physical force - use of bodily physical force to
   limit a patient's freedom of movement, subject to the
   following exceptions:

      a)    Physical holding of a patient by a staff member
      manually for purposes of transporting a patient
      from one area of the hospital to another.
      b)    Physical holding of a patient by a staff member for
      purposes of placing a patient in seclusion or
      restraint.

   2.    Mechanical restraint - any physical device used to
   restrict the movement or normal function of a portion of
   a patient's body. However, mechanical restraint does not
   include:
      a.    physical devices such as orthopedically prescribed
      appliances, surgical dressings and bandages,
      protective helmets and supportive body bands, or
      b.    other physical holding when necessary for routine
      physical examinations and tests, or for orthopedic,
      surgical, and other similar medical treatment
      purposes or when used to provide support for the
      achievement of functional body position or proper
      balance or to protect a patient from falling out of
      bed or to permit a patient to participate in
      ongoing activities without the risk of physical
      harm, or
      c.    pursuant to a physician order, temporarily holding
      a patient in the shower or bathtub in order to
      assist with hygiene, or
      d.    use of any device which limits freedom of movement
      during transportation of patients to or from

2

DOC 8105

Bridgewater State Hospital, pursuant to M.G.L. Chapter 123, S.21 and 103 DOC 530.

3.  <u>Chemical Restraint</u>  - Chemical restraint occurs whenever a patient is given medication involuntarily for the purpose of restraining the patient. Chemical restraint shall not include involuntary administrations of medications when administered:

    a)  in an emergency to prevent immediate, substantial and irreversible deterioration of serious mental illness, or

    b)  for other treatment purposes when administered pursuant to a court approved substituted judgement treatment plan.

4.  <u>Seclusion</u> - Confinement of a patient in a room alone with a locked door which cannot be opened from the inside except for:

    a)  Placement of a patient in his room on a housing unit for the night at the regular hour of sleep, or upon the patient'(s') request after 6:30 PM

    b)  Placement of a patient in a room to await medical assessment and treatment.

K.  <u>Patient Medical Record</u>  - that portion of the patient record which documents the most current behavioral assessments, mental status examinations, problem lists, treatment plans, physician's orders and medication sheets.

L.  <u>Incident Report</u>  - written documentation to be submitted by clinical or security staff detailing a patient's words and/or behavior which was thought to constitute a psychiatric emergency of sufficient magnitude to warrant transfer to the ITU for further assessment and stabilization.

M.  <u>Seclusion and Restraint Order Sheet</u>  - a separate physician's order sheet to be utilized specifically for ordering seclusion or restraint as a therapeutic modality for the management of an acute psychiatric emergency.

**III. POLICY**

It is the policy of Bridgewater State Hospital to prevent, reduce, and strive to eliminate the use of seclusion and restraint in a way that is consistent with the mission of this institution and its commitment to provide a safe environment for its patients, staff, and visitors. Toward this end, BSH is committed to the prevention of emergencies that otherwise might have the potential to lead to the use of seclusion and restraint. It is the policy of BSH that the use of non-physical interventions is preferred to the use of

3

DOC 8106

these special treatment procedures. BSH is also committed to using seclusion and restraint only when there is an imminent risk of a patient physically harming himself or others. It is also the policy of BSH to discontinue its use as soon as possible. BSH, as part of its continuing in-service training for staff, is committed to communicating this policy to staff. Other components of in-service training include de-escalation techniques that can be used to prevent, reduce, or eliminate the need to seclude or restrain patients; how seclusion and restraint can be perceived by patients; and the need to preserve patients' safety and dignity when seclusion or restraint is used.

This policy is developed consistent with the requirements of M.G.L. Ch 123, S 21, Ch. 1 Acts of 1988, the settlement agreement in O'Sullivan v. Dukakis et al, Suffolk Superior Court Civil Action No. 87-3381, and the JCAHO Behavioral Health Care Standards. This policy does not govern the use of mechanical restraints when such restraints are used to transport a patient outside of the secure perimeter of Bridgewater State Hospital pursuant to M.G.L. Ch 123, S21 and 103 DOC 530. Additionally, this policy is promulgated pursuant to M.G.L. 124, S 1(q) and M.G.L. Ch. 125, S 18. The following policy statements apply:

A.    Seclusion and restraint of a patient may only be used in cases of emergency when non-physical intervention would not be effective.

B.    Seclusion and restraint must be authorized by the Medical Director or a physician who is present at the time of the emergency. If the physician or Medical Director are not available in the event of an emergency, a non-chemical means of restraint may be used for a period of one (1) hour provided that within the one (1) hour period the patient is examined by the physician or the Medical Director. If this does not occur within the one-hour period, the patient may be secluded or restrained for an additional one (1) hour period until he is examined by the physician or the Medical Director. In that event, the Superintendent shall attach to the restraint form a written report as to why the examination was not completed by the end of the first hour of seclusion or restraint (see Appendix A).

C.    No order for seclusion or restraint is valid for a period of more than three (3) hours beyond which time it may be renewed upon personal examination of the patient by a physician or, as set forth in this policy, a registered nurse or a certified physician's assistant.

D.    Subject to medical or security considerations, a patient's sleep shall not be disturbed in order to conduct an examination for the purposes of renewing a seclusion or

4

DOC 8107

restraint order, or to relieve or release him from seclusion. This does not preclude the responsibility of the physician, registered nurse, or certified physician's assistant to make visual rounds and rewrite orders for seclusion.

E.   No patient shall be kept in seclusion or restraint without being under the observation of a person in attendance who is specially trained to understand, assist, and afford therapy to the patient. When a patient is in mechanical restraint, the Specially Trained Observer (STO) must be located so that he/she is within verbal contact of the patient and is able to observe the patient in full view at any time. It is not necessary for the Specially Trained Observer in attendance of a patient in mechanical restraints to be in full view of the patient. There will be one (1) STO for every seven (7) patients in seclusion and they will check each seclusion patient every ten (10) minutes for signs of respiration or other activity, document the checks, and make reports directly to the clinical staff as specified in this policy. In all instances where a patient is placed in restraints in a seclusion room, that patient must be monitored on a 1:1 basis by a STO. The following conditions also apply to the observation of all patients in mechanical restraints:

1.   All patients placed in restraints shall be under the constant observation of a Specially Trained Observer (STO).

2.   The STO may be in attendance on a patient in restraint by being situated so that the STO is within verbal contact of the patient and is able to visually observe the patient at any time. It is not necessary for a STO in attendance on a patient in restraint to be in full view of the patient.

3.   The STO shall maintain constant and continuous observation of the patient at all times including the following:

             -showers
             -bathroom/toilet use
             -sleep

     During the shower period, the STO function may be transferred to a Correction Officer.

4.   The STO shall not halt the continuous and constant observation of the patient until a physician, registered nurse, or certified physician's assistant issues an order discontinuing the use of restraints for said patient and the patient has been removed from restraints.

5

DOC 8108

F.  Audio-visual equipment will be used in all rooms for seclusion
    and restraint.  The audio-visual system shall be designed in
    such a way as to afford the maximum possible view of all areas
    of the rooms where patients are secluded.  In addition, all
    components of the system shall be installed in such a way that
    they are not unreasonably hazardous to the patients in
    seclusion.

    The audio-visual equipment will be monitored twenty-four (24)
    hours a day, seven (7) days a week by a staff person specially
    trained for that purpose.  One staff person will not monitor
    more than ten (10) patients on the audio-visual screens.  This
    staff person will be located so that he/she is able to
    communicate with the STO.

G.  In an emergency situation when the audio-visual equipment is
    not working, a patient may be kept in seclusion or restraint
    without one-to-one observation for a period not to exceed two
    hours providing that the patient is observed at least every
    five (5) minutes (see Appendix B).  The Superintendent or
    Medical Director will then be required to attach a written
    report to the patient's restraint form giving reason as to why
    the audio-visual equipment was not available (see Appendix C).

H.  If a patient is in seclusion or restraints for more than eight
    (8) hours in any twenty-four (24) hour period, this must be
    authorized by the Medical Director, or the physician.
    Authorization that occurs in the absence of the Medical
    Director must be reviewed upon his/her return.

I.  There will be no "P.R.N." or "as required" orders written for
    seclusion or restraint.

J.  No later than twenty-four (24) hours after the period of
    seclusion or restraint, a copy of the order form shall be
    delivered to the patient.  A place shall be provided on the
    form for the patient to comment on the circumstances leading
    to the use of restraint and on the manner of restraint used
    (see Appendix D).

K.  A copy of the seclusion and restraint documentation shall
    become part of the patient's medical record.

L.  The use of seclusion and restraint shall normally occur in the
    Intensive Treatment Unit (ITU) and the Infirmary at
    Bridgewater State Hospital.

M.  Pursuant to 103 DOC 650, Mental Health Services policy,
    therapeutic restraints are not, under any circumstances, to be
    used as a disciplinary or punitive measure.

DOC 8109

N.  Should it be necessary to seclude or restrain a minor, the following provisions of M.G.L. Chapter 123, Section 21 shall apply:

1.  The minor shall be examined by a physician within fifteen minutes of the order for seclusion or restraint.  If a physician is not available, the minor must be examined within fifteen minutes of the order for seclusion and restraint by a registered nurse or certified physician's assistant, and then by a physician within one hour of the order of seclusion or restraint.

2.  After each hour, the seclusion and restraint order of a minor must be reviewed by a physician after either direct examination or consultation with unit staff.  If a physician is not available, the hourly examination or consultation may be performed by a registered nurse or certified physician's assistant.

3.  A minor may not be secluded for more than two hours within a twenty-four hour period.

4.  Any seclusion or restraint of a minor exceeding one hour in twenty-four hours must be reviewed within two working days by the Superintendent. The Superintendent's report regarding each such instance of seclusion or restraint must be forwarded to the human rights committee, or if one does not exist, to an "appropriate body" by the Commissioner of Mental Health.

## IV.  APPLICABILITY

This policy is applicable to all state and contract employees at Bridgewater State Hospital except where department regulations which address those subjects provide otherwise.

## V.  PROCEDURE

## A.  Preliminary Interventions

When it appears that a patient's behavior may potentially become an emergency, but does not yet pose an imminent risk of harm, the following steps must be taken:

1.  Approach the patient in a calm and reassuring manner being careful not to intrude on his personal space, and attempt to engage the patient in a calm and quiet conversation.

2.  If the patient's behavior continues to escalate, attempt to reduce the stimuli that are present.  Efforts to reduce the stimuli may include encouraging the patient to use the unit

7

quiet room (where available), as indicated by the appropriate policy, encouraging the patient to go to his room for a specified period of time; redirecting the patient to engage in another activity.

3. Should these efforts fail to de-escalate the situation or be deemed inappropriate but the risk of physical harm still does not appear to be imminent, a clinical member of the patient's treatment team shall be contacted for the purpose of seeing the patient as quickly as possible so that an intervention can be used by that staff member that will resolve the potential emergency without having to resort to the use of seclusion or restraint.

4. If a clinical member of the treatment team is not immediately available, the staff member shall contact the Control Center. The officer assigned to the Control Center shall :

    a. On business days from 5:00 PM - 9:00 PM direct the designated crisis clinician to report to the site of the potential emergency.

    b. On other days or at other times or if the crisis clinician cannot respond immediately, direct the doctor-on-call to respond to the site of the potential emergency.

    c. If the doctor-on-call is unable to respond immediately, direct the nursing supervisor to respond to the site of the potential emergency.

    d. If the nursing supervisor is unable to respond immediately to the site of the potential emergency, direct the Yard Lieutenant to respond to the site of the potential emergency.

5. When a clinical member of a treatment team or the clinical staff member arrives at the site of the potential emergency, s/he shall, if clinically appropriate, attempt to speak to the patient and de-escalate the situation. S/he may direct that the patient be removed from that location and moved to another area within the same building for a private interview. S/he may also direct that the patient be moved to a remote location for a private interview. That remote location would normally be the Infirmary Treatment Room. Transfer of the patient to the Infirmary Treatment Room from a particular unit shall be consistent with the procedures for off-unit movement of patients assigned to it. The clinician directing the transfer of the patient to the Infirmary may request through the Control Center that the patient be escorted by a correction officer. The clinician may also have the patient reassigned to another unit if this is considered the most appropriate resolution to the immediate situation.

8

6. Following this intervention, the clinical staff member may direct that the patient remain assigned to his respective housing unit or, if there is an actual emergency, that he be placed in seclusion or restraint in the ITU. If the latter option is selected then the clinical staff member shall be responsible for writing the One Hour Initial Seclusion or Restraint Order Form (see Appendix D) and accompanying Incident Report. When completing the One Hour Initial Seclusion or Restraint Order Form, staff are to list only the name of the patient for whom the order is being written. For example, if one patient assaults another, the order form for the assailant would include language such as 'patient John Doe assaulted another patient'.

7. If, as described in 4 (d) above, the Yard Lieutenant responds to the site of a potential emergency, s/he shall attempt to de-escalate the patient. If the Yard Lieutenant is unable to de-escalate the patient or if s/he believes that an emergency exists, the Yard Lieutenant shall order that the patient be placed in wrist restraints and escorted to the ITU and placed in Cell 15. Upon placement of the patient in Cell 15, the Yard Lieutenant shall notify immediately the physician, registered nurse, psychologist, social worker, or certified physician's assistant assigned to the ITU so that one of those staff members can immediately assess the patient. If upon assessment the physician, registered nurse, psychologist, social worker or certified physician's assistant believes that an emergency exists, s/he shall order that the patient be placed in seclusion or restraint for up to one hour and shall write the One Hour Initial Seclusion or Restraint Order Form and accompanying Incident Report.

8. Other available staff on the unit or the site where the incident is occurring shall notify the Intensive Treatment Unit staff via telephone or radio that a patient is being transferred to their unit, giving the following information:

    - Sending Unit
    - Reason for transfer

9. Once a transfer to the ITU has been called over the radio, ITU staff is to ensure that any patients currently in mechanical restraints will be fully secured.

10. Whenever a patient is transferred to the ITU, the ITU inmate workers will be secured in the Laundry Room and will be released upon the order of the Unit OIC after the incoming patient/inmate has been secured. In addition, whenever any type of emergency situation exists within the ITU, all inmate workers will be immediately secured within the Laundry room and released when the OIC deems it safe to do so.

9

DOC 8112

B.    Authorization

1.    Any staff person who believes that an emergency exists and
      that the preliminary interventions described in A above would
      not be effective may initiate the process by which a patient
      is assessed by a licensed mental health professional or
      registered nurse for placement into seclusion or restraint.

      The staff person initiating the assessment for possible
      placement in seclusion or restraint must completely fill out:

      a.    An Incident Report (see Appendix E) objectively
            describing:

            (1)    The incident (including precipitant and any
                   interventions that were attempted) including a
                   description of the emergency and why the reporter
                   believed that there was a risk of imminent physical
                   harm to the patient or others.

            (2)    Any staff/patients involved (including witnesses).

            (3)    Location, time and date.

            (4)    Any injuries to staff or patient(s) including any
                   medical interventions.

            (5)    Whether or not Use of Force or handcuffs were
                   utilized.

      b.    The original Incident Report will be submitted to the
            Control Center for review as soon as possible but no
            later than the end of the shift.  A copy of the Incident
            Report and the original One Hour Initial Seclusion or
            Restraint Order Form will be submitted to the Charge
            Officer on the Intensive Treatment Unit.

2.    Upon initiation of the assessment process as described in 1
      above, the patient shall placed in Cell 15 of the ITU. The
      assessment process shall occur as described in Section V. A.
      (7) above.

3.    In any instance where a significant incident precedes the
      placement of a patient in seclusion or restraint, the Shift
      Commander shall inform the physician responsible for ITU
      coverage of the circumstances that led to the use of seclusion
      or restraint. This communication from the Shift Commander
      shall occur by the fastest means possible and no later than
      one hour after the incident has occurred. The physician

                                    10

DOC 8113

receiving this communication shall be responsible for documenting a summary of this conversation in the medical record of the respective patient being secluded or restrained. For the purposes of this section, a significant incident shall include but not be limited to: a suicide attempt, an assault on staff, an assault on a patient/inmate, an escape attempt, a use of force, and inciting a group demonstration or disturbance.

4.  The patient shall be strip searched at the time of the initiation of a seclusion order.

5.  The physician shall examine the patient, and, take any appropriate action, such as issuing a seclusion or restraint order or discharging the patient from the ITU.

6.  A physician or the Medical Director, when present during the course of an emergency, may order the placement of a patient in seclusion or restraint given the following:

    a.  The initial physician's order shall be valid for a period not to exceed three (3) hours.
    b.  The initial order for seclusion or restraint, along with the reasons for its issuance, shall be in writing, and shall be signed by the person issuing it.
    c.  The initial order for seclusion or restraint may be renewed in writing by the physician, certified physician's assistant, or registered nurse for subsequent periods not to exceed three (3) hours upon examination by interview or visual inspection of the patient. However, no patient shall be secluded or restrained for more than six hours without the patient being personally examined by a physician before the order can be renewed. The purpose of the examination shall be to determine whether continued seclusion or restraint is necessary to determine if an emergency still exists or to prevent the occurrence of another emergency situation.

C.  ITU Overflow

In the event that the ITU census exceeds bed capacity, patients on seclusion status may be temporarily placed on Max 1, Max II, or the Infirmary until such time as ITU beds are available.

On such occasions, the procedure is as follows:

1.  The ITU physician determines which patient(s) can be secluded on Max I, Max II or the Infirmary.
2.  The rooms on Max I and Max II equipped with audio-visual cameras will if available, be the first choice for alternate placement of ITU seclusion patients.
3.  If during the course of normal business hours (8:00 AM - 5:00

DOC 8114

PM) it is necessary for patients to be placed in overflow, the ITU Unit Director shall be responsible for notifying the Unit Director of the receiving unit of the pending arrival of the overflow patient(s).   From 5:00 PM - 11:00 PM the ITU unit nurse will be responsible for notifying the receiving unit nurse.   From 11:00 PM to 7:00 AM, the Nursing Supervisor will be notified.   ITU staff will be responsible for notifying the receiving unit of all appropriate information.

4.   The ITU nurse will continue to enter the patient in the logbook and to record/report the patient(s) relocation in all customary ways (ITU doctor, shift report, Nursing Supervisor, Assignment Coordinator, ITU OIC).

5.   The names of the relocated ITU seclusion patients will be recorded on the 'whiteboards' in the Nurse's Office in the affected units.

6.   Any seclusion patients temporarily housed on Max 1, Max II or the Infirmary will have 1:1 observation by a Mental Health Worker; in addition, they must be housed separately from any Special Treatment Status patients.

7.   Whenever seclusion patients are temporarily placed in either of the Max Units, the corridor grille shall be secured in order to prevent any Max Unit patients from having access to the corridor where the temporary seclusion is occurring. After 6:30 PM, any Max Unit patients who reside on this corridor and who elect to go to early bed shall be escorted to and secured in their rooms by security staff.

8.   When ITU seclusion beds become available, it will be the ITU physician who determines which of the 'outplaced' seclusion patients will be returned to ITU.

Overflow rounds process:

In the event ITU seclusion patients are placed in one (or both) Max units or in the Infirmary on 'overflow' status, the following procedure shall pertain to the completion of the rounds for these overflow patients.

Max I and Max II

1.   Seclusion patients relocated to overflow will be seen every three (3) hours and order will be written in accordance with existing seclusion policy.

2.   During normal business hours (8:00 AM to 5:00 PM) the ITU Unit Director or designee is responsible for contacting the Treatment Team on Max 1 or 2 to determine if the doctor is available to perform rounds.   If the doctor is available, he/she will perform rounds.

3.   If a Max doctor is unavailable to perform rounds, the ITU Unit Director will be responsible for contacting the opposite Max unit to see if that Doctor is available.   If neither of the Max Unit doctors is available, the ITU Unit Director shall page the on-call doctor to cover the rounds.

12

DOC 8115

4.  After 5:00 PM the seclusion patients placed in overflow will be seen by the ITU physician.

5.  The nurse from each affected unit housing temporary seclusion patients will accompany the physician when seclusion rounds are conducted.  In the absence of the unit nurse, the Nurse Supervisor will accompany the physician.

Infirmary

The Infirmary psychiatrist shall be responsible for conducting rounds for any ITU overflow patients in the Infirmary.  If the Infirmary psychiatrist is unavailable, the ITU doctor will complete these rounds.

D.   Family Notification Process

Bridgewater State Hospital shall provide patients with the opportunity to have a family member notified when a patient is placed in seclusion or restraint. This notification will take place under the following conditions:

- the patient desires the notification to be made
- the family member is willing to be notified
- it is clinically indicated

1.  The Correction program officer (CPO) will meet all patients on the first business day following their admission to the institution.

2.  The CPO will provide each patient with an explanation of the notification policy and procedure.

3.  Each patient, with the assistance of the CPO, will complete the notification form. A copy will be placed in the medical record.

4.  If the patient wishes to designate someone as his emergency contact, the completed form will then be brought by the CPO to the Records Manager to be mailed.

5.  Upon receipt of the returned signed release slip, the form will be forwarded to the appropriate unit and placed in the medical record.

6.  The ITU nurse will review each patient's medical record upon his admission to ITU for seclusion or restraint. If the signed release form is present in the chart, the ITU nurse will be responsible for attempting to contact the patient's family. One telephone call will be made. This call will normally be made within one hour of the patient's admission to ITU. Upon reaching the family member, the nurse will inform them that

13

DOC 8116

the patient has been placed in seclusion or restraint and state the reason (e.g. agitation, assaultiveness, self injury). If the nurse reaches an answering machine, he/she will leave their name and the Bridgewater State Hospital telephone number for a return call.

7.  The patient or the family member may revoke the designation of the family member for such notification. This revocation must be in writing and shall be filed in the medical record with the family notification.

E.  Management of Patients in Seclusion and Restraint

1.  When a patient is in seclusion or restraint, a specially trained staff person or Specially Trained Observer (STO) shall be in attendance of the patient, subject to the following qualifications:

a.  The STO shall be prepared to understand, assist and afford therapy to patients in seclusion or restraint either personally or by calling for the assistance of appropriate clinical staff.

b.  The STO may be in attendance immediately outside a room in which a patient is being secluded provided that this STO is in view of the patient. NOTE: If the patient is not being observed on the Audio-Visual monitor, the STO must at all times be able to observe the patient.

c.  If an STO or audio-visual equipment are not available, a person may be kept in seclusion or restraint unattended by an STO for a period not to exceed two (2) hours subject to the following qualifications:

1)  The patient must be observed by a staff person every five minutes and this must be documented (see Appendix B).

2)  The Superintendent or Medical Director shall attach to the patient's seclusion or restraint order form a written report as to why an STO was not available (see Appendix C).

2.  Subject to medical or security concerns, a patient in mechanical restraints shall be relieved from the restraints once every two hours, if possible, but in any event, at least once every four (4) hours, except between the hours of 10:00 PM and 8:00 AM Relief from restraints shall include a full release from restraint or a point-by-point rotation of restraints. This shall be monitored and coordinated between the Unit Nurse and Charge Officer on the Intensive Treatment

14

DOC 8117

Unit.  The occurrence or non-occurrence of this activity will be documented by the nurse in the patient's medical record.

F.    Assessment for Discontinuation of Seclusion and Restraint

1.    All staff-patient interactions shall be focused on expediting the movement of patients out of seclusion or restraint

2.    If the STO assigned to perform and document checks of patients in seclusion or restraint observes that the patient has become calm and in control or that other significant changes have occurred, the STO shall inform the registered nurse assigned to the ITU of this observation. The nurse shall then assess the patient and take any appropriate action that is clinically indicated including discontinuing the seclusion or restraint order and/or providing appropriate direction to the STO. Such assessments need not occur at intervals less than thirty minutes.

3.    A physician, a certified physician's assistant, or a registered nurse shall discontinue seclusion or restraint when it is determined that the emergency that led to the use of seclusion or restraint has been resolved. Release of the patient from seclusion or restraint shall occur as soon as clinically indicated and shall be based on individualized behavioral criteria. Factors that may indicate that a patient is ready for discharge from seclusion or restraint include, but are not necessarily limited to:

- absence of struggling and/or agitation
- absence of verbal or behavioral threats
- compliance with or benefit from medications
- compliance with staff direction
- cooperation with ADL's
- patient is asleep (Note: the patient shall remain in ITU until he awakens)

4.    At the time the physician or Medical Director or registered nurse or certified physician's assistant discontinues the order, he/she will notify the ITU Charge Officer or designee who, in turn will notify the Deputy Superintendent of Patient Services or designee, and the patient shall be transferred back to a housing unit.

5.    Within one hour of a patient being placed in seclusion or restraint, or, on the first business day following such placement if it occurred during non-business hours or on a week-end or holiday, a member of the patient's treatment team shall consult with a member of the ITU treatment team. The purpose of this consultation shall be to share information

15

regarding the patient so that the most appropriate treatment is provided to him in order that seclusion or restraint can be discontinued as quickly as possible consistent with the safety of the patient and others.

6.    If a patient has been and continues to be in seclusion or restraint for more than 12 hours, a conference shall be conducted within one business day involving the patient's treatment team and the ITU treatment team. The purpose of this conference is to share information and to develop a treatment strategy for the patient which shall permit the most timely discharge of the patient from seclusion, restraint, or Discontinuation Status consistent with the safety of the patient and others.

G.    Unit Operations

1.    Entry Search & Allowable Clothing

A patient placed in seclusion and restraint in the Intensive Treatment Unit shall have his clothing removed from him at the time of his admission to the unit and the patient shall be strip searched. All physical searches will be performed in a private room.

a.    Outer clothing (e.g., coats, shoes, belts, scarves, gloves) shall be removed from the patient. These clothes shall be returned to the patient upon his release from ITU provided they are do not conflict with BSH property policy regulations.

b.    Only pants without metal zippers shall be permitted. If a patient's pants have a metal zipper, he shall be issued scrubs instead.

c.    Patients are not permitted to have any footwear in the seclusion rooms.

d.    Shoes (without laces) are only to be issued to patients when they are removed from their seclusion room. The shoes are to be issued only after the patient is handcuffed. Shoes are to be retrieved from the patient before he is returned to his room.

e.    When a patient is in restraint, staff will make all necessary attempts to cover the patient, as soon as possible, with a sheet, blanket, or place undershorts on him while he is restrained.

16

2. <u>Hygiene and Shower Process</u>

    a.    MHW's under the direction of nursing staff, will assist patients who are in restraints with hygiene and elimination needs as indicated by the patient's mental status.

    b.    Correction Officers will work in collaboration with the nursing and clinical staff to determine and provide the most appropriate means possible for patient hygiene and elimination.

    c.    Each patient in seclusion shall be offered a shower procedure by security staff after the first 24 hours in seclusion and every day thereafter.  The shower procedure will include:
-    shower (including shampoo)
-    shave (using an electric razor)
-    issuance of toothbrush and toothpaste (toothbrush to be retrieved and discarded immediately after use)
-    issue of clean underwear

Shower procedure (including refusal of same) will be recorded on the 10 minute checklist by the STO.
Clothing exchange will occur more often if circumstances warrant.

3. <u>Meals</u>

The following meal procedure shall apply to all patients/inmates housed in the ITU:

    a.    Uniformed staff will be present at all times when the food slot is opened.

    b.    The ITU Cadre worker will serve the meal after it has been inspected by the Officer.

    c.    Each meal period will be 20 minutes in duration.

    d.    20 minutes after the meal has been served, all refuse will be collected by the Cadre worker under the supervision of the uniformed staff. All items will be accounted for at this time (i.e. cup, bowl, tray).

    e.    All patients/inmates must take the complete meal being served. If a patient/inmate refuses to eat, he must refuse the complete meal; no partial meals (e.g. juice only) will be served.

DOC 8120

f.  In the event a patient/inmate refuses to return all items, the shift commander is to be notified. If necessary, an extraction team will be assembled and a forced move will be ordered (with proper authorization) to recover such items.

4.  Telephone Calls

Patients on seclusion status in the ITU for more than 24 hours may be permitted to make legal telephone calls only to attorneys/law offices already on the patient's approved telephone PIN list. If the patient is a new admission and has not yet completed a PIN form, he will be permitted to complete a PIN form.

The procedure is as follows:

a.  The Correction Program Officer (CPO) currently meets with all patients on the first business day following their admission to the institution to explain the family notification process.

b.  At this same meeting, the CPO will assist each patient with the completion of a telephone PIN form.

c.  All requests for telephone calls by seclusion patients will be made to the ITU Charge Officer during the Noon meal. These requests will be documented by means of a telephone request form which will be completed by the ITU Charge Officer. The Charge Officer will consult with the unit clinical staff and will then determine if the phone calls will be allowed based upon safety and security considerations. If a call is denied, the reason will be noted on the telephone request form.

d.  Phone calls will be limited to a maximum of 10 minutes.

e.  1 phone call will be allowed every 2 days.

f.  Patients in 4 point restraint or on Discontinuation status will not be permitted phone calls.

g.  Phone calls will only be permitted between 1:00 - 2:00 PM and between 4:00 - 5:00 PM.

h.  The ITU Charge officers will also maintain a separate log book which will be utilized to maintain a record of completed phone calls and requested calls that were denied. The logbook shall include the following information:
    (1)  date
    (2)  patient's name & number
    (3)  time call was completed OR

18

DOC 8121

      (4)   reason call was denied
      (5)   the attorney who received the call

i.    All completed telephone request forms will be sent to the Operations Lieutenant each Monday. The Operations Lieutenant will maintain these forms for 1 year.

j.    The Shift Commander may authorize a telephone call immediately, at more frequent intervals (than every 2 days), or for longer than 10 minutes if he/she believes a patient's particular circumstances warrant such exception.

k.    The Operations Lieutenant will conduct monthly audits of the ITU telephone procedure. The audit will consist of a comparison of the completed telephone request forms and the telephone log.

5.    Mail

Patients on seclusion status in the ITU for more than 48 hours shall be permitted to receive **legal mail only**. The procedure shall be as follows:

a.    Any patient who has not received legal mail delivered to the institution because he has been on seclusion status for more than 48 hours shall be permitted to receive said legal mail.

b.    Each day, the Mail Officer shall separate the patient's legal mail per current procedure. The Mail Officer shall then check the daily change sheet to ascertain if any patients who have had legal mail delivered to the facility have been in ITU seclusion for at least 48 hours.

c.    If so, the Mail Officer shall report to ITU for the purpose of delivering the legal mail to the patient.

d.    Prior to delivering the legal mail to the patient, the Mail Officer shall open the legal mail in view of the patient, remove all staples, paper clips, clasps, and fasteners and inspect for other contraband.

e.    The Mail Officer shall then give the legal mail to the patient in his seclusion room for him to read. The patient shall be permitted a reasonable period of time to read the legal mail.

f.    The patient shall not be required to sign the legal mail logbook for the legal mail. Instead, the Mail Officer shall sign the legal mail logbook indicating he has delivered the legal mail.

DOC 8122

g.   After the patient has completed reading the legal mail, he shall return said mail to the Mail Officer. The Mail Officer shall then bring the legal mail to the Property Officer who shall store the mail until the patient is released from the ITU at which time the mail is to be returned to the patient.

h.   Patients who fail to return their mail to the Mail Officer or who misuse their mail in other ways (e.g. flushing it down the toilet, etc.) shall have their legal mail delivery suspended until such time that the Superintendent (or his designee) determines that reinstatement is advisable.

6.    Security Procedures for out of Cell Movement

All out of cell movement in the ITU will be conducted with a hands on escort by a minimum of two (2) officers as follows:

a.   Before opening the cell door, the patient/inmate will be placed in wrist restraints behind the back via the cell door cuffing slot.

b.   The wrist restraint extension chain shall be used whenever Patients/inmates are remove or placed in a cell or shower. One end of the restraint chain will be clipped to the cell door handle and the other end of the chain will be clipped to the wrist restraints. This procedure will reduce the chances that the patient/inmate will be able to pull the wrist restraints and the key into the cell when restraints are being applied or removed. Once the wrist restraints are applied and the key is secured, the extension chain shall be unclipped from the wrist restraints.

c.   The patient/inmate will then be told to remain at the cell doorway with his back facing the door. When he complies, the cell may be opened and leg irons will be applied. If the patient/inmate refuses or appears unable to comply with this direction, the cell door shall not be opened and the sector Lieutenant will be notified immediately.

d.   When returning a patient/inmate to his cell, the above process shall be completed in reverse order.

e.   Patients/inmates being returned to their cells from the 4 point restraint room shall be returned to their cell in wrist restraints behind the back and leg irons.

DOC 8123

### 7.    Out of Cell Medical Treatment

a.    All patients/inmates housed in ITU must be placed in wrist restraints prior to exiting their cell for blood work, physicals x-rays or any other medical procedure. Normally, the wrist restraints shall be applied behind the patient/inmate back. However, depending on the medical procedure being performed, the officer may, with the Shift Commander's permission, apply the restraints to the front of the patient/inmate's torso.

b.    If the medical procedure requires that the removal of wrist restraints from patient/inmates cuffed behind the back, it is more practical and better from a security and control standpoint to apply the restraints to the front of the patient/inmate's torso before exiting the cell.

### 8.    Discharge Process

a.    When a patient/inmate is discharged from ITU, he will be dressed in his room and be handcuffed behind his back. After restraints are applied, he will be escorted to the sally port entrance of ITU. The wrist restraints will be removed in the Clinic corridor and the patient/inmate will be discharged.

b.    New admissions, if cleared for population, shall move through the ITU in wrist restraints as described in 8(a) above.

### 9.    Transfer from Seclusion to Restraint or Restraint to Seclusion

When a patient is taken from seclusion and placed into restraint, or from restraint and placed into seclusion the following must occur:

a.    The physician, registered nurse, or certified physician's assistant must write an order on the Seclusion or Restraint Order Form (see Appendix H) and document a problem oriented progress note in the patient record. He/she must then notify the Unit Nurse and the Charge Officer.

b.    The Charge Officer will ensure safe transport of the patient to the new area and ensure accurate documentation is provided in the Intensive Treatment Unit Logbook.

c.    The Unit Nurse or Unit Director will document the necessary information using a problem oriented progress note in the patient record.

DOC 8124

d.  The STO will make a notation on the Seclusion or Restraint Observation Form under the "Comment" section that the patient's status has changed (see Appendix G).

## 10. Transfer from ITU to Another Unit

If a patient is to return to a unit other than his home unit, the ITU Unit Director or the ITU physician will coordinate communication between the patient's home unit, and the unit where he will be transferred.

## 11. Transportation from ITU to Outside Court or Outside Hospital

If a patient is to be taken out of the institution for a court appearance or hospital appointment, the following will occur:

a.  The physician will assess the patient in seclusion or restraint in order to determine whether or not seclusion or restraint should be continued or discontinued.

b.  The physician will document his/her findings in a problem oriented progress note in the medical record.

c.  If a patient is discontinued from seclusion or restraint to attend the court or hospital appointment, it will be necessary for the physician to assess the patient upon return from court or hospital. This assessment will be to determine whether or not an emergency exists, and the patient needs to return to seclusion or restraint. A physician's order is necessary to discontinue seclusion for an outside trip and to re-institute seclusion, if necessary, upon the patient's return.

d.  After assessing the patient upon return from court, the physician will document his findings using a problem oriented progress note in the medical record.

e.  In the event an outside hospital trip is precipitated by a medical emergency, the patient shall be discontinued from seclusion or restraint immediately.

f.  The shift commander shall be notified as soon as possible whenever an outside court or hospital trip is cancelled due to a patient's placement in seclusion or restraint.

## 12. Transfer from ITU to Inside Court

a.  The physician will assess the patient in seclusion or restraint in order to determine whether or not he is stable enough to make the trip.

b.  The physician will document his/her findings in a problem oriented progress note in the medical record.

DOC 8125

c.   The patient will be returned to seclusion or restraint upon return from inside court.

## 13. Documentation of Initiation/Continuation

a.   The ITU Log Book

The Charge Officer (or designee) will:

1) Enter the information in the Intensive Treatment Unit Log Book.

2) When a patient has been in seclusion or restraint for more than eight (8) hours in any twenty-four (24) hour period, it will be necessary for the Charge Officer to notify the Superintendent's Office, or Shift Commander after hours and on weekends.

3) If a patient remains in seclusion or restraint for more that eight (8) hours in the next twenty-four (24) hour period, the notification of the Superintendent or Shift Commander must occur again and every time thereafter.

4) The Superintendent, in consultation with the Medical Director, will review any cases of seclusion or restraint for more than eight (8) hours in a twenty-four hour period that were authorized by the Shift Commander upon his return to the facility.

b.   Seclusion and Restraint Observation Form

Upon notification that a patient has been placed in seclusion or restraint and ensuring that the Audio-Visual Monitoring is operational, the STO under the supervision and direction of the nurse will immediately initiate a Seclusion or Restraint Observation Form (see Appendix G) and begin making checks every ten (10) minutes. Additionally, the STO will maintain verbal contact with the patient while attempting to understand, assist, and afford therapy, make reports directly to the clinical staff regarding the patient's status, and ensure that the patient receives a copy of the Initial One Hour Seclusion or Restraint Order

c.   Documentation Of Discontinuation

When the decision is made by the physician to discontinue seclusion or restraint, he/she must document a discontinuation order on the Seclusion and Restraint Order Form in the Medical Record.

DOC 8126

14.  Discontinuation Status

a.   If the physician, registered nurse, or certified physician's assistant discontinues seclusion or restraint but the patient refuses to leave the seclusion room or restraint, the patient shall be placed on Discontinuation Status or 'DS'.

b.   A patient who is on Discontinuation Status shall be treated and managed in the same manner as patients who are in seclusion or restraint with these exceptions:

1)   The patient shall be released from the seclusion room or restraint any time he delivers such request to a staff member.

2)   The patient shall be examined by a physician at least once every 24 hours to determine if any mental health interventions, other than those indicated in the Master Treatment Plan, should be implemented.

c.   When the physician, registered nurse, or certified physician's assistant discontinues seclusion or restraint and learns that the patient is refusing to leave the seclusion room or restraint, said clinical staff member shall meet with the patient, inform him that his seclusion or restraint status has been discontinued, and inform him that he can be released from the seclusion room or restraint any time he communicates this request to a staff member. The clinical staff member shall also give the patient a Seclusion and Restraint Discontinuation Form. The patient shall be required to sign the form. If the patient refuses to sign the form, his refusal shall be documented by medical staff who shall sign the form in the designated space (see Appendix L).

d.   In addition, the following may apply to all patients on Discontinuation Status in ITU upon the explicit prior approval of the Superintendent:

1)   each morning after the 7:05 AM count is complete, the respective patient(s) shall be handcuffed and removed from their rooms;

2)   the patient(s)' mattress and blanket will then be removed from the room;

3)   following the removal of the mattress and blanket from the room, the patient(s) shall be returned to the room; the room shall be secured; and the restraints shall be removed;

4)   each night at 9:15 PM, the respective patient(s) shall be handcuffed and removed from their rooms;

24                                                    DOC 8127

> 5) the patient's (s') mattress and blanket shall be placed in the room;
>
> 6) the patient(s) shall be returned to the room; the room shall be secured; and the restraints removed.

This process may be repeated each day for all patients on Discontinuation Status upon the prior approval of the Superintendent.

e. When a patient is discharged from seclusion or restraint status and is placed on Discontinuation Status, this status change shall be documented in the ITU Log Book. In addition, appropriate documentation shall be made in the patient's medical record by the physician.

## 15. Court Approved/Emergency Medication Procedure

a. All court approved/emergency medications are pursuant to the order of a physician.

b. Upon the physician's order to administer court approved/emergency medication, the sector lieutenant shall report to the incident site (i.e. ITU) and be briefed by the senior officer in charge. Thus briefing will be videotaped and shall include the date, time, patient's name, and the essential facts of the event.

c. A member of the ITU medical staff shall provide a summary of the immediate situation (e.g. Dr. _____ has ordered that emergency or court approved medications be administered to patient _____.) The nurse who is to administer the medication be administered. This summary will be videotaped.

d. If the patient is already in restraints in a seclusion room, the medication shall be administered in that same seclusion room. The video operator along with the Sector Lieutenant shall be responsible for ensuring an accurate record of the entire process is maintained.

e. If the patient in question is currently secluded in a seclusion room in the ITU or overflow, he shall be removed from this room and placed in restraints in the restraint dorm. The moving of a patient during this process shall be videotaped. (Including the process of applying the transportation restraints).

f. Once the patient is moved and secured in the restraint dorm, the video operator shall position himself/herself inside the restraint dorm. The doors shall then be closed to ensure patient privacy. Prior to moving the patient, the incident

DOC 8128

site shall be secured.   Cadre inmates must be secured behind a locked door.

g.   The patient shall be placed face up in restraint bed, restraining the patient for the administration of court approved/emergency medication involves 3 Officers.   One Officer will place the polycaptor shield over the patient. The 2nd and 3rd Officers will apply and secure a 5th restraint point on the patient (under the patient's arms and over his chest).   These same 2 Officers will than apply leg straps over the patient's legs and hold the straps in place utilizing a blunt depression shield.   Once this is competed, the nurse will administer the medication(s).

h.   Immediately after the medication is administered, the Officers shall remove the leg straps, the fifth restraint point (across the patient's chest) and the polycaptor shield.   The patient shall then be placed in handcuffs and leg irons and moved back to a seclusion room on restraint status or seclusion status depending upon the Doctor's order.   Under no circumstances shall patients be left in restraint status inside the restraint dorm.

i.   The video operator shall ensure that the entire process of medication administration is videotaped (i.e. until the nurse concludes administration of the medications and the restraint check is completed).   At the conclusion of taping, the operator shall then completely fill out the label and affix it to the videotape.

j.   A separate videotape shall be used for each individual patient receiving court approved/emergency medication.

k.   All incidents of court approved/emergency medication are to be recorded in the court approved/emergency medication logbook in the Control Center.   Videotapes of court approved/emergency medications are to be turned in to the Control Center for review by the Director of Security.

## 16.   Quality Assurance Monitoring

The use of Seclusion and Restraint as well as the documentation provided will be reviewed and audited on a monthly basis by the Qualified Patient Care Assessment Coordinator.   The Qualified Patient Care Assessment Coordinator will report his/her findings to the Deputy Superintendent of Patient Services or designee. All audit results and problem identification will be reported to the Bridgewater State Hospital Executive Committee.
Seclusion and Restraint documentation shall be placed in the patient record prior to discharge from ITU.

Seclusion and Restraint documents are placed in the patient record in the following order:

DOC 8129

a.  <u>INITIAL ORDER FORM</u> - will appear as the <u>first</u> document of a Seclusion and Restraint packet in the Seclusion and restraint section of the medical record.

b.  <u>TEN MINUTE OBSERVATION</u> - will appear <u>chronologically</u> after the Initial Order Form in the Seclusion and restraint section of the medical record.

c.  <u>SAFETY CHECKS</u> - will appear chronologically within the Ten Minute Observation Forms as it was necessary to perform these safety checks due to emergency conditions in the Seclusion and Restraint section of the medical record.

d.  <u>RESTRAINT FLOW SHEET</u> - (If applicable).

e.  <u>DOCTOR'S ORDER FORM</u> - the original will <u>always</u> remain in chronological order in the Physician's Order section of the medical record.

f.  Other documentation:

   <u>INCIDENT REPORT</u> - will be kept on file in the Quality Assurance Office and will not be part of the medical record.

   <u>SUPERINTENDENT'S REPORT ON REASONS FOR DELAY IN COMPLETING PATIENT EXAMINATION</u> - will be attached to the Initial One Hour Seclusion and Restraint Order Form.
   <u>SUPERINTENDENT'S REPORT ON UNAVAILABILITY OF SPECIALLY TRAINED OBSERVER OR AUDIO-VISUAL EQUIPMENT</u> - will be attached to the Initial One Hour Seclusion and Restraint Order Form.

   <u>ROGERS WORK SHEET (Court-Authorized Treatment Referral Form)</u> - will be filled out by the medical doctor and returned to the Bridgewater State Hospital Legal Department for processing.

## VI.  STAFF RESPONSIBLE

The Superintendent, Medical Director and all Bridgewater State Hospital staff are responsible for the overall compliance with this policy.

Kenneth W. Nelson, Superintendent                        6/5/03
                                                          Date

Rizwan Mufti, M.D., Acting Medical Director              6/9/03
                                                          Date

Susan J. Martin                                          6/5/03
Reviewing Authority                                       Date
651s&r-03

27

DOC 8130

APPENDIX A

**SUPERINTENDENT'S REPORT ON
REASONS FOR DELAY IN
COMPLETING PATIENT EXAMINATION**

Patient Name:_____
BSH #: _____
Housing Unit:_____
Date of Sec/Res:_____

Name of Person Completing Report_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Signature of Superintendent                    Date

_____

DOC 8131

APPENDIX B

BRIDGEWATER STATE HOSPITAL
INTENSIVE TREATMENT UNIT
SECLUSION AND RESTRAINT

SAFETY CHECKS

Instructions:       In the event of an emergency, when the audio-visual equipment
                    is inoperative, it is mandated that all patients in seclusion
                    or restraint receive a minimum of five minute safety checks.
                    Please fill out this form completely.

PATIENT NAME _____ BSH # _____

DATE AND TIME CAMERAS BECAME INOPERATIVE: _____

NAME OF SUPERVISOR NOTIFIED: _____ TIME: _____

PERSON INITIATING 5 MINUTE CHECKS: _____ TIME: _____
                                   (please print)

In the boxes below, please mark the time and your initials (from left to right)
in order to represent a 5 minute check for respirations and other activity.

| Time | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |
| Time | | | | | | | | | | | | |
| Init. | | | | | | | | | | | | |

| signature | init. | signature | init. |
|---|---|---|---|
| signature | init. | signature | init. |
| signature | init. | signature | init. |
| signature | init. | signature | init. |
| signature | init. | signature | init. |

DOC 8132

APPENDIX C

**SUPERINTENDENT'S REPORT ON**          Patient Name:_____
**UNAVAILABITY OF SPECIALTY**           BSH #: _____
**TRAINED OBSERVER OR**                 Housing Unit:_____
**AUDIO-VISUAL EQUIPMENT**              Date of Sec/Res:_____

Name of Person Completing Report_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Signature of Superintendent                    Date

_____

DOC 8133

| BRIDGEWATER STATE HOSPITAL<br><br>ONE HOUR INITIAL<br>SECLUSION OR RESTRAINT ORDER | PATIENT:<br><br>DOB:<br><br>BSH#:                                    UNIT:<br><br>                                                      AM<br>DATE:                                   TIME:    PM |
|---|---|

**Clinical Interventions Attempted Before Seclusion or Restraint:**

| | | |
|---|---|---|
| 1. Verbal Intervention with DOC/Clinical | ☐ Yes | ☐ No |
| 2. Intervention of Treatment Team | ☐ Yes | ☐ No |
| 3. Time Out/Quiet Time | ☐ Yes | ☐ No |
| 4. Other (specify): | ☐ Yes | ☐ No |
| ☐ No Intervention Possible | | |

**Categorize Situation Requiring Seclusion or Restraint (check one):**

☐ Substantial Risk of Serious Assault to Others
☐ Occurrence of Serious Assault to Others
☐ Substantial Risk of Self-Destructive Behavior
☐ Occurrence of Serious Self-Destructive Behavior

**Technique Used (check one):**

☐ Patient Requested Seclusion          ☐ Patient Requested Restraint

☐ Involuntary Seclusion          ☐ Involuntary Restraint

**Describe the Emergency Situation:**




**Patient Issued:** ☐ Blankets ☐ Shorts and T-Shirt ☐ Paper Gown ☐ Pants without Zipper

MD Notified:_____  Nurse Notified:_____

Time:_____AM/PM          Time:_____AM/PM

| Signature: | Title/Credentials: | Printed Name: |
|---|---|---|
| | | |

One Hour S&R Order          White: Medical Record    Yellow: ITU          Pink: Lieutenants Office
Revised 2/13/03

DOC 8134

APPENDIX G

| BRIDGEWATER STATE HOSPITAL | PATIENT: |
| SECLUSION & RESTRAINT CHECK SHEET | DOB: |
| Page 1 of 2 | BSH#: |

Date:_____

**Restrained patient: Offer fluids every two hours while awake and document on check sheet**

| Time | Comments | Initials | Time | Comments | | Initials |
|------|----------|----------|------|----------|---|----------|
| 7:00 AM | | | 3:00 PM | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Signature: | | | Signature: | | | |
| Signature | | | Signature | | | |
| Signature: | | | Signature: | | | |
| Signature: | | | Signature: | | | DOC 8135 |

| BRIDGEWATER STATE HOSPITAL | PATIENT: |
| SECLUSION & RESTRAINT CHECK SHEET | DOB: |
| Page 2 of 2 | BSH#: |

Date: _____

**Restrained patient: Offer fluids every two hours while awake and document on check sheet**

| Time | Comments | Initials | Time | Comments | Initials |
|------|----------|----------|------|----------|----------|
| 11:00 PM | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Signature: | | | Signature: | | |
| Signature: | | | Signature: | | |
| Signature: | | | Signature: | | |
| Signature: | | | Signature: | | |

**Additional Observations/Occurrences during shift:**

7 AM – 3 PM


Signature:

3 PM – 11 PM


Signature:

11 PM – 7 AM


Signature:

Seclusion & Restraint Check Sheet
3/08/2001

DOC 8136

| BRIDGEWATER STATE HOSPITAL | PATIENT: |
|---|---|
| SECLUSION AND RESTRAINT ORDER SHEET | DOB: |
| Page 1 of 2 | BSH#: |

| Date | Physician Order For Inclusion And Restraint |
|---|---|
| Time _____ am/pm | **1. Seclude Patient:** ☐ Room Seclusion   ☐ 4 point Restraint   ☐ Special Instructions: _____<br><br>**2. Reason for Seclusion:**<br>☐ Substantial Risk/Occurrence of Serious Physical Assault<br><br>☐ Substantial Risk/Occurrence of Serious Self Destructive Behavior<br><br>**3. Time limit not to exceed:**<br>☐ 3 hours (>18 years of age)      ☐ 2 hours (<18 years of age)<br><br>_____MD   _____RN/LPN<br>Physician's Signature         RN/LPN Signature/Date/Time<br><br>_____MD<br>Print Name |
| Time _____ am/pm | ☐ Continue Seclusion      ☐ Continue Restraint<br>Time limit not to exceed:<br>☐ 3 hours (>18 years of age)      ☐ 2 hours (<18 years of age)<br><br>☐ Change in Status: _____<br><br>Reason for Continued Seclusion:<br>☐ Substantial Risk/Occurrence of Serious Physical Assault<br><br>☐ Substantial Risk/Occurrence of Serious Self Destructive Behavior<br><br>_____MD   _____RN/LPN<br>Physician's Signature         RN/LPN Signature/Date/Time |
| Time _____ am/pm | ☐ Continue Seclusion      ☐ Continue Restraint<br>Time limit not to exceed:<br>☐ 3 hours (>18 years of age)      ☐ 2 hours (<18 years of age)<br><br>☐ Change in Status: _____<br><br>Reason for Continued Seclusion:<br>☐ Substantial Risk/Occurrence of Serious Physical Assault<br><br>☐ Substantial Risk/Occurrence of Serious Self Destructive Behavior<br><br>_____MD   _____RN/LPN<br>Physician's Signature         RN/LPN Signature/Date/Time |
| Time _____ am/pm | ☐ Continue Seclusion      ☐ Continue Restraint<br>Time limit not to exceed:<br>☐ 3 hours (>18 years of age)      ☐ 2 hours (<18 years of age)<br><br>☐ Change in Status: _____<br><br>Reason for Continued Seclusion:<br>☐ Substantial Risk/Occurrence of Serious Physical Assault<br><br>☐ Substantial Risk/Occurrence of Serious Self Destructive Behavior<br><br>_____MD   _____RN/LPN<br>Physician's Signature         RN/LPN Signature/Date/Time |

DOC 8137

APPENDIX K

**BRIDGEWATER STATE HOSPITAL**
**NURSING DEPARTMENT**
**RESTRAINT**
**FLOWSHEET**

PATIENT:

DOB:

BSH#:

Restraint(s) Initiated:  RA____  LA____  RL____  LL____  CHEST____

Nursing Signatures: _____

_____

_____

_____

- Enter date and time.
- Check (√) to indicate restrained extremities have been assessed for CSM. Check indicates (+) CSM. CSM checks must be done and documented every 2 hours.
- Double check (√√) restraint(s) as having been loosened/released. Document all releases. A release must be done every 2 hours between 8 AM and 10 PM. If unable to release, document the reason (i.e. agitated, unable to release).
- Enter respirations, temperature, pulse, and blood pressure every shift. Document refusal of vital signs and releases.
- List meals and fluids offered. Fluids must be offered every 2 hours while awake.
- Document hygiene in "Other" column (i.e. toileting, showering)
- Initial final column.
- Enter signature.
- (CO's will accompany nurse on restraint checks)

Nursing Restraint Flowsheet
Revised 3/09/01

DOC 8138

APPENDIX L

I have been informed by a medical staff person that a physician has determined that I no longer require seclusion and/or restraint. I understand that the physician has therefore discontinued the seclusion and/or restraint order for me.

However, against medical advice, I am refusing to leave the room in which I am currently secluded or restrained. I understand that I will be released from the seclusion room or from restraints when I communicate this request to a staff member.

_____          _____
Patient signature                          Date

_____          _____
Staff signature                            Date

_____          _____
Staff signature                            Date

DOC 8139

33

APPENDIX M

## COMMONWEALTH OF MASSACHUSETTS

## DEPARTMENT OF CORRECTION

## BRIDGEWATER STATE HOSPITAL

### ITU Telephone Request Form

Date: _____

Name: _____ # _____

Requesting to call whom? _____

Telephone # _____

------------------------------------------------------------------

_____ Approved

_____ Denied      _____
                    Staff signature & Title              Date

Date and time call completed _____
(To be recorded in telephone log book as well)

DOC 8140

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION
BRIDGEWATER STATE HOSPITAL

**103 BSH 651**

**USE OF SECLUSION AND RESTRAINT**

**Addendum #1**

Entry #5 on page 8 of the Bridgewater State Hospital Seclusion and Restraint policy is amended as indicated below.

**Delete:**

5.      *When a clinical member of a treatment team or the clinical staff member arrives at the site of the potential emergency, s/he shall, if clinically appropriate, attempt to speak to the patient and de-escalate the situation. S/he may direct that the patient be removed from that location and moved to another area within the same building for a private interview. S/he may also direct that the patient be moved to a remote location for a private interview. That remote location would normally be the Infirmary Treatment Room. Transfer of the patient to the Infirmary Treatment Room from a particular unit shall be consistent with the procedures for off-unit movement of patients assigned to it. The clinician directing the transfer of the patient to the Infirmary may request through the Control Center that the patient be escorted by a correction officer. The clinician may also have the patient reassigned to another unit if this is considered the most appropriate resolution to the immediate situation.*

**Replace with:**

5.      *When a clinical member of a treatment team or the clinical staff member arrives at the site of the potential emergency, s/he shall, if clinically appropriate, attempt to speak to the patient and de-escalate the situation. S/he may direct that the patient be removed from that location and moved to another area within the same building for a private interview. The clinician may also have the patient reassigned to another unit if this is considered the most appropriate resolution to the immediate situation.*

Kenneth W. Nelson, Superintendent            9/23/03
                                              Date

Susan Skea, M.D., Medical Director            9/24/03
                                              Date

651.2                                         DOC 8141

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION
BRIDGEWATER STATE HOSPITAL

103 BSH 651

USE OF SECLUSION AND RESTRAINT

Amendment #2

The Bridgewater State Hospital Seclusion and Restraint policy is amended as indicated below.

In all instances where the word "licensed" appears in the policy, the words "or license eligible health care professional" shall be added. This change shall be effective throughout the entire policy.

_____          _____
Kenneth W. Nelson, Superintendent               Date
                                                11/10/03

_____          _____
Susan Skea, MD, Medical Director                Date
                                                11/14/03

651.3

DOC 8142

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION
BRIDGEWATER STATE HOSPITAL

103 BSH 651

USE OF SECLUSION AND RESTRAINT

Amendment #3

The Bridgewater State Hospital Seclusion and Restraint policy is amended as indicated below.

In section V #15 (Court Approved/Emergency Medication Procedure) which appears on page 25, the words "or another seclusion room in ITU" are added at the end of the first sentence in item (e).

That sentence shall now read:

If the patient in question is currently secluded in a seclusion room in the ITU or overflow, he shall be removed from this room and placed in restraints in the restraint dorm **or in another seclusion room in ITU.**

_Kennett W. Nelson_                          11/28/03
Kenneth W. Nelson, Superintendent            Date

_Susan Skea MD_                              12/1/03
Susan Skea, MD, Medical Director             Date

651.4

DOC 8143

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION
BRIDGEWATER STATE HOSPITAL

103 BSH 651

USE OF SECLUSION AND RESTRAINT

Amendment #4

The Bridgewater State Hospital Seclusion and Restraint policy is
amended as indicated below.

In section C (ITU Overflow) which appears on page 11, item 2 is
revised as indicated by the bold type:

2.   The rooms on Max I and Max II equipped with audio-
     visual cameras **and food slots** will, if available, be
     the first choice for alternate placement of ITU
     seclusion patients. **Patients on overflow seclusion
     status in Max 1, Max 2, and the Infirmary shall only be
     secluded in rooms that are equipped with a food slot.**

_____          2/14/04
Kenneth W. Nelson, Superintendent        Date

_____          2/18/04
Susan Skea, MD, Medical Director         Date

651.5

DOC 8144

| BRIDGEWATER STATE HOSPITAL ADMISSION ASSESSMENT PART II | PATIENT: Burns, Bradley |
|---|---|
| | DOB: 7-23-75 |
| | M87741 |
| | BSH#: 8-8-04 |
| Page 1 of 10 | DATE OF ADMISSION: |

**HISTORY OF PRESENT ILLNESS:** (Psychiatry)

29 yo ♂, hosp @ McLean ~7/24 2° paranoia, on 8/6 allegedly eloped from McLean by forcing a custodian to allow him on elevator. Went to parents home (pt lives c them), 8/7, police called + pt taken to M↑ Auburn → HRI/Arbor. @ HRI/Arbor pt allegedly wrapped ligature around person's neck, + eloped p breaking a window. Then allegedly went to McDonalds (on AU campus) + tried to strangle employee. Then brought to BMC by police. At BMC agitated, paranoid, DOR, Command Att + not preoccupied.

Pt presently calm, but reports conspiracy by CIA to frame him + potentially make him act in illegal forward others, dating from 1993 when he took very large amount of LSD. He reports auditory Att, often derogatory + command, paranoia, thought broadcast + thought control, + compelled to act in certain ways. Also bizarre religious delusions – CIA wants him to be reported to cause the resurrection of Jesus Christ.

**CURRENT MEDICATION(S):**
1. Risperdal 4 mg po BID
2. Cogentin 1 mg po BID pr EPS
3. Ativan 1 BID po
4. Tylenol 100 mg NS prn
5.

**PAST PSYCHIATRIC HISTORY:**

Psychiatric Hospitalization(s) ☐ denies ☑ 5 (number of times)

| Date | Hospital | Diagnosis | Treatment (include meds) |
|---|---|---|---|
| 8/7/04 | Arbor / HRI | | |
| 7/24-8/6 | McLean | | |
| prior | El MHC, Westboro, McLean | | |

**OUTPATIENT TREATMENT:**

McLean – Dr. Michael Murphy

**PREVIOUS MEDICATION TRIALS** (Note date(s), duration, maximum doses, drug levels, efficacy, compliance, if known):

Seroquel ⚹    Celexa    Zyprexa ⚹    Clozaril ?
Trileptal    Risperdal ⚹    Abilify

⚹ wt gain

Revised July 24, 2002

EXHIBIT 1
Comiskey
5-16-08    cb

| BRIDGEWATER STATE HOSPITAL ADMISSION ASSESSMENT PART II | PATIE | Burns, Bradley 7-23-75 |
|---|---|---|
| Page 2 of 10 | DOB: BSH#: | M87741 8-8-04 |

## HISTORY OF HIGH RISK BEHAVIORS:                                                          (Psychiatry)

### 1. Suicide History

| | |
|---|---|
| ☑ Prior suicidal ideation, intent, planning | Precipitants, mitigating factors: |
| ☐ Prior History | _command Att, to hurt_ |
| ☐ Denied | |
| ☑ Prior suicide attempt (s) ____ # of times | Details (precipitants, events, rescue potential, treatment): |
| ☐ Denied | |

### 2. History of Self Abusive Behavior

☐ Yes  ☑ No  Comments:

### 3. Violence History

| | |
|---|---|
| ☐ Denied | (Detail specific precipitants, associated substance abuse, actions, weapons if any) |
| ☑ Physical Assault | |
| ☐ Property Damage | |
| ☐ Weapons use | |
| ☐ Ownership of weapons | |

### 4. History of Gambling Behavior

### 5. Substance Abuse History

| Drug (Check all used) | USE Y/N | Age of 1st Use | Amount/Frequency | Periods of Sobriety | Most Recent Use |
|---|---|---|---|---|---|
| **Depressants:** | | | | | |
| ☑ Alcohol | | | | | |
| ☐ Benzodiazepines | | | | | |
| ☐ Sleeping pills | | | | | |
| **Narcotics:** | | | | | |
| ☐ Heroin | | | | | |
| ☐ Morphine | | | | | |
| ☐ Codeine | | | | | |
| ☐ Methadone | | | | | |
| **Stimulants:** | | | | | |
| ☑ Amphetamine | Y | | | | |
| ☐ Cocaine | | | | | |
| **Hallucinogens:** | | | | | |
| ☑ LSD | N | | | | 1992 |
| ☐ PCP | | | | | |
| ☐ Mescaline | | | | | |
| ☐ Inhalants | | | | | |
| **Others:** | | | | | |
| ☑ Marijuana | Y | AS. | _ten tours/ day_ | | |
| ☐ Steroids | | | | | |
| ☐ Nicotine | | | | | |
| ☐ Tobacco | | | | | |
| ☑ _Cap_ | Y | | _cadex_ | | |

Revised July 24, 2002

☑ _easteng_   Y   _redent_

DOC 0084

| BRIDGEWATER STATE HOSPITAL<br>ADMISSION ASSESSMENT<br>PART II<br><br>Page 8 of 10 | PATIEN<br><br>DOB: | Burns, Bradley<br>7-23-75<br>M87741<br>8-8-04 |
|---|---|---|
| | BSH#: | |

**Personal and Social History Continued:** (Social Work/Ph.D./CNS)

Name, address and telephone number of key social supports:

MŌ   Margaret Burns    (W) 617-342-6276

Name, address and telephone number of Next of Kin:

Fa-   John Burns    (H) 617-484-6468  2617-212-5543

Cultural, Spiritual beliefs, Religious background, including any ethnic concerns:

Catholic

Community Resources used:

None used

**Legal History:**

- Civil ☐ Guardianship ⊗   ☐ Bankruptcy ⊗   ☐ Child custody ⊗   ☐ Other

- Criminal ☐ Denied ☐ Previous arrests(s) ⊗   ☐ Served in jail/prison ⊗   ☐ Currently on probation (name of court, probation officer) ⊗   ☐ Currently on parole ⊗

MU+ leaving scene

**Military History:**

☑ Denied ☐ Type of military service ☐ Type of discharge ☐ Service-connected veteran (give % of service connection and specify reason, e.g. 50% SC for psych)

**Family Structure:**

| ☑ Current Family Involvement:<br>MŌ + Fa are 1° supports | ☑ Need for Family Involvement:<br>PT wishes parents to be involved |
|---|---|
| ☑ Family Psychosocial Stressors:<br>PTS chronic MI and pending incarceration | ☑ Family Educational Needs:<br>How to support PT c chronic MI and incarceration. |

**Psychosocial Summary/Conclusions and Recommendations:** (Address discharge criteria/steps; high risk psychosocial issues; community resources and supports required for discharge, and interventions) Understand warning.

This is the 1st BSH admission for this 29 y.o. SWM on 15b for Unarmed Robbery and assault on person over 65 y.o. PT denies any MI, however, has extensive delusional system believing the CIA is controlling him and making him into "an aggressive soldier." Work c PT will focus on stabilizing sufficiently to fully participate in forensic evaluation and to be able to safely return to appropriate facility.

Revised July 24, 2002

| BRIDGEWATER STATE HOSPITAL ADMISSION ASSESSMENT PART II | PATIENT | Burns, Bradley 7-23-75 M87741 8-8-04 |
|---|---|---|
| Page 9 of 10 | DOB: BSH#: | |

**Initial Psychiatric Formulation/Summary:** (Psychiatry)

29 yo ♂, recent arrest p̄ allegations of multiple episodes of violence + elopement from 2 to hospitals. Very psychotic s̄ neuro[?], but compliant c̄ Risperdal despite Ø insight into m.i.. Pt reports ongoing substance use - cannabis ("makes me more vigilant") and amphetamine (also G&P - dates unknown). Is in acpt tx @ Violence, and pt reports hx of multiple antipsychotic medications.

Hx of tx c̄ Colozam, + pt endorses past hx c/o mania/hypomania (↑ productive, racing thoughts, euphoria, ↓ sleep, ↑ energy).

(Continue on additional page if necessary)

**DSM-IV ADMISSION DIAGNOSES:**

| | |
|---|---|
| Axis I: | Schizophrenia, paranoid type. r/o Schizoaffective r/o bipolar type. |
| Axis II: | deferred    Cannabis abuse, r/o dependence |
| Axis III: | Ø    Stimulant abuse |
| Axis IV: | ( ) 1- None ( ) 2- Mild ( ) 3- Moderate (✓) 4- Severe ( ) 5- Extreme ( ) 6- Catastrophic |

| ☐ Problems with family, friends | ☐ Legal problems | ☑ Occupational problems |
|---|---|---|
| ☐ Housing problems | ☑ Treatment noncompliance | ☐ Economic problems |
| ☐ Other (specify) | ☐ Trauma (specify) | 7 |

| Axis V: | Current GAF: 25 | Highest GAF in past year: |
|---|---|---|

| 90      80      70 | 60      50      40      30 | 20      10      0 |
|---|---|---|
| Absent or minus symptoms | Serious symptoms or impairment | Persistent or severe SI/HI ideation |

Revised July 24, 2002

DOC  0091

| BRIDGEWATER STATE HOSPITAL ADMISSION ASSESSMENT PART II | PATIENT | Burns, Bradley 7-23-75 |
|---|---|---|
| | DOB: | M87741 |
| Page 10 of 10 | | 8-8-04 |
| | BSH#: | |

**INITIAL TREATMENT PLAN:**

| Problem: (Psychiatric and Medical) | Plan: (Psychiatry) |
|---|---|
| 1. Psychosis | Cont. Risperdal Pt appears to be a good clozaril candidate |
| 2. Affective symptoms | Monitor for s/s depression or mania |
| 3. Safety | Pt able to CTS or unit. Promise not to start any fights. |
| 4. Database | Contact outpt provider (Dr. Murphy) @ McLean. |

| Date | Time | Signature: | | Printed Name: |
|---|---|---|---|---|
| 8-10-04 | 3 pm | Aborly, VK | Psychiatrist | Connelly |
| 8-10-04 | 12:30p | Morry Fox LMHC | Social Worker/Ph.D/CNS | Fox |

Revised July 24, 2002

# Prisoner Data Sheet
## Pre-arraignment M.G.L. Chapter 123, Section 18a Evaluation

EXHIBIT 3

Comiskey
5-16-08

Date: 8-8-04 _____ Time: 2:00 PM _____ Police Department: B.U. Police

ESP Contact (name and number): PAM

Prisoner's Name: Bradley Burns (617-272-5548) (617-484-1468)    Soc. Sec.#: 014 / SY / 1134

Address: 18 Banks St   Belmont    DOB: 2-28-75   Sex: M   Lang: English

Charges: Assault + Battery, Threats, Unarmed Assault w/ Intent to Kill

Bail status: CBK

Behavior leading to DFP referral: Escaped McLean Hospital, took staff hostage; Escaped at. At HRI
Allegedly Attacked personnel at McDonald's Brighton; took cl. Hostage @ HRI

Did ESP evaluate prisoner in person or conduct "telephone screening" ?: YES    S.Kelley

## PSYCHIATRIC:

Inpatient Treatment and Dates: McLean Hospital - for last 2 weeks but escaped on
Friday night.

Outpatient Treatment and Dates: Dr Michael Murphy @ McLean

Current Treatment Providers: Dr Michael Murphy, Belmont

Current Psychotropic Medications: Resperidol (hasn't taken it in weeks)

Current Mental Status: Alert, Oriented X3 "I'm at BMC on Sunday - because of my gout"
Believes US Gov't has Abducted his mind -
"Gives him drugs "makes me be the devil."
He believes he's "in a 3-D game - like Jacob's ladder -
only I can't get out. I now live in hell and I'm
taking other people with me cuz it's only a game."
His Thought content is purely irrational, Delusional,
Paranoid, Disjoint. His Thought process is Disorganized
and Tangential, although common theme of "mind control by gov't"
is Pervasive Throughout. He is labile, Agitated, Aggressive.
Poor attention, concentration. He's homicidal + suicidal because
He believes "it's a game. No one will really die."

Current Suicidality / Assaultiveness/ Self –injury or other Acute Behavioral Problems:
Reportedly attacked several patients at HRI yesterday and
escaped. Then he attacked 3 people at McDonald's on BU Campus

Revised 08/07/03

DOC 0027

SUBSTANCE ABUSE:

History: _None Reported_

Recent Use: _None Reported_

MEDICAL:

Significant History: _Unknown. He is unable to articulate his hx in a logical or coherent fashion._

Current Problems: _Paranoid Schizophrenic_

Current Medications: _Respiridol_

Allergies: _None Reported_

Has been medically cleared for transfer? (yes/no) _YES_  If NO, state reason: _____

DIAGNOSTIC IMPRESSION:

✓ Psychosis            ____ Organic Mental Syndrome       ____ Mental Retardation
____ Mood Disorder     ____ Substance Use Disorder        ____ No Psychiatric Illness
____ Malingering       ✓ Personality Disorder             ____ Other (specify): ____
____ Sexual Disorder   ____ Dissociative Disorder         ____ Diagnosis Deferred

RECOMMENDATIONS:

Can this prisoner be managed in the police station? _NO_

If yes, suggested interventions/precautions: _____

If no, reasons why not: _Assaultive, Delusional, Belligerent, Paranoid in 4 pt. Restraints @ BMC_

Does prisoner require medical care/detoxification in a medical facility? _No_

Does prisoner require psychiatric hospitalization? _YES_ Why? _At risk of harm to self and others. His reality testing is so impaired he's unable to discern 'signals' from others. believes his mind is being controlled by the Sou't "to be the devil."_

If you are recommending Bridgewater State Hospital, state reasons: _YES. He's agitated, Assaultive Impulsive, Irrational, Paranoid and an Escape Risk (as evidenced over the past few days @ MCCHT HRI )_

ACTUAL DISPOSITION: Remained in Police Lockup: ____ Remained in ER (if yes, name): ____

Transferred to BSH: ✓        Transfer to DMH (if yes, facility name): ____

Other disposition: ____

DFP signature and printed name: _Dr Maryann Gavin_
_Maryanne Gavin, DPP_

Revised 08/07/03                                                          DOC 0028



## THE COMMONWEALTH OF MASSACHUSETTS
### TRIAL COURT DEPARTMENT
_____ COURT

MIDDLESEX, SS

### Order of Commitment of Prisoner for Observation
#### Under Section 18 (A) Chapter 123, General Laws)

WHEREAS this Court has received a report from: _Michael Sperber_ M.D., Stating that a detainee named: _Mosher, William_ Age: _31_ , a Male prisoner at the Middlesex Jail, is in such mental condition that he should be committed to ~~a facility of the Department of Mental Health or~~ the Bridgewater State Hospital for a period of observation.

THEREFORE it is ORDERED that the said prisoner be committed to the **Bridgewater State Hospital** for observation FOR A PERIOD NOT TO EXCEED 30 DAYS, by which time said prisoner shall be returned to the original place of detention unless a petition for his further commitment has been filed in this court.

THEREFORE, The prisoner is to be conveyed to the **Bridgewater State Hospital** by officers of said place of detention who are then to make return of this warrant, with their doings thereon, to the Judge of this Court.

FURTHERMORE, the prisoner is to be reconveyed by the said officers to his original place of detention unless said officers have been notified that a petition has been filed in this court for the commitment of said prisoner.

And the **Bridgewater State Hospital** is ordered to report the mental condition of said prisoner to this court and said Superintendent, and if the mental condition of said prisoner so requires, to file a petition in this Court for his commitment.

The date of expiration of said prisoner's sentence is _____Pre-Trial_____

Witness my Hand and Seal at Cambridge, Massachusetts , .................................................

_Roanne Sragow /Reg Denny_
                                  Justice
_Camb Dist Court_

This commitment order expires : _30 Days_ .........................................

**RETURN**
Middlesex ,ss

                         DATE:.......... _7/24/04_ ....................

I certify I delivered said prisoner to the Bridgewater State Hospital, together with a copy of this Order.

.................................................
**Deputy Sheriff / Transportation Officer**

DOC5147

Department of Mental Health
Provisional Form 18A
Approved by the Chief Justice
of the District Courts

Effective November 1, 1971

COMMONWEALTH OF MASSACHUSETTS

_Middlesex_ ss.                                        of _Middlesex_ _Superior_ Court

### ORDER OF COMMITMENT OF A PRISONER FOR OBSERVATION
(Under Section 18(a), Chapter 123, General Laws)

Whereas, This Court has received a report from _Bridgewater State Hospital_

stating that _William Mosher_ age _32_ sex _M_, a prisoner at

_Bridgewater State Hospital_, is in such a mental condition that

he should be committed to a facility of the Department of Mental Health or the

Bridgewater State Hospital for a period of observation.

Therefore, it is ORDERED that said prisoner be committed to the

_Bridgewater State Hospital_ Hospital for observation for a period

not to exceed ~~thirty days~~ _6 months_, by which time the said prisoner shall be returned

to the _Middlesex Superior Court_ unless a petition has been

filed in this Court by the Superintendent/Master/Sheriff of _____

_Middlesex Middlesex Jail_ or the Superintendent/Medical Director of

_Bridgewater_ Hospital for his/her further commitment

under G.L. c. 123, s. 18.

And, therefore, the Superintendent/Master/Sheriff is ordered to convey

the said prisoner to the _Bridgewater State_ Hospital and deliver

him to the Superintendent therefore, and to make return of this warrant with

his doings thereon to the Clerk of this Court as soon as may be.

Furthermore, said Superintendent/Master/Sheriff is ordered to reconvey

the said prisoner to _Middlesex Superior Court_ if at the end of the period of

observation the Superintendent/Medical Director of the _____

of _Bridgewater_ Hospital does not petition this Court for the commitment

of said prisoner.

**DOC5145**

And the Superintendent/Medical Director of the _Bridgewater_

Hospital is ordered to report the mental condition of said prisoner to this

Court and to said Superintendent/Master/Sheriff, and if the mental condition

of said prisoner so requires to file a petition in this Court for his

commitment.

The date of expiration of said prisoner's sentence is _____N/A_____ 19___

WITNESS my hand and seal at _____Cambridge_____, ___ August 12 ___ 20___

_____Kern, J._____ JUSTICE

THIS COMMITMENT ORDER EXPIRES _____February 12 19 2008_____

**DOC5146**